Westlaw.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1773349 (N.D.Cal.), 71 U.S.P.Q.2d 1914
**(Cite as: Not Reported in F.Supp.2d)**

Page 1

▷
Perfect 10, Inc. v. Visa Intern. Service Ass'n
N.D.Cal.,2004.

United States District Court,N.D. California.
PERFECT 10, INC., Plaintiff,
v.
VISA INTERNATIONAL SERVICE ASSOCIATION; First Data Corp.; Cardservice International, Inc.; Mastercard International Inc.; Humboldt Bank, Defendants.
No. C 04-0371 JW.

Aug. 5, 2004.

Howard E. King, Stephen Davids Rothschild, King, Holmes, Paterno & Berliner, LLP, Jeffrey Neil Mausner, John R. Yates, Berman, Mausner & Resser, Los Angeles, CA, for Plaintiff.
Mark T. Jansen, Townsend and Townsend and Crew, LLP, Michael H. Page, Robert James Slaughter, Keker & Van Nest, LLP, Andrew P. Bridges, Winston & Strawn, LLP, San Francisco, CA, for Defendants.

ORDER GRANTING DEFENDANTS' MOTION TO DISMISS
WARE, J.

I. INTRODUCTION

*1 This is a dispute involving claims of copyright and trademark infringement, violation of publicity rights, unfair competition, libel, and intentional interference with prospective business advantage. Plaintiff Perfect 10, Inc. ("Plaintiff") has brought suit against Visa, Mastercard, First Data Corp., Cardservice International, and Humboldt Bank (collectively "Defendants"). Defendants are moving to dismiss the complaint pursuant to Rule 12(b)(6) for failure to state a claim for which relief can be granted. The Court conducted a hearing on July 9, 2004. For the following reasons, the Court GRANTS Defendants' motion to dismiss.

II. BACKGROUND

For the purposes of this motion, all facts alleged in the complaint are taken as true. Plaintiff provides adult entertainment services, including a magazine and website featuring nude models. Plaintiff owns the copyrights in most of the images displayed in its magazines and on its website. Many of the images display the registered mark "Perfect 10." Plaintiff also owns the right of publicity for many of the models that appear in its images.

Visa and Mastercard are entities owned by associations of banks, including Defendant Humboldt Bank, which process hundreds of millions of credit transactions over their networks each day. Two types of banks are associated with Visa and Mastercard-acquiring banks and issuing banks. Acquiring banks contract with merchants to allow those merchants to accept Visa and Mastercard cards as payment. Issuing banks provide credit cards to consumers. Another type of organization, an Independent Service Organization ("ISO"), can act in lieu of an acquiring bank as an agent for member banks. Defendants First Data Corp. ("FDC") and Cardservice International ("CSI") are ISOs.

When a merchant processes a Visa or Mastercard account number from a customer, the merchant electronically relays the transaction to its acquiring bank or ISO. The bank or ISO then presents the transaction to Visa or Mastercard. The issuing bank for the card notifies Visa or Mastercard whether it authorizes the transaction, and Visa or Mastercard relays that information back to the acquiring bank or ISO, which then provides that information to the merchant. The entire process takes a matter of seconds. Visa and Mastercard receive a fee for each transaction processed using their cards.

Visa has certain internal regulations regarding the conduct of its member banks. It prohibits its banks from providing services to entities involved in illegal activity, and requires its acquiring banks or ISOs to investigate and terminate merchant accounts if the merchant is engaging in illegal

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                                                    Page 2
Not Reported in F.Supp.2d, 2004 WL 1773349 (N.D.Cal.), 71 U.S.P.Q.2d 1914
**(Cite as: Not Reported in F.Supp.2d)**

activity. Visa also requires member banks to terminate the accounts of merchants who have excessively high "chargeback" ratios. A chargeback occurs when a customer requests a reversal of an improper charge. A "black list" of terminated merchants is published, and access to this list is provided to all members of Visa and all third-party processors. In 2001, Plaintiff was added to this list after hackers allegedly caused it to reflect high chargeback rates. Although Visa and its member banks terminated Plaintiff's merchant account at that time, Plaintiff is still able to accept Visa cards as payment through the use of an intermediate service.

*2 At the center of this case is a group of websites that publish material that allegedly infringes Plaintiff's copyrights and trademarks. Typically these are websites that claim to display pornography featuring prominent actresses. Plaintiff refers to these websites as "Stolen Content Websites." Defendants allegedly provide financial services to these Stolen Content Websites, allowing them to process Visa and Mastercard cards as a method of payment. Plaintiff sent letters to Defendants informing them of the websites' alleged infringing behavior and demanding that Defendants terminate the provision of financial services to those websites. When Defendants did not comply, Plaintiff brought this suit. The Stolen Content Websites are not a party to this lawsuit.

