

FILED
U.S. DISTRICT COURT
NORTHERN DIST. OF TX.
FT. WORTH DIVISION

2008 MAY -9  PM 2:32

CLERK OF COURT

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

               Plaintiff,

-v.-

                                   No. 4:07-CV-487-A

GOOGLE INC.,

               Defendant.

## SUPPLEMENTAL APPENDIX IN SUPPORT OF PLAINTIFF'S MOTION TO COMPEL

Dee J. Kelly
  State Bar No. 11217000
Dee J. Kelly, Jr.
  State Bar No. 11217250
Lars L. Berg
  State Bar No. 00787072
**KELLY HART &
HALLMAN LLP**
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

Frederick Brown
  admitted pro hac vice
George A. Nicoud III
  admitted pro hac vice
**GIBSON, DUNN &
CRUTCHER LLP**
One Montgomery St., Ste. 3100
San Francisco, CA 94104
Phone: (415) 393-8200
Fax: (415) 986-5309

Terence P. Ross
  admitted pro hac vice
Howard S. Hogan
  admitted pro hac vice
**GIBSON, DUNN &
CRUTCHER LLP**
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

*Attorneys for Plaintiff American Airlines, Inc.*

Dockets.Justia.com

## Table of Contents

American Airlines, Inc. respectfully submits this supplemental appendix in support of its motion to compel filed on May 7, 2008. Exhibits L, O, and V to American's original appendix reflected that they were placeholders for documents that Google originally designated, or by extension were designated, as highly confidential. Google has withdrawn that designation as to the attached portions of such documents; therefore, American is now free to file them. American has added highlights to some of the following exhibits to direct the Court's attention to relevant passages:

| Exhibit | Page(s) | Description |
|---------|---------|-------------|
| Exhibit L: | 81-83 | Excerpts from 30(b)(6) Deposition of Chris Millikin, conducted on March 14, 2008 ("Millikin Tr."). |
| Exhibit O: | 94-116 | Excerpts from 30(b)(6) Deposition of Leslie Altherr, conducted on March 20, 2008 ("Altherr Tr."). |
| Exhibit V: | 168-171 | List of deposition questions which Google's counsel instructed Leslie Altherr not to answer, organized by category. |

Respectfully submitted,

*[signature]*

Dee J. Kelly (State Bar No. 11217000)
Dee J. Kelly, Jr. (State Bar No. 11217250)
Lars L. Berg (State Bar No. 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

OF COUNSEL:

Frederick Brown (admitted pro hac vice)
George A. Nicoud III (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
One Montgomery St., Suite 3100
San Francisco, CA 94104
Phone: (415) 393-8200
Fax: (415) 986-5309

Terence P. Ross (admitted pro hac vice)
Howard S. Hogan (admitted pro hac vice)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

ATTORNEYS FOR PLAINTIFF
AMERICAN AIRLINES, INC.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on the 9th day of May,

2008 to Defendant's counsel, as follows:

*Via CMRRR #7007 0710 0000 0927 8181*
*and Email*
Joseph F. Cleveland, Jr.
BRACKETT & ELLIS, P.C.
100 Main Street
Fort Worth, TX 76102-3090

*Via CMRRR #7007 0710 0000 0927 8198*
*and Email*
Michael H. Page
Klaus H. Hamm
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704

Lars L. Berg



L

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

Fort Worth Division

--oOo--

| | |
|---|---|
| AMERICAN AIRLINES, INC., | ) |
| | ) |
| Plaintiff, | ) |
| vs | ) Case No. 4-07CV-487-A |
| | ) |
| GOOGLE INC., | ) |
| | ) |
| Defendant. | ) |
| | ) |

**HIGHLY CONFIDENTIAL**

30(B)(6) DEPOSITION OF

CHRIS MILLIKIN

———————

MARCH 14, 2008

HIGHLY CONFIDENTIAL

ACCESS LIMITED BY CONFIDENTIALITY AGREEMENT

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#407383]

Page 1

Page 2

1           I N D E X
2      INDEX OF EXAMINATIONS
3  EXAMINATION BY MR. BROWN ........................... 4
4      EXHIBITS MARKED FOR IDENTIFICATION
5  Exhibit 1 Notice of Deposition...................... 4
6  Exhibit 2 List of custodians and titles (1 page).... 47
7  Exhibit 3 Plaintiff American Airlines Inc.'s First
              Request for the Production of Documents
8             from Defendant Google Inc. ............... 61
9  Exhibit 4 Plaintiff American Airlines, Inc.'s
              Second Request for the Production of
10            Documents from Defendant Google Inc. ..... 61
11 Exhibit 5 Organizational chart concerning Google;
              (13 pages)................................ 62
12
       Exhibit 6 Portion of Excel spreadsheet (5 pages).... 64
13
            --oOo--
14
15
16
17
18
19
20
21
22
23
24
25

Page 3

1            --oOo--
2      Deposition of Chris Millikin, taken by the
3  Plaintiff at 633 Battery Street, San Francisco,
4  California, commencing at 7:45 a.m. on March 14, 2008,
5  before CAROLYN M. MANN, CSR, pursuant to Notice.
6            --oOo--
7       A P P E A R A N C E S
8  FOR THE PLAINTIFF:
9       GIBSON, DUNN & CRUTCHER LLP
         One Montgomery Street, Suite 3100
10       San Francisco, California 94104
         BY: FREDERICK BROWN
11
         GIBSON, DUNN & CRUTCHER LLP
12       1050 Connecticut Avenue, N.W.
         Washington, D.C. 20036
13       BY: HOWARD S. HOGAN (appearing by phone)
14 FOR THE DEFENDANT:
15       KEKER & VAN NEST LLP
         710 Sansome Street
16       San Francisco, California 94111
         BY: KLAUS H. HAMM
17
            --oOo--
18
19
20
21
22
23
24
25

Page 4

1       SAN FRANCISCO, CALIFORNIA
2       FRIDAY, MARCH 14, 2008
3            7:45 a.m.
4            --oOo--
5       CHRIS MILLIKIN
6  _____
7  called as a witness, who, having been first duly sworn,
8  was examined and testified as follows:
9            --oOo--
10      EXAMINATION BY MR. BROWN
11 (Deposition Exhibit 1 was marked for
12 identification prior to the start of the
13 deposition)
14      MR. BROWN: So Mr. Hamm, just so we have a
15 complete deposition record for the judge and so that my
16 transcript is clear, I'm Fred Brown. I represent
17 American Airlines, and I represent American Airlines in
18 a case against Google.
19      I understand that you are being offered by
20 Google as a corporate representative on certain issues.
21 I've given you Exhibit 1, which is the 30(b)(6) notice,
22 and ask you which topics you have been designated to
23 testify on.
24      MR. HAMM: Before he does that, I'll just make
25 my appearance. I'm Klaus Hamm from the law firm Keker

Page 5

1  Van Nest, representing Google, Inc.
2       THE WITNESS: I am here prepared to testify
3  for items 15 and 16.
4       MR. BROWN: Q. And what have you done to
5  prepare yourself on those two items?
6       A. For number 15, just personal and professional
7  knowledge. And number 16, I met with counsel yesterday
8  to discuss some specifics of the case, as well as
9  Google's internal legal and --
10      MR. HAMM: I just, in answering his question,
11 don't discuss any specifics of our conversation. That's
12 attorney-client privilege.
13      THE WITNESS: Understood.
14      MR. BROWN: Q. Your answer might have been
15 interrupted, so were you finished?
16      A. I was. Thank you.
17      Q. And how much time did you prepare to answer
18 question 16? And let me just, so that we have it
19 present in the transcript, topic 16 is "Google's
20 preservation of, search to find and produce documents in
21 this action." How much time did you prepare to testify
22 about that particular topic?
23      A. I'm sorry. Could you say that part again?
24      Q. Yes.
25      A. Search to find?

2 (Pages 2 to 5)

Page 46

1    A.  I was told and remember specifically now that
2  it was in October; that the legal hold was placed on, I
3  believe, 126 accounts; that approximately in two blocks,
4  the two dozen people, two dozen accounts were actually
5  searched and the data was collected.  I was shown a list
6  of names, which I did not commit to memory, and
7  particular departments and titles of those who were
8  involved.  You have -- I'm gesturing to the list that
9  Fred has in front of him.  I connected the dots with the
10  issue from the week prior with regard to the
11  compatibility issues we had with files, who we merely
12  referred to as the legal team prior to that point, was a
13  vendor, or anything, anything more specific than that.
14    Q.  Let me ask you about the 126 accounts that you
15  say were put on legal hold in October.  When did you
16  learn that?
17    A.  Yesterday.
18    Q.  Did you know that before yesterday?
19    A.  No.
20    Q.  And who told you that yesterday?
21    A.  Leslie.
22    Q.  What did she say about that?
23    A.  There are 126 accounts that we had put on
24  legal hold in October.
25    Q.  Did she show you -- were you shown any

Page 47

1  documents at any point in time yesterday?
2    A.  There's a document in front of you that looks
3  like the document I was shown.  I can't read it from
4  here, but that may be the document.  Other than that,
5  and the (Witness indicates) -- I'm not sure what you
6  call this.
7      MR. HAMM:  Deposition notice.
8      THE WITNESS:  Deposition notice, and a cover
9  page for the request, but I don't remember the details
10  of that.
11      MR. BROWN:  Q.  Okay.  Other than those three
12  documents, were you shown anything yesterday?
13    A.  No, I was not.
14    Q.  You weren't shown the legal ticket that you
15  mentioned earlier --
16    A.  No, I was not.
17    Q.  -- that began the search process for these
18  documents?
19    A.  No.
20      MR. BROWN:  Let's have the next exhibit marked
21  in order.
22      (Deposition Exhibit 2 was marked for
23      identification.)
24      MR. BROWN:  Q.  So I've got before you what is
25  Exhibit 2 in this case, and it's a list of custodians

Page 48

1  and titles.  I believe it's 21 names that your counsel
2  had given to us, I believe it was last week.  Have you
3  seen this list before?
4    A.  I have.
5    Q.  And when did you see this list?
6    A.  Yesterday.
7    Q.  And what were you told about this list?
8    A.  These are the folks who we have done search
9  and collection of data, the accounts, these folks'
10  accounts.
11    Q.  And other than the conversation you had
12  yesterday, you don't have any knowledge about whether
13  these accounts were actually searched or not.
14    A.  I don't.
15    Q.  Did the conversation yesterday, or any
16  conversation you've had, relate to what other kinds of
17  documents other than e-mails and attachments were
18  searched for these people?
19    A.  Can you ask the question one more time?  I'm
20  sorry.
21    Q.  Yes.  For example, some people have hard copy
22  files, some people might have local files on their
23  computers.  Were you told anything about the search for
24  those non-e-mail files?
25    A.  We would have -- I do know that we searched

Page 49

1  also their, searched and collected their home
2  directories on what we refer to as filer.  It's a
3  network filer, F-I-L-E-R.  It's a network-attached
4  storage device.  It's where home directories and such
5  reside.
6    Q.  So tell us, because we have to, we have to
7  understand what you are talking about, and the judge
8  also has to understand what you're talking about --
9    A.  I understand.
10    Q.  -- none of us are technically as savvy as you
11  are, so tell us what you mean by "filer."  Also tell us
12  what you mean by "home directory."
13    A.  Uh-huh.  Filer, again, is a network-attached
14  storage device.  Think of it as a hard drive that you
15  access over the network as opposed to on your local
16  machine.  It can be shared with others; it generally is.
17  And that is where hard copies of files of any sort can
18  be stored.
19    Q.  So give me an example.
20    A.  Home directory -- I'm sorry.
21    Q.  I apologize for interrupting.  Please
22  continue.
23    A.  I'm trying to remember.  A home directory is a
24  specific piece of that carved out for an individual
25  user; that is, a user's allocated space.  And when I use

13  (Pages 46 to 49)



0

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF TEXAS

Fort Worth Division

--oOo--

AMERICAN AIRLINES, INC.,    )

    )

        Plaintiff,    )

   vs.    ) Case No. 4-07CV-487-A

    )

GOOGLE INC.,    )

    )        **HIGHLY CONFIDENTIAL**

        Defendant.    )

    )

30(B)(6) DEPOSITION OF

LESLIE ALTHERR

_____

MARCH 20, 2008

HIGHLY CONFIDENTIAL

ACCESS LIMITED BY CONFIDENTIALITY AGREEMENT

REPORTED BY:  CAROLYN M. MANN, CSR 10066 [#407553]

1

**2**

1       I N D E X
2       INDEX OF EXAMINATIONS
3   EXAMINATION BY MR. BROWN ..................... 4
4       EXHIBITS MARKED FOR IDENTIFICATION
5   Exhibit 7 E-mail chain including message from
        Prashant Fuloria to Jane Butler, dated
6       December 20, 2003; Bates Nos. 127271 -
        127274, 144884  144885, 140728 - 140134 . 83
7
    Exhibit 8 E-mail chain including message from
8       Prashant Fuloria to Lealeka Samarasinghe,
        Bismarck Lepe, and Kabir Masson, dated
9       February 11, 2004; Bates Nos. 127082 -
        127091................................ .. 97
10
    Exhibit 9 Document entitled "Google/American
11      Airlines Document Production Cross
        Reference Log"................................107
12
    Exhibit 10 Document entitled "List of companies from
13      AA's Second Request for Admission to
        Google"............................... ...111
14
        --oOo--
15
16
17
18
19
20
21
22
23
24
25