### III. STANDARDS

Pursuant to Rule 12(b)(6), a complaint may be dismissed for failure to state a claim upon which relief may be granted. "A claim may be dismissed as a matter of law for one of two reasons: (1) lack of a cognizable legal theory or (2) insufficient facts under a cognizable legal claim."*Robertson v. Dean Witter Reynolds Co.,* 749 F.2d 530, 534 (9th Cir.1984)."A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."*Conley v. Gibson,* 355 U.S. 41, 45-46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957). The Court "must presume all factual allegations of the complaint to be true and draw all reasonable inferences in favor of the nonmoving party."*Usher v. City of Los Angeles,* 828 F.2d 556, 561 (9th Cir.1987). In ruling on such a motion, "a court *may not* look beyond the complaint."*Schneider v. California Dept. of Corrections,* 151 F.3d 1194, 1197 (9th Cir.1998) (emphasis in original).

### IV. DISCUSSION

#### A. Copyright Infringement

Plaintiff does not provide any facts supporting an allegation of direct copyright infringement against Defendants. Instead, Plaintiff alleges that the Stolen Content Websites engaged in direct infringement and Defendants are liable for contributory and vicarious copyright infringement. The gravamen of Plaintiff's complaint is that, despite receiving notice of the alleged infringing activity committed by third parties, Defendants have materially contributed to and controlled the alleged infringing activity by providing financial services to the alleged infringers.

#### 1. Contributory Copyright Infringement

In order to prevail on a claim for contributory infringement, Plaintiff must show that (1) Defendants had knowledge of the infringing activity; and (2) induced, caused, or materially contributed to that infringing activity.*Ellison v. Robertson,* 357 F.3d 1072, 1076 (9th Cir.2004). Plaintiff claims that it contacted Defendants numerous times in order to notify them of the websites' alleged infringing conduct, and as a result, Defendants had knowledge of the infringing activity. Defendants do not argue the issue of knowledge. However, Defendants vigorously deny that they materially contributed to that alleged infringement.

*3 To have engaged in contributory copyright infringement, it is not sufficient for the Defendants to merely have contributed to the general business of the infringer. To have materially contributed to copyright infringement, "the ... assistance must bear

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d                                                                 Page 3
Not Reported in F.Supp.2d, 2004 WL 1773349 (N.D.Cal.), 71 U.S.P.Q.2d 1914
**(Cite as: Not Reported in F.Supp.2d)**

some direct relationship to the infringing acts." 3-12 *Nimmer on Copyright* § 12.04[A][2][a] (2004); *Fonovisa, Inc. v. Cherry Auction, Inc.,* 76 F.3d 259, 264 (9th Cir.1996) ( "One who directly contributes to another's infringement should be held accountable."); *MGM Studios, Inc. v. Grokster, Ltd.,* 259 F.Supp.2d 1029, 1042 (C.D.Cal.2003) (The Defendants' assistance "must bear a direct relationship to the infringing acts."). In addition, the contributing conduct must be substantial. *Religious Tech. Ctr. v. Netcom On-line Comm. Servs.,* 907 F.Supp. 1361, 1375 (N.D.Cal.1995).

Examples of material contribution from recent Internet case law include providing an online index of copyrighted songs to facilitate their transfer between software users, *A & M Records v. Napster,* 239 F.3d 1004, 1021 (9th Cir.2001), and providing a bulletin board system allowing Internet users to upload and download copyrighted video games, *Sega Enters. v. MAPHIA,* 948 F.Supp. 923, 933 (N.D.Cal.1996). In non-Internet cases, contributory infringement has traditionally been found where defendant swap-meet owners provided infringing vendors at the swap-meet with "space, utilities, parking, advertising, plumbing, and customers."*UMG Recordings, Inc. v. Sinnott,* 300 F.Supp.2d 993, 1001 (E.D.Cal.2004) (citing *Fonovisa, Inc. v. Cherry Auction. Inc.,* 76 F.3d 259, 264 (9th Cir.1996)). All of these acts were directly tied to not only the business operations of the infringers, but specifically to their infringing conduct.

Plaintiff relies heavily on *Perfect 10, Inc. v. Cybernet Ventures, Inc.,* 213 F.Supp.2d 1146 (C.D.Cal.2002). In that case, Plaintiff brought suit against Cybernet, a company that provided age verification services for the same allegedly infringing websites at issue in the present case. The court in *Cybernet* granted Plaintiff's motion for a preliminary injunction based on the fact that Cybernet materially contributed to the websites' alleged infringing actions by advertising the websites and paying a commission to a website whenever someone registered for Cybernet's services through that particular website. *Id.* at 1170.The court compared that situation to the swap-meet situation in *Fonovisa* and concluded that Cybernet's provision of support services was comparable to the comprehensive services provided in *Fonovisa.*

The situation in the present case is simply not on par with that in *Cybernet.*Unlike Cybernet, Defendants provide content-neutral services. Defendants do not promote the websites that use their services. Nor do Defendants have content-specific regulations with which merchants must comply before using Defendants services, as Cybernet did. Defendants do not hold out certain merchants as being providers of a particular quality of product. Defendants are concerned solely with financial aspects of the websites, not their content.