**3**

1       --oOo--
2   Deposition of Leslie Altherr, taken by the
3   Plaintiff at 710 Sansome Street, San Francisco,
4   California, commencing at 1:04 p.m. on March 20, 2008,
5   before CAROLYN M. MANN, CSR, pursuant to Notice.
6       --oOo--
7   A P P E A R A N C E S
8   FOR THE PLAINTIFF:
9       GIBSON, DUNN & CRUTCHER LLP
        One Montgomery Street, Suite 3100
10      San Francisco, California 94104
        BY: FREDERICK BROWN
11
    FOR THE DEFENDANT:
12
        KEKER & VAN NEST LLP
13      710 Sansome Street
        San Francisco, California 94111
14      BY: KLAUS H. HAMM
15  ALSO PRESENT:
16      STACEY L. WEXLER
        Google Litigation Counsel
17
        --oOo--
18
19
20
21
22
23
24
25

**4**

1       SAN FRANCISCO, CALIFORNIA
2       THURSDAY, MARCH 20, 2008
3           1:04 p.m.
4           --oOo--
5       LESLIE ALTHERR
6   _____
7   called as a witness, who, having been first duly sworn,
8   was examined and testified as follows:
9           --oOo--
10      EXAMINATION BY MR. BROWN
11      MR. BROWN: Should probably have
12  introductions, so we know who's here.
13      MR. HAMM: I'm Klaus Hamm, from the firm Keker
14  & Van Nest, representing the defendant, Google, Inc.
15      MS. WEXLER: I'm Stacey Wexler, an attorney at
16  Google.
17      MR. BROWN: I'm Fred Brown. I'm not
18  affiliated with Google, but at Gibson Dunn & Crutcher,
19  representing American Airlines in the American Airlines
20  vs. Google lawsuit.
21      Q.  May I pronounce your last name Altherr?
22      A.  Altherr.
23      Q.  Altherr?
24      A.  Uh-huh, A-L-T-H-E-R-R.
25      Q.  I understand that you are here as a, what we

**5**

1   call a corporate representative witness. Is that your
2   understanding?
3       A.  Yes.
4       Q.  I have before you Exhibit 1, and we have a
5   general agreement that we are going to, as best lawyers
6   can, number exhibits in a serial fashion.  We took
7   Mr. Millikin's deposition the other day as a corporate
8   representative witness, and this is an exhibit from his
9   deposition, but we'll use it in yours as well.
10      A.  Okay.
11      Q.  And we're going to see if we can stay to that
12  regimen throughout the litigation.
13      A.  Okay.
14      Q.  So I'm putting before you Exhibit 1
15      A.  Uh-huh.
16      Q.  If you can tell me which topics you are
17  prepared to testify about, that would be helpful to me.
18      And Exhibit 1, just for the record, is the
19  notice of Rule 30(b)(6) deposition of Google.
20      A.  Topic M, Google's preservation of, search to
21  find and produce documents in this action.
22      Q.  And what did you do to prepare yourself to
23  testify about topic 16?
24      A.  I reviewed e-mail communications between
25  myself and counsel, and e-mail communications between

2  (Pages 2 to 5)

14

1    MR. HAMM: Just be careful not to reveal any
2  communications that you had at the instructions of
3  counsel.
4    THE WITNESS: Okay. Ask for the type of
5  documents we're looking for.
6    MR. BROWN: Q. And what kind of documents are
7  you looking for?
8    A.  Trademark policy documents, trademark -- that,
9  both internal and external policy documents, trademark
10 team training materials on how to handle trademark
11 complaints.
12   Q.  Is there a, an electronic storage place that
13 you go to retrieve those documents?
14   MR. HAMM: Just, are you asking her where she
15 goes or where somebody else goes? Are you asking about
16 where Google goes or where Leslie goes?
17   MR. BROWN: Q. Where she goes.
18   MR. HAMM: Objection, lack of foundation.
19   THE WITNESS: I don't go. I ask to get
20 provided the documents.
21   MR. BROWN: Q. So you ask other people for
22 the documents, and they send them to you, essentially.
23   A.  Correct.
24   Q.  You don't go to the electronic database
25 yourself, wherever it may be, and do a search for those

16

1    Q.  Do you recall when she responded to you?
2    A.  Same. Immediately.
3    Q.  And do you recall how many documents she
4  provided you with?
5    A.  Not actual number, but she provided us with
6  what we asked for.
7    Q.  Can you describe it in terms of quantity? Was
8  it like a gigabyte, two gigabytes? If you know. I
9  don't want you to guess.
10   A.  I don't know.
11   Q.  So you don't know page number, number of
12 documents, or quantity described as gigabytes or
13 megabytes, those kinds of things?
14   A.  They were electronic, and I didn't check the
15 file size, no.
16   Q.  So other than the categories of trademark
17 policy, both internal and external, training materials,
18 and how to handle trademark complaints, were there any
19 other trademark documents, trademark-related documents
20 that you asked from Alene or anyone on the trademark
21 team?
22   A.  That I specifically asked?
23   Q.  Yes.
24   A.  I followed up with Alene to ask about training
25 documents on how to use --

15

1  documents.
2    A.  No, I --
3    MR. HAMM: Vague as to time.
4    THE WITNESS: No.
5    MR. BROWN: Q. And how many -- who is on the
6  trademark team with whom you checked?
7    A.  I checked with Alene Latimer.
8    Q.  Please spell her name.
9    A.  Alene, A-L-E-N-E, Latimer, L-A-T-I-M-E-R.
10   Q.  Did you check with anyone else?
11   A.  Alene was my, my main contact from the
12 trademark team.
13   Q.  And what is Alene's position?
14   A.  She's a trademark paralegal.
15   Q.  And do you know if she in turn did any
16 checking, further checking? Did she, for example, reach
17 out to the lawyers? If you know. If you don't know,
18 that's fine. You can tell me you don't know.
19   A.  I don't know.
20   Q.  And how long has Alene been there?
21   A.  I would have to guess.
22   MR. HAMM: Don't, if you don't know, don't --
23   THE WITNESS: I don't know exact time frame.
24   MR. BROWN: Q. When did you check with Alene?
25   A.  I believe it was in the November time frame.

17

1    MR. HAMM: Again --
2    THE WITNESS: Sorry.
3    MR. HAMM: -- please don't, please don't talk
4  about what you asked for from Alene.
5    THE WITNESS: Okay. Sorry.
6    I asked for additional documents from Alene.
7    MR. BROWN: Q. What documents?
8    MR. HAMM: Fred, I'm just trying to be careful
9  here to have her not testify about communications that
10 she's had with Alene. If you want to ask her about what
11 documents Alene provided to her, that's fine.
12   MR. BROWN: I want to know what documents she
13 asked for.
14   MR. HAMM: That's a privileged communication.
15   MR. BROWN: Are you instructing her not to
16 answer?
17   MR. HAMM: I'm instructing her not to answer.
18   MR. BROWN: Q. Other than following up with
19 Alene to ask her more about training documents, what
20 other kinds of documents did you ask Alene for?
21   MR. HAMM: Objection, same objection.
22   MR. BROWN: It's got to be an instruction.
23   MR. HAMM: And I instruct you not to answer.
24   MR. BROWN: Q. I just meant by that -- I'm
25 not asking him to give you an instruction. I'm just

5 (Pages 14 to 17)

18

1　telling him, an objection is not good enough; he needs
2　to give you an instruction not to answer, if that's what
3　he wants you to do.
4　　A.　Okay.
5　　Q.　What documents -- describe the categories of
6　documents that Alene gave to you.
7　　A.　Trademark team documents, which I think I
8　already told you.
9　　Q.　What categories of trademark team documents?
10　　A.　Training materials for the team, which include
11　how to use a tool called Beaker, policy as it relates to
12　trademark terms. I believe those are the main
13　categories of documents from the trademark team.
14　　Q.　The other noncustodial data source you said
15　you checked was the ads database. What did you do to
16　check for documents from the ads database?
17　　A.　Contacted an ads engineer.
18　　Q.　And who was that?
19　　A.　There were a few folks on the ads engineering
20　team that we asked for help. I believe ultimately, the
21　engineer's name was Robert On, O-N.
22　　Q.　And what did you ask him for?
23　　　MR. HAMM:　Again, I'm going to object to that
24　question and I'm going to instruct you not to answer.
25　　　MR. BROWN:　Q.　In your request to Alene and

19

1　your request to Robert, did you ask them to search for
2　the use of particular terms so that you could determine
3　some relevancy from the documents you were asking them
4　to search for?
5　　　MR. HAMM:　Again, same objection, same
6　instruction. If you want to ask if they used particular
7　terms, that's fine; not if she communicated anything of
8　that nature. It's the same instruction.
9　　　MR. BROWN:　Q.　What kind of documents are in
10　the ads database?
11　　A.　The ads database is a very large database that
12　keeps all the information about an advertiser's
13　campaign, keywords that are used for those campaigns,
14　dates, impressions, clicks, costs. Those are just some
15　of the things that I know off the top of my head.
16　　Q.　Did the persons other than Robert who were ads
17　engineers that you contacted, did they provide
18　information to you other than that you should work
19　through Robert?
20　　A.　I don't think I understand your question.
21　　Q.　Okay. See if I can do better.
22　　You mentioned that you had contacted initially
23　more than one ads engineer, and eventually you got to
24　Robert. So I want to know if I need to -- I'm trying to
25　determine whether it's worth our while to explore what

20

1　you, how you worked with the other ads engineers other
2　than Robert. If all they did was refer you to Robert,
3　then I will simply focus on Robert.
4　　A.　Basically, that's Robert et al.
5　　　MR. HAMM:　I'll let her answer that question
6　if you agree that it's not a waiver of anything, just to
7　expedite the process. Is that . . .?
8　　　MR. BROWN:　No, I won't make any agreements.
9　That's really an issue that you have to -- whether you
10　believe it's a privileged answer or not. I mean, you
11　know my position. I don't think any of the questions
12　that I've asked today call for attorney-client
13　privileged information. You're taking a different cut
14　on it, so . . .
15　　　MR. HAMM:　What's the question?
16　　　MR. BROWN:　Q.　I began by saying, "If all
17　they did was refer you to Robert, then I will simply
18　focus on Robert." And the witness began to answer the
19　question, "Basically, that's Robert . . ."
20　　　MR. HAMM:　So that wasn't a question. I'm not
21　trying to be difficult here, but it didn't end with a
22　question.
23　　　MR. BROWN:　I'll ask a question.
24　　　MR. HAMM:　Okay.
25　　　MR. BROWN:　Q.　Did the other ads engineers

21

1　solely refer you to Robert as the source for information
2　about the ads database?
3　　　MR. HAMM:　Objection. I'm going to instruct
4　you not to answer.
5　　　MR. BROWN:　Q.　Did Robert eventually provide
6　information to you?
7　　A.　Yes.
8　　Q.　And what types of information did he provide
9　to you?
10　　A.　Data collected from the ads database.
11　　Q.　Did he provide -- did you ask him for any
12　information from an ads database that related to United
13　Airlines, for example?
14　　　MR. HAMM:　Objection. I'm going to instruct
15　you not to answer.
16　　　MR. BROWN:　Q.　Travelocity?
17　　　MR. HAMM:　Objection, instruction.
18　　　MR. BROWN:　Q.　Orbitz?
19　　　MR. HAMM:　Objection, instruction. I'm -- you
20　can have it on the record that I'm objecting to any, any
21　question about communications that Leslie has had with
22　Robert in the process of collecting data in this case.
23　　　MR. BROWN:　Q.　CheapoAir? Question mark.
24　　　MR. HAMM:　Objection. Instruct you not to
25　answer.

6　(Pages 18 to 21)

22

1     MR. BROWN: Q. Did you ask Robert for any
2  information related to conversion data?
3     MR. HAMM: Objection. That calls for
4  attorney-client communications. I instruct you not to
5  answer.
6     MR. BROWN: Q. When did Robert provide
7  information to you and in what form did he provide it?
8     A. It's raw data from the database. The time
9  frame, late December, early January.
10    Q. And if I've asked you this before, please
11 forgive me. When did you ask for the data from Robert?
12    MR. HAMM: Lack of foundation, objection.
13    You can answer the question, though.
14    THE WITNESS: I don't remember exactly dates.
15 Again, I think it was late fall. So maybe November time
16 frame, early December.
17    MR. BROWN: Q. And when you say raw data,
18 what do you mean? You said he provided raw data to you.
19    A. It was an extraction from the database. So it
20 looks much like fields and goobledygook to me, but : . .
21    Q. Looks like a spreadsheet?
22    A. In other words -- similar. Yes.
23    Q. Did you receive any information about how
24 long, how many hours people-hours it took Robert or
25 others working with him to extract that data?