*4 Plaintiff alleges that because Defendants provide essential financial services to the alleged infringers, they are materially contributing. There are two flaws with this argument. The first flaw is the assumption that the services Defendants provide are essential to the functioning of the allegedly infringing websites. Plaintiff asserts, "acceptance of MasterCard and Visa is necessary to an Internet merchant's commercial viability."(P's Opp. to Mot. to Dismiss, p. 1.) This statement is belied by facts from the Plaintiff's own complaint. Plaintiff itself was blacklisted by Visa and had its merchant account revoked, yet it still continues to operate its website and accept Visa and Mastercard as payment through an intermediate payment service. The allegedly infringing websites could employ intermediate payment services if Defendants terminated their merchant accounts. The websites could also use alternate forms of payment such as personal checks, money orders, debit cards, or other credit card providers. There is no reason to believe that the allegedly infringing websites could not continue to infringe and operate effectively if Visa and Mastercard were to terminate their financial services.

The second flaw with Plaintiff's assertion is the fact that while Defendants may provide services that materially contribute to the functioning of the

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Not Reported in F.Supp.2d
Not Reported in F.Supp.2d, 2004 WL 1773349 (N.D.Cal.), 71 U.S.P.Q.2d 1914
**(Cite as: Not Reported in F.Supp.2d)**

Page 4

website businesses, there is no factual basis for the allegation that they materially contribute to the alleged *infringing activities* of the websites. The alleged infringing activities are the copying and distribution of Plaintiff's images. The only service Defendants provide to the websites is the ability to process credit cards. The ability to process credit cards does not directly assist the allegedly infringing websites in copying Plaintiff's works. Defendants do not provide the means for distributing those works to others, nor do they provide bandwidth or storage space with which to transfer or store the works. Defendants' conduct does not begin to approach the level of involvement that existed in the cases enumerated above, where material contribution was found. In each of those cases, the defendants' conduct specifically assisted the infringing activity itself. Here, the websites would be every bit as capable of copying and distributing Plaintiff's copyrighted works regardless of whether they employed Defendants' services. As a result, Plaintiff has not adequately pled a claim for contributory copyright infringement. Defendants' motion to dismiss this claim is granted with leave to amend. In its amended complaint, Plaintiff must establish a relationship between the financial services provided by Defendants and the alleged infringing activity as opposed to the mere operation of the website businesses.

2. Vicarious Copyright Infringement

In order to establish a claim for vicarious copyright infringement, Plaintiff must allege that Defendants have (1) the right and ability to control the infringing activity and (2) a direct financial benefit from the infringing activity. *Ellison v. Robertson,* 357 F.3d 1072, 1078 (9th Cir.2004).

a. Right and Ability to Control

*5 Plaintiff claims that Defendants have the right and ability to control the alleged infringing activity based on two grounds-first, because the provision of financial services is essential to the survival of the allegedly infringing websites, Defendants can dictate content by threatening to revoke their services if the websites do not comply with their standards, and second, Defendants have in place internal regulations governing the provision of service to high-risk merchants, including adult entertainment websites. The Court finds that neither ground constitutes the right and ability to control the alleged infringing activity.

First, the only enforcement mechanism that is within Defendants' power is the threat of rescinding their financial services. However, as the Court established in the previous section on contributory infringement, the allegedly infringing websites will be able to continue their alleged infringing conduct regardless of whether Defendants blacklist them. Therefore, Defendants' ability to rescind their services does not indicate control over the websites' alleged infringing actions.

Second, the existence of Defendants' internal regulations has no bearing on the ability or right of Defendants to control the conduct of a third party. Even if, as Plaintiff contends, Defendants monitor the allegedly infringing websites on a regular basis, Defendants still have no basis for dictating content to those websites. Third party websites are not bound by Defendants' internal regulations. Defendants have no contractual right to dictate the websites' content Nor do Defendants have the authority to shut down the websites' servers, delete any infringing material they find, or prevent the transmission of such material.

The present situation is quite different than that in cases such as *Napster,* where the party found vicariously liable actually supplied the product that was being used to enable the infringing distribution of copyrighted works. *Napster,* 114 F.Supp.2d at 921-22. In that case, Napster directly controlled whether users of the software could see and therefore download an infringing file by maintaining an index of available files. Napster had the ability to prevent the distribution of copyrighted files by removing them from the index. *Id.* at 906, 920-21.Here, Defendants cannot remove infringing works from the websites. They simply do not have the right or ability to do so.

© 2007 Thomson/West. No Claim to Orig. U.S. Govt. Works.