23

1     MR. HAMM: Objection. If you're asking about
2  a communication that was made to Leslie, then I object
3  and I will instruct her not to answer. Again, if you
4  want to ask her how long it took for the data to be
5  extracted, that would be a question I wouldn't object
6  to.
7     MR. BROWN: Q. Do you know how many hours it
8  took to extract that data, how many person hours?
9     A. No.
10    Q. Do you know anything about the effort it took
11 to extract that data?
12    A. Not specifics, no.
13    Q. Do you know how the data was chosen from the
14 database, what criteria were used to select that
15 information?
16    A. At the advice of counsel, the criteria
17 was . . .
18    MR. HAMM: Again, if -- don't talk about
19 information that was provided at the advice of counsel.
20    THE WITNESS: It's privileged.
21    MR. BROWN: Q. Do you know --
22    MR. HAMM: Just, just, just so that we're
23 clear on what's privileged and what's not. if -- you can
24 testify about what criteria were used to select the data
25 from the database, if you know.

24

1     MS. WEXLER: Leslie, if you're not clear, we
2  can take a break and talk about it.
3     THE WITNESS: Search terms.
4     MS. WEXLER: I'm not asking a question;
5  there's no question pending. I'm just saying, if you
6  need to take a break to talk to Klaus about what he's
7  trying to explain to you, you can take a break.
8     THE WITNESS: Search terms was the criteria.
9  There were search terms that were used.
10    MR. BROWN: Q. What search terms?
11    MR. HAMM: Objection, calls for attorney work
12 product. And I feel like you two are not talking about
13 the same thing right now at this point, but I will
14 explain more if you want me to, and I will not say
15 anything if you don't want me to.
16    MR. BROWN: I think all you, at this point,
17 should do is make objections or talk about
18 attorney-client privilege off the record if that's it.
19 I think my questions are clear.
20    MR. HAMM: Okay.
21    MR. BROWN: Q. But we do need an absolutely
22 clear record, so I'll ask the question again to make
23 sure we have a clear record of what's, what my question
24 is and what your answer is.
25    What search terms were used by Robert to

25

1  search the ads database?
2     A. Search terms provided by counsel.
3     Q. And I'm asking you what those search terms
4  were.
5     MR. HAMM: I'll instruct you not to answer.
6     MR. BROWN: Q. Can you give us an idea of the
7  quantity of data that was provided to you by Robert?
8     A. No.
9     Q. And that's because you don't have an idea
10 about the quantity of that data?
11    A. I guess I need you to tell me what you mean by
12 "quantity."
13    Q. It could be in gigabytes; it could be in
14 cells; it could be in any way that you're able to
15 describe to us, and as you understood it, the quantity
16 of data that was provided.
17    A. I could not quantify it for you.
18    Q. What did you do with the data that you got
19 from Robert after you received it?
20    A. It was turned over to counsel.
21    Q. Were there any further communications that you
22 had with Robert about that data after you first received
23 it?
24    A. I may have been on a, a string of e-mail, but
25 it was with counsel.

· 7 (Pages 22 to 25)

26

1    Q.  Did you have to go back to Robert and ask for
2  more data or different data or less data, those kinds of
3  things?
4    A.  I don't believe so.
5    Q.  Let's go to the Beaker database, which you
6  said contains information related to trademark monitored
7  terms.  I believe that's what you said.
8    A.  Correct.
9    Q.  So what is a trademark monitored term?
10    A.  Well, there used to be a list of these terms.
11  These are terms that we monitor because they are
12  trademark marks; they are not to be used.  I believe
13  there were other words in this monitored list before,
14  bad words, other terms that should not be used in
15  advertising.
16    Q.  "Bad words" as in profanity?
17    A.  Correct.  Beaker is the tool to manage that
18  data because there's a lot of data now.
19    Q.  Who manages the Beaker database, if you know?
20    A.  On the back end it's engineers.  I don't know
21  if it's one person.  I can't say.
22    Q.  Is there a head of a group, nonengineering
23  group that manages Beaker?
24    A.  Well, it's a tool.  And so in terms of
25  managing it, I think it's managed by an engineering

27

1  team.
2    Q.  And you don't know who the head of that team
3  is?
4    A.  I know an individual who's, who has been on
5  the team for developing the tool.  I don't know if -- I
6  can't tell you his manager's name.
7    Q.  And with whom did you communicate related to
8  the Beaker database?
9    A.  I've communicated with Alene Latimer about
10  Beaker.
11    Q.  And she is a legal assistant within the
12  trademark group?
13    A.  Correct.
14    Q.  And what did you ask of Alene related to the
15  Beaker database?
16    MR. HAMM:  Objection.  I'm going to instruct
17  you not to answer that on attorney-client privilege
18  grounds.
19    MR. BROWN:  Q.  Did you describe to her what
20  words you wanted searched for within the Beaker
21  database?
22    MR. HAMM:  Objection, same instruction.
23    MR. BROWN:  Q.  Which words did you ask her to
24  search for?
25    MR. HAMM:  Again, same objection.

28

1    MR. BROWN:  Q.  Did you ask her to search for
2  terms that Orbitz, for example, put on the, asked to be
3  put on the Beaker database?
4    MR. HAMM:  Objection, instruct not to answer.
5    MR. BROWN:  Q.  Did you ask for terms that
6  American Airlines had asked not to be used by Google?
7    MR. HAMM:  Objection, instruct not to answer.
8    MR. BROWN:  I assume if I ask about other
9  entities you would give the same instruction?
10    MR. HAMM:  I would.  As long as you're asking
11  about communications that she had with Alene.
12    MR. BROWN:  Q.  What words were used to search
13  the Beaker database?
14    MR. HAMM:  Objection; lack of foundation,
15  assumes facts.
16    MR. BROWN:  Q.  Well, were any words used to
17  search the database for information responsive in this
18  case?
19    A.  Yes.
20    Q.  Which words?
21    MR. HAMM:  Objection, instruction not to
22  answer.
23    MR. BROWN:  Q.  When did you ask Alene Latimer
24  for the information related to the Beaker ads database?
25    A.  In --

29

1    MR. HAMM:  You can go ahead.
2    THE WITNESS:  Can you repeat the question?
3  I'm sorry.
4    MR. BROWN:  Q.  It was a when question.  When
5  did you ask for the information from Alene?
6    A.  I believe that was in the November-December
7  time frame.
8    Q.  When did she respond?
9    A.  I think there was a couple weeks lag time
10  because, the time to collect it.
11    Q.  Can you give us an estimate of the quantity of
12  information, whether it's pages or gigabytes or
13  megabytes, however you can describe it?  Can you give us
14  any description of the quantity?
15    A.  I cannot quantify the data.
16    Q.  Other than Alene, did you talk to anyone else
17  or communicate with anyone else related to the Beaker
18  database, in terms of trying to collect information from
19  the database?
20    A.  No.
21    Q.  How do words get onto the, the Beaker tool or
22  database?
23    A.  I don't know.  That's the trademark team.
24  That's what the trademark team does.  That's not my
25  area.

30

1   Q. And I'm not talking about how does an engineer
2   put them on or a programmer put them on, but how are
3   words selected for the Beaker database?
4       MR. HAMM: And you can answer the question if
5   you know the answer, but I'm just going to note that
6   this is outside the scope of the 30(b)(6) topic.
7       THE WITNESS: I don't know. It's not my area.
8       MR. BROWN: Q. Fair enough. I'm not being
9   critical in any way, just asking to see if you have that
10  information.
11      Now, you mentioned Trax, which you also
12  described generally as a customer support database.
13      A. It's an interface tool. It's a communication
14  tool.
15      Q. And with whom did you communicate in order to
16  get information from the Trax database?
17      A. I contacted Logan Hanks, who is an engineer.
18      Q. Did you contact anyone else about that
19  database?
20      A. I did not.
21      Q. And what did you ask Logan for?
22      MR. HAMM: Objection. I'm going to instruct
23  you not to answer.
24      MR. BROWN: Q. Did you give him any search
25  terms that he should look for, or other criteria?

31

1       MR. HAMM: Objection. Instruction not to
2   answer.
3       MR. BROWN: Q. Are you aware whether he used
4   any criteria to search the Trax database?
5       MR. HAMM: Objection, assumes facts not in
6   evidence.
7       You can answer the question, though.
8       THE WITNESS: Yes.
9       MR. BROWN: Q. What, what criteria did he
10  use?
11      A. Search terms.
12      Q. Which search terms?
13      MR. HAMM: Objection, calls for work product
14  and attorney-client privileged communication.
15      MR. BROWN: Q. When did you ask him for the
16  information and when did he provide it to you? And I'm
17  assuming, I think we actually established just the other
18  day. Logan is a man's name in this instance?
19      A. Yes.
20      Q. When did you ask him, when did he provide the
21  information to you?
22      A. Again. I believe that was the November time
23  frame.
24      Q. So you asked for it in November. Did he also
25  provide it in November?

32

1       A. I think it came in December.
2       Q. I'm going to ask that you just, you -- why
3   don't we take a 10-minute break.
4       A. Okay.
5       (Recess taken.)
6       MR. BROWN: Q. Do you know how much time was
7   spent in gathering information from the Trax database?
8       A. Man-hours, computer hours?
9       Q. Yes, yes.
10      A. No.
11      Q. How about Beaker?
12      A. No.
13      Q. How about the TM team documents?
14      A. No.
15      Q. Do you know if anyone other than you and those
16  whom you've identified on the record today were involved
17  in searching those databases that you mentioned for
18  documents related to this case?
19      A. Repeat the question? I'm sorry.
20      Q. Yes. Do you know if any persons other than
21  those you've identified in this deposition today were
22  involved in searching the various databases that you've
23  mentioned in this deposition?
24      A. Not that I'm aware of.
25      Q. And how much time have you spent on gathering

33

1   documents relevant to this case?
2       A. Time. So just actually collection, or just
3   the whole process of . . .
4       Q. Let's talk about collection, if you can. If
5   you don't have an estimate, you can fairly tell me that
6   if that's, in fact, the case.
7       A. A long time. I can't, I can't really give --
8   I mean, I can give you an estimate, I guess, if I have
9   to break it down into hours. Yeah, I would be guessing.
10  So . . .
11      Q. Don't guess.
12      Are there any other databases that come to
13  mind, other than those you mentioned that you asked to
14  be searched? And I'm going to get to e-mails in a
15  moment, but putting aside the e-mails, any databases
16  other than those that you've mentioned?
17      A. There's the keyword tool.
18      Q. And what is the keyword tool?
19      A. The keyword tool, as -- I have limited
20  understanding on the keyword tool. It's not a tool I
21  have access to or play with. The keyword tool is where
22  advertisers can put in words to get suggestions for
23  their advertising campaigns.
24      MR. HAMM: And again. this is beyond the scope
25  of the deposition.

9 (Pages 30 to 33)

34

1    THE WITNESS: Yes, this is --
2    MR. HAMM: But it's fine to ask her questions
3 about it if she knows the answer.
4    MR. BROWN: Q. Oh, I see what happened. I
5 was asking you for what databases were searched at your
6 request for information related to this lawsuit. Is
7 keywords one of those databases that was searched for
8 documents relevant to this case?
9    MR. HAMM: Keyword tool?
10    MR. BROWN: Q. Keyword tool.
11    A. It is one of the tools that's being searched
12 for data.
13    Q. And what is being done, what has been done,
14 and who did it?
15    A. It's at advice of counsel as to what's being
16 searched.
17    Q. Were you involved in asking for the
18 information from someone who searched the keyword
19 database?
20    A. Limited. It was on the communication.
21    Q. Who was in charge of getting the information
22 from the keyword tool or database?
23    A. Dustin --
24    MR. HAMM: Objection, vague.
25    You can answer, though.

35

1    THE WITNESS: Dustin Baker.
2    MR. BROWN: Q. Who is Dustin Baker?
3    A. A software engineer.
4    Q. And who made the request to Dustin?
5    A. Counsel.
6    Q. Did you make it? Did you make the request?
7    A. I was on the communication.
8    Q. But you did not, you did not make it.
9    A. No.
10    **Q. And what was Dustin Baker asked for?**
11    **MR. HAMM: Objection. I'm going to instruct**
12 **you not to answer the question.**
13    **MR. BROWN: Q. Do you know if Dustin Baker**
14 **was asked to use particular search terms or other**
15 **criteria to search the keyword tool?**
16    **MR. HAMM: Same objection, same instruction.**
17    **MR. BROWN: Q. Do you know what terms or**
18 **criteria he was asked to use?**
19    **MR. HAMM: Same objection, same instruction.**
20    MR. BROWN: Q. Can you describe the quantity
21 of information that Dustin provided?
22    MR. HAMM: Objection, assumes facts.
23    THE WITNESS: No.
24    MR. BROWN: Q. When was the information asked
25 for and when was it provided?

36

1    MR. HAMM: Object, same objection. Compound.
2 I just --
3    MR. BROWN: Q. When was it asked for?
4    A. I think this week.
5    Q. When was it provided?
6    A. I don't believe it's been provided.
7    Q. Any other databases other than the e-mail
8 database that has been searched by Google for documents
9 responsive to American's request for information?
10    A. You say e-mail database. Are you talking
11 about Trax?
12    Q. No, I'm not talking about Trax.
13    A. You're not talking about Trax.
14    Q. I'm -- I am not talking about Trax.
15    A. Okay.
16    Q. I'm talking about -- when I say e-mail
17 databases, I'm talking about the, what I think you refer
18 to as --
19    A. Custodial --
20    Q. -- custodial.
21    A. -- sources.
22    Q. Yes.
23    A. So you're asking me about noncustodial
24 sources.
25    Q. Correct.

37

1    MR. HAMM: Just, what's -- let's get the
2 question back on the record.
3    MR. BROWN: Q. Other than the custodial
4 databases, are there any other databases, other than
5 you've already mentioned, that have been searched by
6 Google for information related to this case?
7    MR. HAMM: I'm going to object that that
8 question is vague.
9    You can answer.
10    THE WITNESS: Pending right now, I don't
11 believe so.
12    MR. BROWN: Q. I don't want to limit it. I'm
13 not limiting my question as to time.
14    A. Well, investigation and discovery is ongoing,
15 so the door is still open.
16    Q. So you mean up to now, you don't know of any
17 other databases that have been searched?
18    A. As of today, I don't know of any other
19 databases that have been searched.
20    Q. Thank you. What other databases, other than
21 those you've mentioned, are you aware of that exist at
22 Google?
23    A. There's a lot of data at Google. Are you
24 asking -- I'm not really sure what you're asking.
25    Q. I'm asking you to identify other databases

10 (Pages 34 to 37)

38

1  that you're aware of at Google, other than those that
2  you've mentioned.
3      MR. HAMM: Objection, vague.
4      You can answer the question, though.
5      THE WITNESS: That are -- I mean, I don't
6  understand why I would identify all of Google's data
7  that is likely not relevant to this action.
8      MR. HAMM: He's entitled to --
9      MR. BROWN: Q. I'm asking you to --
10     MR. HAMM: If you know the answer, you can
11 answer it.
12     THE WITNESS: I couldn't possibly itemize data
13 sets at Google. It's . . .
14     MR. BROWN: Q. I'm asking you to identify
15 those that you are aware of.
16     A. I have to think about it. I guess I can't
17 name other databases, but I know there's other data out
18 there.
19     Q. Have you on other cases looked at other
20 databases?
21     A. I haven't looked at databases.
22     Q. Have you asked others to look at other data
23 sources for you?
24     A. Well, yes.
25     Q. What data sources?

39

1      A. Financial data.
2      Q. Others?
3      A. Patent data, video data, image data. I mean,
4  I could probably go on. I have to think about every
5  case I've worked on to think about this.
6      Q. Well, take a minute.
7      A. Okay. I think those are generally the main
8  categories for cases that involve patent or copyright.
9      Q. Are you aware if Google has searched for any
10 financial data relevant to this case?
11     A. I believe that's in the process. Yes.
12     Q. Have you been involved in that process?
13     A. I've been on communications.
14     Q. And what -- who has been asked for
15 information?
16     A. I believe Jeff Zidell.
17     Q. Anyone else?
18     A. That's the only name that comes to mind.
19     Q. And who is Jeff Zidell?
20     A. Jeff Zidell is a travel vertical manager in
21 the direct sales group.
22     Q. And do you know what accounts he is
23 responsible to manage?
24     MR. HAMM: Objection, assumes facts.
25     MR. BROWN: Q. I'll ask it a different way.

40

1      What are Jeff's job responsibilities, as best
2  you know?
3      A. Well, he has reports from other direct sales
4  representatives that he manages.
5      Q. What additional responsibilities does he have,
6  as far as you are aware?
7      A. I'm not aware of his day-to-day
8  responsibilities as a manager.
9      Q. Do you know if, is he the most senior person
10 in the travel vertical?
11     A. I can't think of who he reports to, but I'm
12 sure there's somebody above him.
13     Q. Do you know the names of those who report to
14 him?
15     A. I know at least one of the names.
16     Q. Who is that?
17     A. Cindy Anstis. A-N-S-T-I-S.
18     Q. Where is Jeff Zidell?
19     MR. HAMM: Objection, vague. Do you
20 mean . . .
21     MR. BROWN: Q. Where does he work?
22     MR. HAMM: Okay, sorry.
23     THE WITNESS: Where -- he works at Google.
24     MR. BROWN: Q. Where? Physically where?
25     A. I actually don't know what office he's at.

41

1      Q. Do you know which client accounts either he or
2  those who work with him are responsible for?
3      A. I know that Cindy's -- I couldn't name them,
4  but Cindy is an American Airlines senior representative.
5      Q. For Google, correct?
6      A. For Google.
7      Q. Yes.
8      A. Correct.
9      Q. What information was asked of Jeff Zidell?
10     MR. HAMM: Objection, calls for
11 attorney-client communications.
12     I'm going to instruct you not to answer.
13     MR. BROWN: Q. Do you know if information was
14 sought by anyone else in the travel vertical other than
15 from Jeff Zidell?
16     A. Yes.
17     Q. Who?
18     A. We're talking about any data or financial
19 data?
20     Q. Let's talk about financial data, and we'll
21 come back to any data after that.
22     A. Well, no. I think the request was asking Jeff
23 if there is any financial data.
24     MR. HAMM: Just be careful --
25     THE WITNESS: Sorry.

11 (Pages 38 to 41)

42

1    MR. HAMM: -- not to testify about any
2  communications --
3    THE WITNESS: Sorry.
4    MR. HAMM: -- that you've had at the request
5  of counsel.
6    MR. BROWN: Q. Do you remember when that data
7  was requested?
8    A. Fairly recently, so within the last few weeks,
9  I believe.
10    Q. Do you know if Mr. Zidell or anyone on his
11  behalf has provided data in response to the requests?
12    A. I believe very recently some data. I have not
13  had a chance to review the data.
14    **Q. Do you know what criteria he was asked to use**
15  **to search for data?**
16    **MR. HAMM: Objection, instruct not to answer.**
17    MR. BROWN: Q. Can you describe generally the
18  quantity of data that he has provided?
19    A. No.
20    Q. Do you know the extent of Mr. Zidell's or
21  someone on his behalf's search for the data?
22    A. No.
23    Q. Do you know what accounts they looked for data
24  concerning?
25    A. No.

43

1    Q. Do you know what date range they used?
2    A. No.
3    **Q. Other than financial data, how would you**
4  **describe with more particularity what he was asked to**
5  **look for?**
6    **MR. HAMM: Objection, and instruction not to**
7  **answer.**
8    MR. BROWN: Q. Do you know if any financial
9  data has been gathered by Google in relationship to this
10  case from anyone who worked within the chief financial
11  officer function or those who reported to the chief
12  financial officer?
13    A. No, I do not.
14    Q. When you say direct sales, what are you
15  referring to?
16    A. As opposed to online sales. So a direct
17  relationship with an advertiser.
18    Q. So some of the sales by Google are done by a
19  direct sales force.
20    A. Correct.
21    Q. And some of the sales by Google are done
22  online?
23    A. Correct.
24    MR. HAMM: And I'll just note for the record
25  that this is outside the scope of the deposition topic.

44

1    MR. BROWN: Q. Did you -- has Google done
2  anything to gather information related to this case from
3  its online sales function?
4    A. I believe there are some folks that we've
5  contacted from the online sales team.
6    Q. And who are they?
7    A. I can't give -- off the top of my head, I
8  can't give names.
9    Q. When were they contacted?
10    A. During the course of the litigation.
11    Q. When, as best you know?
12    A. I don't recall.
13    Q. Do you know if any information has been
14  provided related to online sales?
15    A. I, I can't -- no, I can't say with certainty.
16    Q. Do you know what quantity of information has
17  been provided?
18    A. No.
19    Q. If anything?
20    A. No.
21    Q. And how, if at all, were you involved in that
22  process?
23    A. Through direction of counsel on determining
24  what people, which concerns may have relevant
25  information.

45

1    Q. Doesn't sound like -- let me just -- am I
2  correct in saying that you were not charged with
3  gathering the information from the online sales people?
4    A. I'm saying I can't recall if we've gathered
5  any information from online sales, but we've contacted
6  online sales individuals.
7    Q. Did you contact them?
8    A. I believe I was involved in at least one, one
9  interview.
10    Q. And with whom was that?
11    A. Dan Green --
12    Q. And who is Dan Green?
13    A. -- is his name. I think it's part of the
14  online sales group.
15    Q. When did you contact Dan Green?
16    A. I believe that was in the November time frame.
17    **Q. What did you ask him for?**
18    **MR. HAMM: Objection, instruction not to**
19  **answer.**
20    **MR. BROWN: Q. Did you give him criteria that**
21  **he was to use?**
22    **MR. HAMM: Same objection, same instruction.**
23    MR. BROWN: Q. Did he provide any information
24  to you?
25    A. I believe he provided additional people who --

12 (Pages 42 to 45)

46

1     MR. HAMM: Just, I believe he asked a yes or
2  no question, and if -- were he to ask the question about
3  what kind of communications you had, I would object.
4     THE WITNESS: Can you repeat the question?
5     MR. BROWN: Q. Did he provide any information
6  to you?
7     A. Yes.
8     Q. What did he provide?
9     MR. HAMM: Objection. If you want to ask what
10  documents he provided, if you're asking about what his
11  communications were I'll object first that it's vague,
12  and second, that it calls for attorney-client privileged
13  information.
14     **MR. BROWN: Q. What did he provide to you?**
15     **MR. HAMM: Objection, vague. Objection,**
16  **attorney-client privilege. Instruction not to answer.**
17     MR. BROWN: Not able to answer the question,
18  you're instructing her not to answer the question at
19  all?
20     MR. HAMM: No, my instruction is that you can
21  provide testimony about any documents that were provided
22  to you by Dan Green, but that you are not to testify
23  about any communications, including information that he
24  would have provided in, in such communications.
25     THE WITNESS: I vaguely recall, I hope I'm not

47

1  messing up the name here, that Dan may have provided a
2  list of additional folks in his group.
3     MR. BROWN: Q. Did you follow up with those
4  additional people?
5     A. I believe that process is ongoing.
6     Q. Did you do it? Did you follow up?
7     A. I believe those people were contacted with
8  counsel.
9     Q. Were you personally involved in that?
10     A. I was on the communication.
11     Q. Other than receiving e-mails?
12     A. I was on the communication.
13     Q. Were you in charge of that process?
14     A. In charge . . .
15     Q. Meaning did you initiate the communication.
16  gather that information?
17     A. No.
18     Q. Who did?
19     A. Catherine Lacavera.
20     Q. Can you spell her name for the record, please.
21     A. L-A-C-A-V-E-R-A. Catherine with a C.
22     Q. And do you know if she has received any
23  information, she or anyone else has received information
24  back concerning that request?
25     A. I don't recall.

48

1     Q. I'd like to turn to the custodial databases
2  and ask you what you have done to gather information
3  from the custodial databases.
4     A. You're starting me off with the databases,
5  that's not . . .
6     Q. How do you refer to it?
7     A. It's not really a database. I don't think of
8  it as a database, but I guess maybe an engineer would
9  disagree with that. These are the custodial sources.
10     Q. Custodial sources, okay.
11     What did you do to gather information from the
12  custodial sources?
13     A. We -- I, I submitted a ticket to collect
14  e-mail.
15     Q. What's a ticket?
16     A. A ticket is our system where we can request
17  different departments to handle things for us that I
18  don't have access to.
19     **Q. And what information did you put on the**
20  **ticket? Describe it in general first, and then I'll ask**
21  **you in particular after that.**
22     **MR. HAMM: Okay. I'm going to -- as long as**
23  **the question is focused on the information that was in**
24  **the ticket, which is a communication to other folks at**
25  **Google, I'm going to object to the question as calling**

49

1  **for attorney-client privileged information and instruct**
2  **the witness not to answer.**
3     MR. BROWN: At the moment, I'm asking for
4  generalized information -- headings, fields, those kinds
5  of things. I will ask questions about the particulars.
6  I expect when I ask questions about the particulars, I
7  will get an attorney-client privilege objection and
8  instruction, but at the moment I'm asking about fields.
9     Q. What fields do you have to fill out to give
10  the instructions about what kinds of information to
11  gather? For example, do you provide the names of the
12  custodians whose records are to be gathered?
13     A. Yes.
14     **Q. What else do you ask for, in general?**
15     **MR. HAMM: And you're not asking about the**
16  **particular ticket?**
17     **MR. BROWN: I am asking about the particular**
18  **ticket.**
19     **MR. HAMM: Okay --**
20     **MR. BROWN: General --**
21     **MR. HAMM: I'm going to object that this calls**
22  **for the contents of an attorney-client communication and**
23  **it's privileged, and I'm going to instruct the witness**
24  **not to answer. Whether you're asking generally what was**
25  **included in the communication, or specifically what was**

13  (Pages 46 to 49)

50

```
1   included in the communication? You're entitled to know
2   what the subject matter of the communication was, but
3   beyond that those other details are privileged.
4        MR. BROWN: Q. I believe that's all I'm
5   asking for; I'm asking for the fields. For example, is
6   there a date field, is there a general field, is there a
7   names field that you would fill out saying, Gather
8   information from these sources? Is there a subject
9   field describing generally the subject? That's all I'm
10  asking for, the fields. What are the categories of
11  information that are on this ticket that you have
12  provided?
13       MR. HAMM: Okay, and I'm going to continue
14  with my objection and instruct you not to answer.
15       MR. BROWN: Q. Is there a date field on this
16  ticket?
17       MR. HAMM: Objection.
18       MR. BROWN: Q. Is there a subject field on
19  this ticket?
20       MR. HAMM: Objection.
21       MR. BROWN: Q. Do you identify the litigation
22  that it's concerned about on this ticket?
23       MR. HAMM: You can answer that question.
24       THE WITNESS: Not in a field, but yes.
25       MR. BROWN: Q. Is there a to and from on this
```

51

```
1   ticket?
2        MR. HAMM: Objection, vague.
3    .   MR. BROWN: Q. Do you send it to somebody?
4   Do you have to fill out the person's name that you send
5   it to?
6        A. No. There's a cue.
7        Q. What's a cue?
8        A. A drop down menu and a, it automatically goes
9   to sys operations.
10       Q. Are there any other drop down menus that you
11  use on this ticket?
12       MR. HAMM: Objection, instruction not to
13  answer.
14       MR. BROWN: Q. Are there any criteria that
15  you must provide on this ticket in order for the systems
16  operations group, in this case, to search for
17  information?
18       MR. HAMM: Same objection, same instruction.
19       MR. BROWN: I haven't asked about the
20  particulars. I'm just asking if there are any criteria
21  that are provided.
22       MR. HAMM: Just, I think it would be helpful
23  to go off, if you don't mind, Fred, to go off the
24  record.
25       MR. BROWN: Sure, please. Anytime.
```

52

```
1        MR. HAMM: Just so we're clear, and perhaps to
2   even have a little conference off the record with you.
3        MR. BROWN: That's fine, if that's what you'd
4   like to do.
5        (Recess taken.)
6        MR. BROWN: We've had a brief discussion off
7   the record, and I am going to re-ask some of the
8   questions that I've asked related to what the form looks
9   like, the ticket.
10       Q. I'm not asking at the moment about what
11  information, the precise information that you put into a
12  particular field, but I am going to ask what the fields
13  or categories of information are. So what information
14  is called for in the ticket?
15       A. Subject line, due date, status, cc. The from
16  is already populated.
17       Q. And you told us earlier that the to is a drop
18  down menu?
19       A. It's actually populated for the discovery
20  ticket. It's sys operations.
21       Q. Is this called a discovery ticket?
22       A. Yes.
23       Q. And in this case, how many discovery tickets
24  were filled out, as far as, for Google, for this case?
25       A. Three.
```

53

```
1        Q. Three. Who issued the first one?
2        A. I did.
3        Q. When was that?
4        A. January 11th.
5        Q. Second one?
6        A. February 25th.
7        Q. Third one?
8        A. March 5th. Might be a day or two off on one
9   of those.
10       Q. And what type of information was asked for in
11  the first ticket?
12       MR. HAMM: I'm going to object and instruct
13  you not to answer.
14       MR. BROWN: And if I ask about the types of
15  information requested in the second and third tickets,
16  you'd give the same instruction?
17       MR. HAMM: Yes.
18       MR. BROWN: Q. You issued the first ticket.
19  Who issued the second ticket?
20       A. I did.
21       Q. Third ticket?
22       A. I did.
23       Q. And to whom did you send the first one?
24       A. Sys operations.
25       Q. Second one?
```

14 (Pages 50 to 53)

54

1     A. Sys operations.
2     Q. Third one?
3     A. Sys operations.
4     Q. Did you provide any criteria for the
5  information that was to be looked for?
6        MR. HAMM: And I'm going to object and
7  instruct you not to answer.
8        MR. BROWN: Q. Did you provide any names that
9  were to, names of persons whose e-mail was to be
10  retrieved?
11        MR. HAMM: Same objection, same instruction.
12        MR. BROWN: Q. How many persons' e-mail was
13  to be retrieved?
14        MR. HAMM: Objection, vague.
15        MR. BROWN: Q. How many people, how many
16  e-mail accounts did you ask to be retrieved?
17        MR. HAMM: Same objection, same instruction.
18        MR. BROWN: Q. Did you receive any data back
19  in response to the first ticket dated January the 11th?
20     A. Yes.
21     Q. Can you give me any description of the
22  quantity of data that came back?
23     A. I understand, but haven't verified, if that's
24  okay.
25     Q. Please.

55

1     A. Two hundred gigabytes.
2     Q. And who told you that?
3     A. Chris Millikin.
4     Q. When did he tell you that?
5        MR. HAMM: I'm a little slow on the draw here,
6  but objection to questions about -- first of all,
7  objection to the question, "Who told you that" because
8  that assumes facts not in evidence. And objection to
9  contents of communications between Leslie and people at
10  Google that she made at the instruction of counsel.
11        MR. BROWN: Q. When did Chris tell you that?
12        MR. HAMM: Objection. No, I withdraw the
13  objection.
14        THE WITNESS: At our meeting about a week ago.
15        MR. BROWN: Q. Now. Chris testified in his
16  deposition -- and Mr. Hamm can correct me if he believes
17  I'm misstating this -- that approximately 200 gigabytes
18  of information was provided to an outside service
19  provider, I think he said it was called FIOS. Does that
20  sound right to you?
21     A. Actually, it was sent to Faegre. who is our
22  national discovery counsel.
23     Q. And when was the information send to Faegre?
24     A. With regard to . . .
25     Q. That 200 gigabytes of information.

56

1     A. About third week in January. January 21st.
2     Q. And Chris, Mr. Millikin, rather, said that a
3  week or so ago -- and he was speaking to us last Friday,
4  so he was talking about now what would be almost two
5  weeks ago -- that he learned that there was some
6  conversion problem of some kind in FIOS being able to
7  read the data. Are you aware of that problem?
8     A. Yes.
9     Q. What was the problem, as far as you understand
10  it?
11     A. As far as I understand it, there were file
12  incompatibility issues.
13     Q. Is it your testimony that, as far as you know,
14  Faegre provided the information to FIOS?
15     A. Correct.
16     Q. And then FIOS responded somehow by saying that
17  there was a data compatibility issue?
18        MR. HAMM: Objection, calls for communications
19  between counsel, people working on behalf of counsel,
20  and their agents, their vendors. Instruction not to
21  answer.
22        MR. BROWN: Q. You understand that there's
23  some compatibility issue with the data?
24     A. There was.
25     Q. And prior to the clearing up of that

57

1  compatibility issue, was FIOS able to search the data
2  that was provided?
3     A. I believe with the exception of those
4  incompatible files.
5     Q. How many of the files were found to be
6  incompatible?
7     A. Approximately, I mean, 10 items that were.
8     Q. Ten out of how many items?
9     A. Couldn't tell you total.
10     Q. Was that -- were the 10 items a significant
11  portion of the data?
12        MR. HAMM: Objection, vague.
13        You can answer the question, though.
14        THE WITNESS: I'm not an engineer, so I can't
15  quantify it, so I couldn't tell you if it's a
16  significant amount. It didn't seem to be a significant
17  amount.
18        MR. BROWN: Q. Do you know if FIOS has
19  actually searched the data in any way prior to the
20  compatibility issues being cleared up?
21        MR. HAMM: And objection, vague as to data.
22  Which data?
23        MR. BROWN: The 200 gigabytes of data that
24  she's referring to. The only data that I've been
25  informed has been given to FIOS.

15 (Pages 54 to 57)

62

1    Q.  And how about the second ticket?
2        MR. HAMM: I think you meant the third ticket.
3        MR. BROWN: Q. I apologize, I misspoke. I'm
4    not counting very well today. I didn't get above two.
5        How much data was provided, if any, in
6    response to the third ticket?
7    A.  I do not know.
8    Q.  And by "provided," I mean in response to the
9    ticket within Google.
10   A.  I understood the question.
11   Q.  One of the things, I wanted to make sure we
12   were talking the same language. I asked you sometimes
13   about databases. Sometimes you used the word "data
14   sources"; sometimes you used the word "databases."
15   Would any of your answers change if I had consistently
16   used the word "data sources" for the questions I asked
17   of you earlier? As far as you know.
18   A.  A database --
19       MR. HAMM: It's a yes or no question.
20       THE WITNESS: Oh.
21       MR. BROWN: Q. Yeah.
22   A.  Would, would my answer change?
23   Q.  Would any of your answers change --
24   A.  No.
25   Q.  -- that I asked you before?

63

1    A.  No.
2    Q.  They would remain the same.
3    A.  Yes.
4        MR. HAMM: And I'm just going to object to
5    that question as very broad.
6        MR. BROWN: Q. I'm going to give you a list
7    of names that your counsel has provided to me. It was
8    used as Exhibit 2 with Mr. Millikin.
9    A.  Okay.
10   Q.  Have you seen this list before?
11   A.  This exact exhibit?
12   Q.  Yes.
13   A.  I don't think so.
14   Q.  Is this the list of names that you gave to
15   systems operations to search for their custodial files?
16       MR. HAMM: Objection, calls for
17   attorney-client privileged communication.
18   I'm going to instruct you not to answer.
19       MR. BROWN: Q. Were there any names of
20   custodial files that you asked be gathered and provided
21   that are not on this list?
22       MR. HAMM: Same objection, same instruction.
23   You can ask her if there are any other files that have
24   been collected.
25       MR. BROWN: Q. Were there any custodial files

64

1    other than those identified in Exhibit 2 that were
2    gathered by Google and produced in this case to American
3    Airlines?
4        MR. HAMM: Compound, objection.
5        MR. BROWN: Q. Please answer the question.
6    A.  Yes.
7    Q.  Whose files?
8        MR. HAMM: Same objection.
9        You can answer the question.
10       THE WITNESS: Additional custodians?
11       MR. BROWN: Q. Additional custodians?
12   A.  There -- let's see. There were about 10
13   additional custodians.
14   Q.  Please identify them.
15       MR. HAMM: If you know the answer.
16       THE WITNESS: I can maybe think of a name or
17   two. I don't know all the names on the list.
18       MR. BROWN: Q. Give me all that you are
19   prepared here to give me.
20   A.  Okay. Daniel Dulitz.
21   Q.  Please spell his name?
22   A.  D-U-L-I-T-I-Z.
23       MR. HAMM: And I'm going to just correct the
24   spelling because I think it's wrong. D-U-L-I-T-Z.
25       THE WITNESS: Oh, I had an extra I in there.

65

1    Sorry.
2        Laura Granka, G-R-A-N-K-A; Karen Taylor;
3    Kerry, I think it's Kerry Rodden, R-O-D-D-E-N. How many
4    is that, that I've remembered?
5        MR. BROWN: Q. Four.
6        MR. HAMM: That's pretty good.
7        THE WITNESS: But they're right there. I can
8    kind of see some of these names. I don't want to guess,
9    though.
10       MR. BROWN: Q. Were the four names that you
11   just gave me asked for at a different time than those
12   who are on Exhibit 2?
13   A.  Yes.
14   Q.  When were the files requested for those in
15   Exhibit 2?
16       MR. HAMM: And just, I'm going to object that
17   it calls for attorney-client communication.
18   Instruct you not to answer.
19       MR. BROWN: Q. When were the files requested
20   for the four names you just mentioned to me?
21       MR. HAMM: Same objection, same instruction.
22       MR. BROWN: Q. Have you had -- has the
23   information you requested about the four names you just
24   mentioned to me been provided to you?
25       MR. HAMM: Can you just hang on for a second?

17 (Pages 62 to 65)

**66**

1    MR. BROWN: I can --
2    MR. HAMM: I think I understand the question.
3    You can answer that.
4    MR. BROWN: Q. Let me rephrase.
5    You mentioned four names in asking for
6    information. Has the information you requested about
7    those four persons been provided to you?
8    A. Yes.
9    Q. When?
10   A. Let me clarify. There were four custodians.
11   I don't know if those exact custodians were the ones
12   that were collected, so February 26th.
13   Q. And if you were to look at the tickets --
14   A. Oh, I'm sorry. I take that back. Not -- can
15   I correct myself?
16   Q. Please.
17   A. The data was provided to me for the additional
18   custodians March 11th.
19   Q. If you were to look at the tickets that we
20   have been talking about, would you be able to tell me
21   the names of the files that were requested, the names of
22   the persons whose files were requested?
23   MR. HAMM: I'm going to object because again,
24   you're asking about the contents of an attorney-client
25   communication, and I'm going to instruct the witness not

**67**

1    to answer.
2    MR. BROWN: Q. Which ticket were those four
3    names on? The second ticket, third ticket, first
4    ticket?
5    MR. HAMM: Same objection, same instruction.
6    MR. BROWN: Q. What quantity of information
7    was provided to you related to those four names, if you
8    have an idea?
9    A. I don't.
10   Q. Of the names on Exhibit 2 and those four names
11   that you've mentioned, do you know how much time was
12   spent by the systems operations people in gathering that
13   information? Personal hours or computer hours,
14   whatever, whatever you might know about it.
15   A. I can't quantify it that way.
16   Q. You already told us about 200 gigabytes. Is
17   that the only way that you are able to describe it?
18   A. I know that because that was told to me. I
19   didn't confirm that that was the size of the data.
20   Q. Is there any other way in terms of quantity or
21   time or effort that you know of that you can describe
22   the effort to gather that information?
23   A. No. I'm not an engineer.
24   Q. Do you know Dan Dulitz's title?
25   A. I believe he's a product, project manager.

**68**

1    Q. Do you know what kinds of projects?
2    A. I believe he works with the ads UI.
3    Q. What's the ads UI?
4    A. The user interface.
5    Q. And just so we're both talking the same
6    language, what's the user interface?
7    A. So it's how the page looks to the end user.
8    Q. And Laura Granka, what does she do?
9    A. I believe she's also -- I don't know if she's
10   a product manager. She might be associate manager. I
11   can't recall her exact title.
12   Q. But does she also work in ads UI?
13   A. I believe so.
14   Q. And how about Karen Taylor, what's her title?
15   A. I believe she's a project manager as well.
16   Q. Same group, ads UI?
17   A. Yes.
18   Q. And how about Kerry Rodden? What is her title
19   and where does she work?
20   A. I don't know her exact title. I can't recall.
21   I believe she also worked with the ads UI team at some
22   point.
23   Q. Do you know if Google has gathered any
24   custodial files related to David Dietze, D-I-E-T-Z-E?
25   A. Custodial files from David Dietze?

**69**

1    Q. Yes.
2    A. Not off the top of my head.
3    Q. How about Eric Filler?
4    A. Not off the top of my head.
5    Q. Prashant Feloria, F-U-L-O-R-I-A?
6    A. Not off the top of my head.
7    Q. Lauren Gellman?
8    A. Not off the top of my head.
9    Q. David Green?
10   A. David Green?
11   Q. Yes.
12   A. Not off the top of my head, no.
13   Q. Sarah Hobbs?
14   A. Don't recognize the name.
15   Q. Annie Hsu, H-S-U?
16   A. Not that I recall.
17   Q. Shawn Salmon?
18   A. Not that I recall.
19   Q. This one is going to be very hard for me to
20   pronounce, but I'll do my best. Leshika Samarasinghe?
21   A. The name does not ring a bell.
22   Q. Let me spell it for the court reporter.
23   S-M-A -- I'm sorry. Let me start that name again.
24   S-A-M-A-R-A-S-I-N-G-H-E.
25   Tu Tsao, spelled last name T-S-A-O. Does that

18 (Pages 66 to 69)

70

1   name ring any bells in terms of documents searched for?
2       A.   I know the name.  I don't recall if we've
3   collected documents from Tu.
4       Q.   Do you know David's position, David Dietze's
5   position?
6       A.   It's not ringing a bell.
7       Q.   Is that name familiar to you at all?
8       A.   Ditz, Dietze?
9       Q.   D-I-E-T-Z-E.
10      A.   No, it's not.
11      Q.   How about Eric Filler, is that name familiar
12  to you?
13      A.   It's familiar.  I don't . . .
14      Q.   You don't know what his title is?
15           How about Prashant Fuloria?
16      A.   It's familiar.  I couldn't tell you that
17  person's title.
18      Q.   Lauren Gelman, G-E-L -- Gelman, I'm sorry,
19  G-E-L-I-M-A-N?
20      A.   I don't think that's the right spelling.  I
21  think it's Laura Gelman.  I know the name.  I don't
22  know her title off the top of my head.
23      Q.   And were her files searched, do you know?
24      A.   I don't recall.
25      Q.   David Green, does that name ring any bells

71

1   with you?
2       A.   I think that name might not be right.
3       Q.   Okay.  What do you think it might be?
4       A.   Are you talking about -- I think it's Dan
5   Green.
6       Q.   It may be.
7       A.   Maybe I'm wrong.
8       Q.   I don't know.  Who's Dan Green?
9       A.   Dan Green is -- well, maybe it is David and
10  I'm wrong, but he's one of the OSO folks.
11      Q.   What's OSO?
12      A.   Online sales operations.  He's in the sales
13  team.
14      Q.   Was Dan Green's files retrieved?  Were Dan
15  Green's files retrieved?
16      A.   I believe so.
17      Q.   Do we add that to the four names you've
18  mentioned?
19      A.   You know, I can't recall if his name is . . .
20      Q.   Sarah Hobbs, who is Sarah Hobbs?
21      A.   I don't know who Sarah Hobbs is.
22      Q.   Annie Hsu, H-S-U?
23      A.   Hsu?
24      Q.   Hsu?
25      A.   I can't recall her title.

72

1       Q.   Shawn Salmon?  Don't know the title.
2       A.   I'm actually not familiar with the name.
3       Q.   And then Leshika, whose name I was having a
4   hard time with?
5       A.   I don't think I've ever heard that name.
6       Q.   And then Tu, you do know Tu?
7       A.   I do know Tu.
8       Q.   Who is Tu?
9       A.   Tu is a trademark attorney and a product
10  counsel.
11      Q.   Were his --
12      A.   She.
13      Q.   Excuse me.  Thank you for the correction.
14           Were her files collected, her custodial files?
15      A.   Her custodial files -- I don't recall.
16      Q.   I'm going to give you an organizational chart
17  that was marked, each one, and . . . You can have your
18  own if you like.  This is an organizational chart that
19  was provided by Google in this case.  Have you seen
20  other organizational charts similar to this in terms of
21  having a block diagram on it within Google?
22      A.   Similar.  I don't know that I've ever seen
23  this organizational chart.
24      Q.   Right.  And on what occasions have you seen
25  other organizational charts that were similar to this?

73

1           MR. HAMM:  Objection.  That assumes facts.
2           You can answer the question.
3           MR. BROWN:  Q.  Please answer the question.
4   On what other occasions have you seen organizational
5   charts similar to this?
6       A.   The legal department has organizational
7   charts.  I believe I've seen some sales team
8   organizational charts.  Not many.  The company's not a
9   fan of organizational charts.
10      Q.   But it does have some?
11      A.   I haven't seen these before.
12      Q.   No, no.  It does have some organizational
13  charts --
14      A.   Yes.
15      Q.   -- however?
16      A.   Yes.
17      Q.   Have you done any search for organizational
18  charts for the purposes of finding such organizational
19  charts for this case?
20      A.   I believe so.
21      Q.   And what organizational charts did you find?
22           MR. HAMM:  Objection, form of the question.
23           You can answer.
24           THE WITNESS:  I believe we've contacted the
25  sales team to get organizational charts.

74

1    MR. BROWN: Q. Have any organizational charts
2  from the sales team been provided to you?
3    A.  I don't recall.
4    Q.  When was that request made?
5    A.  I don't recall.
6    Q.  Other than asking the sales team for
7  organizational charts, have you asked for any other
8  organizational charts?
9    A.  I don't recall.
10   Q.  Have you seen other organizational charts in
11 your gathering of information for other cases?
12   MR. HAMM: Can you hang on for just a second?
13   THE WITNESS: Am I supposed to be answering?
14   MR. HAMM: You can answer.
15   THE WITNESS: You told me to hang on.
16   MR. HAMM: I was thinking about whether or not
17 to object, and I'm not going to object to that question.
18   THE WITNESS: Can you repeat the question,
19 please.
20   MR. BROWN: Q. Yes. Have you seen
21 organizational charts when you gathered information for
22 other cases?
23   A.  I believe very seldom.
24   Q.  But you have.
25   A.  Vaguely recall seeing some organizational

75

1  charts.
2    Q.  When you want to find out who somebody works
3  for in Google, how do you do that?
4    A.  Using our directory on our intranet.
5    Q.  What is the directory?
6    A.  What is it?
7    Q.  Yes.
8    A.  It's an intranet home page.
9    Q.  So if, for example, if you put in your name,
10 would somebody --
11   A.  It would show my manager.
12   Q.  It would show your manager?
13   A.  Uh-huh.
14   Q.  Would it also show persons who report to you?
15   A.  Correct.
16   Q.  And how far up in management does it go and
17 how far down in people that might report to you does it
18 go?
19   A.  It would only show my manager and my reports.
20 From there you would have to look further.  If you
21 wanted to see who my manager reports to, you'd have to
22 look up my manager.
23   Q.  So if one were trying to find all the people
24 that worked, for example, in sales, direct sales, you
25 could do that through the directory.

76

1    A.  I don't think that would be simple.
2    Q.  But it could be done.
3    A.  I haven't tried to find everyone who works in
4  direct sales.
5    Q.  How about if we wanted to find out those to
6  whom Jeff Zidell reported, could you look in the
7  directory and figure out to whom he reported?
8    A.  Yes.
9    Q.  And up the chain from there?
10   A.  Yes.
11   Q.  And down the chain from Jeff and below Jeff.
12 You could figure out who reports to Jeff and who reports
13 to others and so forth, all the way down to --
14   A.  I don't know how far down it would go,
15 but . . .
16   Q.  But it would go below Jeff, for example.
17   A.  Yes.
18   Q.  As far as you know.
19       Have you done any of that kind of searching in
20 this case to give us the organizational structure for
21 those, for the information that we have asked for?
22   A.  No.
23   Q.  Taking a look at Exhibit 5, just on the first
24 page, I'm going to ask if you have searched -- and
25 rather than doing it on a person by person, which would

77

1  take a while, I'll just ask you page by page, if you
2  don't mind.
3    A.  Okay.
4    Q.  Have you searched in your gathering of
5  information for this case for the custodial files of any
6  persons on the first page of Exhibit 5?
7    A.  I'm sorry.  Repeat the question, please?
8    Q.  Yeah.  Actually, you know what?  I can --
9  yeah.  Let's do it page by page.
10       In your gathering of information for this
11 case, have you searched for the custodial files of any
12 persons on the first page of Exhibit 5?
13   A.  No.
14   Q.  How about on the second page of Exhibit 5?
15 And the second page is titled "Sales and Operations
16 Organizational Structure."
17   A.  Have I searched for custodial records.
18   Q.  You or anyone at Google.  I mean, you're here
19 testifying on behalf of Google.
20   A.  You've been asking me what I've done.
21   Q.  I asked you, but Google.
22   A.  Just trying to clarify.  Of any of these
23 people?
24   Q.  Yeah.
25   A.  For this case, no.

20  (Pages 74 to 77)

90

1    MR. BROWN: Sure. Absolutely.
2    (Recess taken.)
3    MR. BROWN: Q. Sticking with Exhibit 7, on
4 the third page of the document, which has got a control
5 number -- again the larger print on the control
6 number -- of 127273, there are four hotels, hotel chains
7 that are mentioned towards the top half of the page:
8 Intercontinental Hotel Group; Wyndham, W-Y-N-D-H-A-M;
9 Marriott; Starwood. See those?
10    A. Yes.
11    Q. Did you look for any documents in this case
12 involving any of those hotel groups?
13    A. I don't know.
14    Q. You're not aware that Google did any such
15 searching?
16    A. I'm not aware of any such searching.
17    Q. Okay. When I'm using the word "you," I'm
18 using it as a reference, unless I specifically indicate
19 otherwise, I'm using "you" meaning Google because you're
20 here representing Google.
21    A. Okay.
22    Q. So I'm taking the deposition of Google.
23    A. Okay.
24    MR. HAMM: And that wasn't made clear --
25    THE WITNESS: Earlier.

91

1    MR. HAMM: -- at the beginning of the
2 deposition, so . . .
3    THE WITNESS: At all.
4    MR. BROWN: Q. Are there any answers that
5 you've so far given -- I can go back over them, if need
6 be, but are there any answers so far given that you
7 would change if I were to have used specifically the
8 word "Google" rather than "you"?
9    MR. HAMM: I'm going to object. That's very
10 broad question about a lot of questions and answers.
11    THE WITNESS: Yeah.
12    MR. HAMM: We at one point objected. I raised
13 the point that it wasn't clear if you were talking about
14 what Leslie did or what Google did, and you clarified
15 that it was Leslie when you used the pronoun.
16    MR. BROWN: Q. That suggested to me that you
17 understood before, because this is a deposition not of
18 you personally; this is a deposition of Google. So I
19 can go back over those areas if that's what you want me
20 to do. But I have to have the information that Google
21 has. I don't want the information that solely you have.
22 Google has a responsibility to provide a witness who is
23 able to talk about, in a reasonably knowledgeable
24 fashion the topic that I've designated. You have been
25 chosen as that witness. So I've been asking you

92

1 questions in your capacity as a corporate
2 representative, not as what you know personally. If
3 I've said "personally," I meant personally. If I said
4 "you" or "Google," I meant Google.
5    MR. HAMM: And I'm just going to say that you
6 have, Mr. Brown, at some points, you've used "Google" to
7 ask about things that have happened; at some points
8 you've used "you." We asked towards the beginning of
9 the deposition what you meant when, and you specified
10 that you meant her personally. You don't want you to --
11 I mean, we're not asking you to go back and redo the
12 deposition. You do what you need to do, but . . .
13    MR. BROWN: I will --
14    MR. HAMM: -- your questions were answered in
15 the way that they were asked.
16    MR. BROWN: Q. Okay. Let's go back. When I
17 asked you about data sources that were reviewed -- and
18 now I'll use "Google," if that is clearer for you -- did
19 Google review any data sources other than those that you
20 had mentioned in this deposition today?
21    A. I believe I've identified all the data
22 sources.
23    Q. Have you identified all those persons' files
24 that Google, custodial files that Google has identified
25 and retrieved for production in this case?

93

1    A. We haven't given specific names, but we've
2 talked about custodial files that Google has collected.
3    Q. And the only ones that Google is prepared to
4 identify today are those that you have identified; is
5 that correct?
6    A. If you're asking me to recall specific names
7 and -- unless Klaus has objected I've tried to recall
8 names.
9    Q. And there are no names that Google is prepared
10 to share with us today related to custodial files that
11 Google has searched, other than those that you have
12 testified about today; am I correct?
13    A. I believe that's correct.
14    Q. In terms of the effort that various persons
15 have put forward to gather documents, you have testified
16 about what you know. Is Google prepared to offer any
17 different testimony than that which you have offered in
18 terms of the effort that was expended to gather
19 documents?
20    MR. HAMM: And these questions are very broad
21 again. Objection.
22    THE WITNESS: That's a little broad for me to
23 answer.
24    MR. BROWN: Q. Okay. How much effort did
25 Google put forward in gathering TM team documents? How

24  (Pages 90 to 93)

**94**

1   much effort was expended by Google?
2       A.   I don't know how I'm supposed to -- how much
3   effort?
4       Q.   Hours, people --
5       A.   I can't quantify that.
6       Q.   -- documents?
7           How about in reviewing the ads database; how
8   much effort did Google put forward in reviewing those
9   documents?
10      A.   I can't quantify that.
11      Q.   How about the Beaker documents?
12      A.   Again, you're asking me how much time.  I
13  can't quantify that.
14      Q.   How about Trax?
15      A.   I cannot quantify that.
16      Q.   How many dollars were expended by Google in
17  reviewing any of those data sources?
18      A.   I cannot quantify that.
19      Q.   How much effort was expended in gathering
20  documents from the e-mail custodial databases?
21      A.   I can't quantify that.
22      Q.   How much in terms of people-hours or dollars
23  were expended by Google --
24      A.   I personally don't have knowledge to quantify
25  these questions.

**95**

1       THE REPORTER:  I didn't hear the end of your
2   question, Mr. Brown.
3       MR. BROWN:  Q.   How much in terms of
4   people-hours or dollars were expended by Google in
5   gathering information from the custodial databases?
6       A.   I don't have that information in my head today
7   to tell you that.
8       Q.   What does -- what information does Google have
9   related to that?
10      A.   The question again, please?
11      Q.   Yes.  How much effort was expended by Google
12  in gathering information from the custodial data
13  sources?
14      A.   I can't quantify that.
15      Q.   Keyword tool was another data source that you
16  mentioned.  How much effort has Google expended using
17  the effort and using the keyword tool?
18      A.   I can't quantify that.
19      Q.   How much effort has Google expended in
20  gathering what you suggested was financial data?
21      A.   I can't quantify that.
22      Q.   How much effort has Google expended in
23  attempting to gather information related to
24  organizational charts?
25      A.   I can't quantify that.

**96**

1       Q.   How much has Google expended in these -- for
2   third party reviewers that you have mentioned?  I think
3   you mentioned some contract lawyers working for Faegre.
4   How much time, effort, or money has Google expended in
5   that effort?
6       A.   That data is available.  I don't have that
7   data.
8       Q.   How many discovery tickets have been issued in
9   this case by Google?
10      A.   Three.
11      Q.   Three that you mentioned before.
12      A.   Yes.
13      Q.   That you personally issued.
14      A.   Correct.
15      Q.   The hotel groups I mentioned to you, did
16  Google do any searching for any documents for this case
17  related to those hotel groups?
18      A.   Not to my knowledge.
19      Q.   All right.  You and I have talked about a
20  number of individuals' names.  I went through a long
21  list with you of names and asked you if you had done any
22  searching for any custodial files related to those
23  particular individuals' names.  Would your answers be
24  different if I asked, Has Google done any searching for
25  documents related to custodial files for those people?

**97**

1       A.   To those names that you listed?
2       Q.   Yes.
3       A.   No.
4       Q.   Give you another e-mail string.  Mark as
5   Exhibit 8.
6           (Deposition Exhibit 8 was marked for
7           identification.)
8       MR. BROWN:  Q.   This one begins with document
9   production number, our control number, the large type,
10  127082.  And this one, I believe, is a single e-mail
11  string as it was produced to us.  It ends with 091.
12          I'm going to ask you some questions about the
13  first page.  In the middle of the page under the
14  number 3, it says, "All coordination information will be
15  posted and updated at," and there's a long string, and
16  may I properly call that an index?
17      MR. HAMM:  Objection.
18      MR. BROWN:  Q.   Is that what you would call
19  it?
20      MR. HAMM:  I'm just going to object.  Lack of
21  foundation about her knowledge of this document.
22      MR. BROWN:  Q.   Do you call that address an
23  index?  It begins with http.
24      A.   It's a pointer to a document.
25      Q.   It's a pointer to a document.  Did you --

25  (Pages 94 to 97)

98

1    A.  So.
2    Q.  Do you recall if Google gathered information
3 by going to the place described here, a pointer to a
4 document, to gather information for this case?
5        MR. HAMM: Objection, foundation.
6        THE WITNESS: No, I do not.
7        MR. BROWN: Q.  Now, the lead-in to that
8 address is, "All coordination information will soon be
9 posted and updated at," and then it's got a long address
10 beginning with http://. Do you see that?
11   A.  Yes.
12   Q.  It suggests to me when I read this that that
13 information then can be accessed by others within
14 Google. Is that how you understand it?
15       MR. HAMM: Same objection.
16       THE WITNESS: I'm not certain that that's
17 true.
18       MR. BROWN: Q.  Are there circumstances that
19 you've seen where an address such as this has been
20 provided to a group and the group is invited to go take
21 a look at the document at that address?
22   A.  And they didn't have access?  Is that . . .
23   Q.  That had access, that was giving more than one
24 person access to that document or to that address.
25   A.  I'm sorry.  Repeat the beginning part of your

99

1 question?
2    Q.  Yeah.  Have you, in your working for Google,
3 seen situations in which an address similar to this, of
4 this type --
5    A.  Uh-huh.
6    Q.  -- where more than one person was invited to
7 go look at the document or documents located at the
8 address?
9    A.  Yes.
10   Q.  In what kinds of circumstances?
11   A.  E-mail communication where a link is provided.
12   Q.  And for example, a work group, let's say a
13 sales group, have you seen any sales groups that have
14 shared a common address like that and said, That is work
15 of the group. go look at that document if you want
16 access to it?
17   A.  I don't know in that context.  I'm, I've seen
18 e-mail communications where there's links so that you
19 can look at a document.
20   Q.  So this particular address has Mr. Fuloria's
21 name embedded in the address.  Do you see that?
22   A.  Yes.
23   Q.  And that suggests that it's somewhere on, its
24 an index somehow related to Mr. Fuloria.  Is that how
25 you understand it?

100

1        MR. HAMM: Objection, lack of foundation.
2        THE WITNESS: Yes.
3        MR. BROWN: Q.  Let's look at the next page,
4 which is 127083.  And at the very top it says, "Notes
5 from meeting earlier today." Number 1, "Eric Filler's
6 team will process current list of TM terms (posted at,"
7 and then has a long HTTP address without any person's
8 name in the address.  Do you see that?
9    A.  Yes.
10   Q.  Is that also an index for a location?
11       MR. HAMM: Objection, lack of foundation.
12       MR. BROWN: Q.  As far as you understand it?
13       MR. HAMM: Same objection.
14       THE WITNESS: Yes.
15       MR. BROWN: Q.  Have you seen addresses of a
16 similar type to this where information has been posted
17 and others are invited to go see that information?
18   A.  Yes.
19   Q.  In what circumstances have you seen that?
20   A.  In e-mail communication.
21   Q.  Had you -- do you know if Google has gone to
22 this location to try to find documents that were
23 responsive to requests made in this case?
24   A.  No, I do not.
25   Q.  Now, towards the bottom of this page, the

101

1 words "Redacted" are in there.  Do you see that?
2    A.  Yes.
3    Q.  I'm sure you don't have any personal
4 recollection of what was redacted from there.  Do you
5 know how -- do you know who makes decisions, and I'm not
6 asking you the person's name, but do you know who makes
7 decisions about what information is redacted or kept in
8 a document?
9        MR. HAMM: Objection, vague.
10       MR. BROWN: Q.  In this case.
11   A.  I've never seen this document.
12   Q.  Okay.
13   A.  The review is conducted by our counsel.
14   Q.  Okay.  Thank you.
15       Do you know if Google, in this case, made any
16 attempt to gather information responsive to American
17 Airlines' requests related to the Broad Match
18 functionality of Google's AdWords?
19       MR. HAMM: Objection, vague.
20       MR. BROWN: Q.  Please answer the question.
21   A.  I don't have recollection of the exact
22 request.
23   Q.  And I'm asking this as Google.  Did Google
24 make any attempt to gather information responsive to
25 requests by American Airlines related to the Broad Match

26  (Pages 98 to 101)

102

1  functionality within AdWords?
2      A. I don't recall.
3      MR. HAMM: Objection, vague.
4      MR. BROWN: Q. Do you know how much effort
5  would be required in terms of hours, in terms of
6  persons, in terms of money, that would have to be
7  expended by Google to respond to American Airlines'
8  requests that have been made for information related to
9  the Broad Match functionality of AdWords?
10     MR. HAMM: Objection; vague, ambiguous.
11     THE WITNESS: No, I do not.
12     MR. BROWN: Q. Do you know if Google has done
13  any searching of its Google Analytics for information
14  that's responsive to requests in this case?
15     A. I don't recall.
16     Q. Do you know what Google Analytics is?
17     A. I have a vague understanding of Google
18  Analytics.
19     Q. What is your understanding?
20     A. As it relates to the advertising program.
21     Q. It's some online analysis that's available to
22  advertisers to analyze their AdWords campaign; is that
23  how you understand it?
24     A. That's my limited understanding.
25     Q. What, if anything, did Google do to look for

103

1  responsive information in Google Analytics?
2      A. I do not recall.
3      Q. Do you know if they did anything?
4      A. I don't recall.
5      Q. What's Google's position? Did it look or
6  didn't it look?
7      A. I don't recall, as I sit here.
8      Q. So you're speaking on behalf of Google. What
9  is your testimony on behalf of Google?
10     MR. HAMM: What's the question?
11     MR. BROWN: Q. Yes. What information, if
12  any, did Google look for in response to requests made by
13  American Airlines within Google Analytics?
14     MR. HAMM: Objection, asked and answered.
15     MR. BROWN: Q. You still must answer.
16     A. I do not recall.
17     MR. HAMM: And also, I'm going to object to
18  that last question as vague.
19     MR. BROWN: Q. Show you the next exhibit.
20     She doesn't need it.
21     THE REPORTER: Oh, that's previously marked.
22     MR. BROWN: Q. It's Exhibit 6, which has
23  previously been marked in this case. It was first used
24  with Mr. Millikin. And this is a printout of part of a
25  long spreadsheet that was provided to us by Google. And

104

1  you may have seen it on your computer at the office and
2  not as a printout. But I'm asking you if you have seen
3  information similar to this that was produced to
4  American Airlines in this case by Google.
5      A. Yes, I recall seeing data that looks much like
6  this.
7      Q. And from what database or databases or
8  information sources was this information gathered?
9      A. This appears to be from the ads database.
10     Q. Do you know if gathering this information that
11  was on Exhibit 6 there was any effort to gather
12  information related to Broad Match terms?
13     MR. HAMM: Objection, vague.
14     THE WITNESS: I don't recall.
15     MR. BROWN: Q. Do you know how much effort
16  was expended by Google in gathering the information that
17  is, was provided on Exhibit 6, or the remaining portion
18  of the spreadsheet, which I didn't print because it
19  would have been many pages?
20     A. I can't quantify.
21     Q. What is Google's position -- does Google have
22  a position about how much effort was expended?
23     A. I don't believe we've looked into that in
24  terms of quantifying how much time and resources it took
25  to collect this data.

105

1      MR. HAMM: Can we go off the record?
2      MR. BROWN: Not at the moment. I've not
3  finished my line of questioning here so we may not go
4  off the record.
5      MS. WEXLER: Actually, I think the witness is
6  entitled to take a break whenever she wants to.
7      MR. BROWN: Counselor, you are not
8  representing the witness here; only Mr. Hamm is. I've
9  been polite and I will continue to be polite, but we are
10  not going off the record now until I've finished this
11  line of questioning.
12     Q. We've taken a look at this database, and we
13  have found that there are approximately 75,000 records
14  that have no company name, explicit company name
15  associated with it. Have you done any investigation
16  that relates to how many missing company names there
17  were on the data that was provided to us that was within
18  the information provided, exemplified by Exhibit 6?
19     MR. HAMM: Objection, vague.
20     THE WITNESS: I don't understand the question.
21     MR. BROWN: Q. Did you do anything, did
22  Google do anything to make sure that the information
23  that was provided to American Airlines in this case was
24  complete? And I'm referring to the information that's
25  exemplified by Exhibit 6.

27  (Pages 102 to 105)

**106**

1    A. I, I don't know the answer.
2    Q. Did Google do anything to ascertain whether
3  all company names that it had were reflected in the
4  Excel spreadsheet that was provided to American Airlines
5  in this case?
6    A. I'm not sure what you mean by "all company
7  names."
8    Q. Well, there were, as I said, by our count
9  almost 75,000 names that were missing from the Excel
10 spreadsheet that were provided to American Airlines.
11 Did Google do anything to ascertain whether it had that
12 company names or it didn't have those company names that
13 were missing?
14   A. You're asking about search criteria from the
15 ads database?
16   Q. I'm asking --
17   A. An engineer pulled the data.
18   Q. -- did you, Google, do anything to make sure
19 that all company names that it had were reflected in the
20 Excel spreadsheet that was provided to American
21 Airlines?
22   A. I do not know if that was what was part of the
23 request.
24   MR. BROWN: Okay. I have no problem in taking
25 a break now if you need a break. We can go off the

**107**

1  record.
2    MS. WEXLER: I would like to take a break.
3    MR. BROWN: That's fine. We are not having
4  substantive suggestions discussions the witness about
5  testimony when we are off the record.
6    MR. HAMM: Sure, we are.
7    MR. BROWN: You are not allowed to. It's
8  sanctionable conduct.
9    MS. WEXLER: We know what we're allowed to do.
10   MR. BROWN: Q. I will ask you when you get
11 back what you talked about.
12   (Recess taken; Deposition Exhibit 9 was
13   marked for identification.)
14   MR. BROWN: Let's go back on the record.
15   THE WITNESS: Okay.
16   MR. BROWN: Q. I'm going to ask you about if
17 you talked about the substance of your testimony during
18 your last break.
19   MR. HAMM: I'm going to object that the
20 conversations we had during our last break are
21 attorney-client privileged, and I'm instructing you not
22 to answer that question.
23   MR. BROWN: Q. I'm not asking you what was
24 said. I'm asking you if you talked generally about
25 the -- my question is general. Did you talk about the

**108**

1  subjects that we're covering here in the deposition
2  today with your lawyer during the last break?
3    MR. HAMM: It's a yes or no question. You can
4  answer it.
5    MS. WEXLER: It's the same objection.
6    MR. HAMM: I'm going to continue with my
7  objection, and I'm going to instruct the witness not to
8  answer.
9    MR. BROWN: Q. I have before you the next
10 exhibit in order, which is Exhibit 9.
11   A. Okay.
12   Q. Have you seen this document before?
13   A. No.
14   Q. Let's put the exhibit aside.
15     In other cases in which Google has produced
16 documents related to trademark disputes -- for example,
17 the trademark dispute it had with Geico and American
18 Blinds -- it produced documents in those cases. Am I
19 correct?
20   A. Yes.
21   Q. And those documents had document production
22 numbers on them when they were produced to the other
23 parties; is that right?
24   A. I believe so.
25   Q. Have you ever seen those documents, some or

**109**

1  all of them, produced in those other cases?
2    A. No.
3    Q. Where are those documents stored?
4    A. With counsel.
5    Q. Which counsel?
6    A. I believe Keker handled Geico and American
7  Blinds.
8    Q. Do you know if documents from those other
9  cases were produced in this case?
10   A. Yes, I understand that.
11   Q. Do you know if the document numbers from the
12 previous cases were removed from those documents when
13 those documents were produced to American Airlines in
14 this case? Do you know one way or the other?
15   A. I do not know.
16   Q. If you wanted to see the documents that were
17 produced in the other cases with the document production
18 numbers on them, where would you go?
19   A. I would call counsel.
20   Q. And by counsel, you mean lawyers at Keker?
21   A. Yes.
22   Q. Do you have any online access, does Google
23 have any online access to those documents produced in
24 the other cases?
25   A. Not currently.

28  (Pages 106 to 109)

114

```
1   with Google.
2       Q.  What is the ICS?
3       A.  It's the internal customer support system.
4       Q.  So -- okay.  Thank you.
5           And how does someone in Google access the
6   internal customer support system?
7       A.  Through our password intranet.
8       Q.  Do you sometimes, does Google sometimes take a
9   look at the information within its internal customer
10  support system in relationship to litigation?
11      A.  Yes.
12      Q.  On what occasions have -- has that been done
13  in this case?
14          MR. HAMM:  Objection.
15          MR. BROWN:  Q.  Has Google taken a look at its
16  ICS for purposes of this case?
17          MR. HAMM:  Objection.  I'm going to instruct
18  you not to answer that question.  It's an objection that
19  it's vague and that it's calling for attorney-client
20  communications and work product.
21          MR. BROWN:  Q.  Has Google taken a look for
22  purposes of this case at information within Google
23  Analytics?
24          MR. HAMM:  Same objections.
25          MR. BROWN:  Same instruction?
```

115

```
1           MR. HAMM:  Same instruction, same objections.
2   Your questions are not limited in any way to document
3   collection efforts at this point.  You're asking what
4   we've done potentially to prepare for this case
5   strategically, among many other possibilities, and I'm
6   going to instruct the witness not to answer.
7           MR. BROWN:  Q.  What information is kept
8   within the customer support system, the internal
9   customer support system?
10      A.  Information, it's, it's like I said, it's the
11  interface where the customer service rep can monitor the
12  account.  So billing information, address information.
13  Sometimes advertisers' accounts are managed by a third
14  party advertising company.  So contact information for
15  those parties.  campaign data.
16      Q.  What is campaign data?
17      A.  Campaign data is the campaigns that the
18  advertisers are running and the keywords that they're
19  using for those campaigns.  They identify them as a
20  campaign or an ad group.  So that type of information is
21  in there.  This is an interface so that you can get a
22  quick look at a particular account.  And the advertiser
23  has access to that account with the same interface.
24      Q.  Google has access and the advertiser has
25  access to that information.
```

116

```
1       A.  To only their information, correct.
2       Q.  Does the customer support system have number
3   of clicks on a particular advertisements, for example?
4           MR. HAMM:  Object that this is beyond the
5   scope of the topic of this that you're testifying about
6   today, but you can answer the question, if you know.
7           THE WITNESS:  I believe so, in the campaign
8   management that you can see average click and cost.
9   Again, this is an interface.  This information is in the
10  ads database as well, in a much more detailed and
11  substantive format.  This is just a, a UI.
12          MR. BROWN:  Q.  Can you also, through this
13  interface, take a look at conversions, from clicks to
14  conversions?
15          MR. HAMM:  Objection, vague.
16          THE WITNESS:  I don't know the answer to that.
17          MR. BROWN:  Q.  Is there information kept
18  within ICS related to Broad Match?
19          MR. HAMM:  Objection, vague.
20          THE WITNESS:  I don't know the answer to that.
21          MR. BROWN:  Q.  Now, when you say it's an
22  interface to the ads database, tell us what you mean by
23  that.
24      A.  I already explained that it's where the
25  customer service representative for that account can
```

117

```
1   access the information about the account, about the
2   customer, and the customer can access and monitor their
3   accounts from that UI.
4       Q.  Is Google Analytics provided through that ICS,
5   do you know, just to those customers who sign up for it?
6       A.  I don't know the answer to that.
7       Q.  In what form, or how -- let me rephrase.
8           How is Google Analytics made available to
9   Google's customers for those who sign up to it?
10          MR. HAMM:  Objection that this is beyond the
11  scope of the deposition topic.
12          THE WITNESS:  I don't know the -- I can't
13  answer that.
14          MR. BROWN:  I don't have any further
15  questions.  Thanks very much for your time.
16          THE WITNESS:  Uh-huh.
17          MR. HAMM:  Before -- can we go off the record,
18  and then . . .
19          THE REPORTER:  Is that okay with you.
20  Mr. Brown?
21          MR. BROWN:  Sure, absolutely.
22          (Whereupon, the deposition was
23          recessed and subsequently adjourned
24          At 4:40 p.m.)
25              --oOo--
```

30  (Pages 114 to 117)



V

# DEPOSITION QUESTIONS WHICH GOOGLE'S COUNSEL INSTRUCTED
# LESLIE ALTHERR NOT TO ANSWER

**A. Questions Regarding What Documents or Information Were Requested or Provided**

1. 16:16-17:17: What documents [did you ask for from Alene Latimer on the trademark team]?

2. 17:18-23: Other than following up with Alene [Latimer] to ask her more about training documents, what other kinds of documents did you ask Alene for?

3. 18:22-24: And what did you ask [Robert On, the ads engineer] for?

4. 27:14-18: And what did you ask of Alene [Latimer] related to the Beaker database?

5. 30:21-23: And what did you ask Logan [Hanks, an engineer] for?

6. 35:10-12: And what was Dustin Baker [the software engineer] asked for?

7. 41:9-12: What information was asked of Jeff Zidell [a manager in the travel vertical direct sales group]?

8. 43:3-7: Other than financial data, how would you describe with more particularity what [Jeff Zidell] was asked to look for?

9. 45:17-19: What did you ask [Dan Green, an online sales individual] for?

10. 46:14-16: What did [Dan Green] provide to you?

**B. Questions Regarding Whether Additional Documents or Information Were Requested**

11. 21:11-15: Did [Robert On] provide, did you ask him for any information from an ads database that related to United Airlines, for example?

12. 21:16-17: [Did you ask Robert On for any information from an ads database that related to] Travelocity?

13. 21:18-22: [Did you ask Robert On for any information from an ads database that related to] Orbitz?

14. 21:23-25: [Did you ask Robert On for any information from an ads database that related to] Cheapo Air?

15. 22:1-5: Did you ask Robert [On] for any information related to conversion data?

**C. Questions Regarding What Search Terms or Criteria Were Used to Identify Relevant Documents or Information**

16. 18:25-19:8: In your request to Alene [Latimer] and your request to Robert [On], did you ask them to search for the use of particular terms so that you could determine some relevancy from the documents you were asking them to search for?

17. 25:3-5: And I'm asking you what [search terms were used by Robert On to search the ads database]?

18. 27:19-22: Did you describe to [Alene Latimer] what words you wanted searched for within the Beeker database?

19. 27:23-25: Which words did you ask [Alene Latimer] to search for [within the Beaker database]?

20. 28:1-4: Did you ask [Alene Latimer] to search for terms that Orbitz, for example, [] asked to be put on the Beaker database?

21. 28:5-7: Did you ask [Alene Latimer] for terms that American Airlines had asked not to be used by Google?

22. 28:20-22: Which words [were used to search the Beaker database for information responsive in this case]?

23. 30:24-31:2: Did you give [Logan Hanks] any search terms that he should look for, or other criteria?

24. 35:13-16: Do you know if Dustin Baker was asked to use particular search terms or other criteria to search the keyword tool?

25. 35:17-19: Do you know what terms or criteria [Dustin Baker] was asked to use?

26. 42:14-16: Do you know what criteria [Jeff Zidell] was asked to use to search for data?

27. 45:20-22: Did you give [Dan Green] criteria that he was to use?

**D. Questions Regarding Possible Sources of Information or Possible Obstacles to Information Retrieval**

28. 20:25-21:4: Did the other ads engineers solely refer you to Robert [On] as the source for information about the ads database?

29. 56:16-21: And then FIOS responded somehow by saying that there was a data compatibility issue?

30. 63:14-18: Is this the list of names that you gave to systems operations to search for their custodial files?

31. 63:19-24: Were there any names of custodial files that you asked to be gathered and provided that are not on this list?

32.     65:14-18:  When were the files requested for those [names listed] in Exhibit 2?

33.     65:19-21:  When were the files requested for the four names you just mentioned to me?

34.     114:15-20:  Has Google taken a look at its [internal customer support system] for purposes of this case?

35.     114:21-115:6:  Has Google taken a look for purposes of this case at information within Google Analytics?

**E.    Questions Regarding Types of Information Requested on Discovery Ticket**

36.     48:19-49:2:  And what information did you put on the ticket? Describe it in general first, and then I'll ask you in particular after that.

37.     49:14-50:14:  What else do you ask for, in general [with respect to the particular discovery ticket]? . . . I'm asking for the fields. For example, is there a date field, is there a general field, is there a names field that you would fill out saying, Gather information from these sources? Is there a subject field describing generally the subject? That's all I'm asking for, the fields. What are the categories of information that are on this ticket that you have provided?

38.     51:10-13:  Are there any other drop down menus that you use on this [discovery] ticket?

39.     51:14-18:  Are there any criteria that you must provide on this [discovery] ticket in order for the systems operations group, in this case, to search for information?

40.     53:10-13:  And what type of information [were] asked for in the first [discovery] ticket?

41.     54:4-7:  Did you provide any criteria for the information that was to be looked for [with respect to the discovery tickets]?

42.     54:8-11:  Did you provide any names [] of persons whose email was to be retrieved?

43.     54:15-17:  How many people, how many email accounts did you ask to be retrieved?

44.     66:19-67:1:  If you were to look at the tickets that we have been talking about, would you be able to tell me the names of the files that were requested, the names of the persons whose files were requested?

45.     67:2-5:  Which ticket were those four names on? The second ticket, third ticket, first ticket?

**F.    Question Regarding Possible Coaching of Witness During Deposition Break**

46.     107:16-108:8:  I'm going to ask you about if you talked about the substance of your testimony during your last break. . . . I'm not asking you what was said. I'm asking you if you talked generally about the -- my question is general. Did you talk about the

subjects that we're covering here in the deposition today with your lawyer during the last break?

100428015_3.DOC