

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC., <br><br> Plaintiff, <br><br> -v.- <br><br> GOOGLE INC., <br><br> Defendant. | No. 4:07-CV-487-A |

# PLAINTIFF'S REPLY BRIEF RELATIVE TO ITS MOTION TO COMPEL

| | | |
|---|---|---|
| Dee J. Kelly <br>    State Bar No. 11217000 <br> Dee J. Kelly, Jr. <br>    State Bar No. 11217250 <br> Lars L. Berg <br>    State Bar No. 00787072 <br> KELLY HART & <br> HALLMAN LLP <br> 201 Main Street, Suite 2500 <br> Fort Worth, Texas 76102 <br> Phone: (817) 332-2500 <br> Fax: (817) 878-9280 | Frederick Brown <br>    admitted pro hac vice <br> George A. Nicoud III <br>    admitted pro hac vice <br> GIBSON, DUNN & <br> CRUTCHER LLP <br> One Montgomery St., Ste. 3100 <br> San Francisco, CA 94104 <br> Phone: (415) 393-8200 <br> Fax: (415) 986-5309 | Terence P. Ross <br>    admitted pro hac vice <br> Howard S. Hogan <br>    admitted pro hac vice <br> GIBSON, DUNN & <br> CRUTCHER LLP <br> 1050 Connecticut Ave., N.W. <br> Washington, D.C. 20036 <br> Phone: (202) 955-8500 <br> Fax: (202) 467-0539 |

*Attorneys for Plaintiff American Airlines, Inc.*

944524_1

American has established four important points: (1) Google is withholding discoverable information responsive to American's requests; (2) Google has withheld the requested information for five months since it was requested on January 9, 2008; (3) Burden is not the issue. For the *first time* during this litigation, Google now seeks to explain with facts the basis of its burden objections but these attempts are far too late and completely inadequate; and, (4) Google finally admits that it seeks to withhold from production electronically stored and easily accessible information maintained for itself and its advertisers in AdWords, Google Analytics, or elsewhere.

Google's opposition also incorrectly describes the meet and confer discussions with American. The written record shows that American has spent countless hours seeking to find a resolution to this dispute, but Google conducts discovery in only one way – it unilaterally sets the parameters and ground rules for what it will provide in discovery and requires precision beyond any reasonable measure before it will produce documents. That is not how the discovery process was intended to work.

### A. Google Has The Information Requested.

The declarations of Google employees Mr. Yan in Shanghai (Google App. Ex. E, pp. 22-23; consumer search information available), Mr. Haque in Santa Monica (Google App. Ex. F, pp. 24- 25; keyword information available) and Mr. Baker in Mountain View (Google App. Ex. H, pp. 27-28; sponsored link information available), make clear that Google has the information that American seeks in its discovery requests. Google's Opposition makes that point in a different way when it declares, albeit incorrectly, that: "[i]n some cases, Google *already* has produced all responsive information." Opp. at 1 (emphasis in original). *See also* American App. Ex. P, p. 119 (in which Google admits "Google has access to some of the other information that you request through its Google Analytics program" but refusing to produce it because "it is not

tracked on a keyword basis"). Moreover, Google's opposition makes no attempt to dispute the broad array of responsive information that it maintains and makes available every day for itself and its advertisers. *See, e.g.,* American App. Ex. T, pp. 145-157 (*e.g.,* over 80 reports available for advertisers; *id.* at p. 150).

B.  **Google Has Withheld The Information For Five Months.**

American followed up its January 9, 2008 discovery requests with a long series of in-person meetings, letters, and telephone calls in an attempt to persuade Google to produce the requested information. For example, after a several hour in-person meeting on March 5, American wrote to Google on March 14 re-confirming that Google's spreadsheet, which Google now says was a complete response to Request 11, was inadequate because it did not include "broad match search data; click stream data; landing pages; navigation summaries; funneling; depth of visit; length of visit; measures of customer loyalty; click through rates and/or other data measured and captured by Google or its advertisers concerning consumer responses, such as conversion rate, quality score, or other similar data available to Google and the advertisers responsible for such Sponsored Links." American App. Ex. M, pp. 84-88, at 85. In that same letter, American asked Google to identify the source of the data on the spreadsheet and the meaning of its many column headings, information that was needed to make sense of the data provided. *Id.* at p. 84. Yet despite those efforts and many more, Google produced no information to American, not even the information needed to make its spreadsheet comprehensible, between the date the Second Requests to Produce were served on January 9 and the date American's motion to compel was filed on May 7. There is no dispute on that point. Indeed, Google's opposition does not contend that it produced any information at all as a result of the many meet and confer discussions over that several month period. Google's statement that

American accepted Google's spreadsheet without protest is corrected by Mr. Berg's letter of March 31. American App. Ex. Q, at pp. 122-124.

The information that Google produced on May 9, *after* the motion was filed, was only partially responsive to Request 8. Google, without ever talking to American about providing "test" data, sent American over 500 pages of scanned printouts that contains only 2007 data. Google knew that it was withholding all responsive information for years 2005 and 2006, the years preceding the threat of this litigation and before Google claims to have partially reformed its behavior. Had Google produced data from 2005 or 2006, American believes the data would been more damaging to Google. In any case, American is entitled to information from those years and Google admits it has withheld that data. (Google App. Ex. F, p. 25 at ¶ 7-8).

For the very first time since Request 11 was served five months ago regarding broad match, Google only now, after the motion was filed, claims to have "produced data fully responsive to Request No. 11." Opp. at 5. But Google has not produced fully responsive data; rather, Google attempts to severely narrow Request 11 to match the limited information Google provided 10 days *before* Request 11 was served.

In Request 11, American seeks data on how Google profited from the use of American's marks. One of the ways in which Google profits by using American's marks is by collecting money from advertisers who designate an American mark as a keyword in a Google advertising program. Through its "Broad Match" technology, Google increases the amount of money that it collects for the designated use by serving advertisements, not merely in response to consumer searches for a particular American mark purchased by the advertiser, but in response to user searches for a long list of *related terms* and other American marks not purchased by the advertiser. For example, if an advertiser purchased the keyword "American Airlines" and no

other American mark, Broad Match would serve up that advertiser's Sponsored Links when a consumer searched for "www.aa.com", "AmericansAirlines"[1], "American to Miami", and even "travel."

Google admits in its opposition that it has not provided data about the use of search terms. Opp. at 6 (arguing that keywords and search terms are "two entirely different things."). In defense of this incomplete production, Google claims that American does not seek search terms used by an Internet user or consumer and thus search term information was not provided by Google. Opposition at p. 6. But Google ignores the meet and confer process and the definitions that accompanied Request 11. In the definitions, American defined the term "Broad Match Keywords" broadly to include the above related search terms, among others. American App. Ex. E, p. 48, definition 9. (Defining "Broad Match Keywords" as "terms related to Keywords that Google designates to trigger the Sponsored Link when an Internet user [i.e. consumer]" conducts a search).

Further, even if Google were allowed to ignore the definitions provided by American, it still has not responded fully to Request 11. Under Google's recent interpretation of Request 11, which unfairly narrows the request, Google was required to provide data concerning all Broad-Match-based advertisements for customers that purchased an American mark. If a travel site, for example, purchased the American mark "American Airlines," Google should have provided the requested data about *all* of that travel site's Sponsored Links which were triggered by Broad Matched terms, not only the Sponsored Links that were triggered by the limited number of purchased terms addressed in Google's spreadsheet. In this example, the data withheld by

---

[1] Misspelling is intentional.

Google would show that Google profited not only by the sale of "American Airlines" in the first instance but also by linking American with other Broad Match terms purchased by that travel site.

The information that Google now claims is "fully responsive" to Request 11 (Opp. at 5) was produced on February 1, 2008, 10 days *before* Google responded to Request 11 on February 11. If the information Google produced just 10 days earlier was, in fact, fully responsive to Request 11, its response should have said precisely that. Google's response, however, *says nothing about having already satisfied the request.* American App. Ex. F, pp. 69-72. In fact, although American specifically asked Google about its "refus[al] to produce *any* documents responsive" to Request 11 on February 21 (American App. Ex. I, pp. 73-74, at no time did Google claim that it had already produced all such information. To the contrary, Google affirmatively represented on April 4 that *it could not produce documents responsive to Request 11* because "[s]uch information is not stored in Google's ads database and thus cannot be included in a spreadsheet of data from that database." American App. Ex. S, pp. 134-35. Nevertheless, Google promised that "if we have" responsive data, "and can assemble and access it, we will produce it. . . ." *Id.* Google has not lived up to that promise. No such Broad Match data was forthcoming since the date of that commitment.

American became so frustrated with Google's repeated obfuscations through overly technical definitions that it issued Request 13 in its Third Request for Production on March 17, 2008, and again asked for broad match data. Google App. Ex. I, pp. 29-41, at p. 40, Request 13. That third set fared no better as Google repeated the same objections and provided no data. American soon may need to file another motion to compel.

Google also claims that American did not inform it of the shortcomings of Google's February 1 spreadsheet. Opp. at 9-10. Google is incorrect. *See, e.g.,* American App. Ex. M, pp. 84-85 (March 14 letter detailing problems with Google's February 1 spreadsheet); *id.* Ex. Q, pp. 122-23 (March 31 letter disputing Google's history of its February 1 spreadsheet); *id.* Ex. R, pp. 125-26 (separate March 31 letter disputing Google's substantive defense of its February 1 spreadsheet).

### C. The Information Requested Is Not Burdensome.

For months, Google has steadfastly refused to provide details about what, if any, burden was involved in providing the information requested in Requests 8 and 11. These Requests were served on January 9. American App. Ex. E, pp. 42-54. Google's February 11 objections to Requests 8 and 11 contained nothing more than repetitive, boilerplate and conclusory objections. American App. Ex. F, pp. 69-72. Despite repeated requests over many months from American for details to support those objections, Google provided none until after the motion to compel was filed on May 7. In the interim, Google: (1) had its corporate representative testify on March 20 that Google did not know how much time or effort it had expended or would need to expend in gathering the information American requested (American App. Ex. O, pp. 113-114); and (2) provided a variety of ever changing excuses on why it was not producing responsive information.

In early April, Google's lawyers wrote that *"Google has no documents responsive to [Request 8.]"* American App. Ex. S, p. 135. That declaration of "no documents" was proven false two days after the motion was filed when Google produced over 500 pages of data partially responsive to Request 8. It is inconceivable how Google could represent in April that *no documents* existed that were responsive to Request 8, yet less than one month later reveal reams

of responsive data when faced with a motion to compel. Google's Opposition is silent on this point.

Google also made an incorrect statement that it had no documents responsive to Request 11. American App. Ex. S, pp. 134-35. ("Such information is not stored in Google's ads database and thus cannot be included in a spreadsheet of data from that database."). Google's new and inconsistent position that it produced all responsive information to Request 11 on February 1 is contradicted by its long-standing burden objection. Google cannot in good faith argue undue burden and then abruptly, after the motion was filed, assert that the requested information had been provided long ago, even before Request 11 was served.

Google claims that the data American seeks is "not reasonably accessible" under Rule 26(b)(2). Opp. at 9. But Google's own words show that this is not true. Electronic data is considered "not reasonably accessible" when it resides on backup tapes or in damaged form. *E.g., Zubulake v. UBS Warburg LLC*, 217 F.R.D. 309, 318-320 (S.D.N.Y. 2003); 8 CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2008.1 (2d ed. Supp. 2008). Google, however, has admitted that the data American seeks is in "the Ads Database," (Google App. Ex. H, p. 27) an active, functioning and accessible database. Google provides no basis to conclude that any of the information American seeks is not actively maintained by Google's operational systems.

Even if Google could point to any facts supporting its threshold claim that the data is "not reasonably accessible," facts already in the record show that producing the data would not create an undue burden. Mr. Haque's declaration that it would take an additional 35 hours of an engineer's time to provide the requested information for 2006, shows that with only a little

additional effort, Google could readily respond.[2] To put the amount of Google's claimed burden in context, American has spent over $1,400,000 already on non-attorney expenses related to document production, the great majority of which relates to the production of American's own documents. Indeed, Google has undoubtedly expended more than 35 attorney hours merely in opposing the instant motion.

And even if Google had made a timely and credible showing of undue burden, American has shown good cause to require the production of the requested information. See Committee Note to Rule 26(b)(2)(C). Courts balance a respondent's burden with the propounding parties need based on various factors. See, e.g., Zubulake, 217 F.R.D. at 324 (listing several factors). American has satisfied these factors: (1) it has carefully tailored its requests; (2) Google is the only source of this data; (3) Google's own statements show that the cost of production, which American estimates to be about $1,750 (35 hours of an engineer's time at $50 an hour) is minimal in comparison with the scale of this lawsuit and the vast financial resources available to Google, which has over $12 billion in cash and 17,000 employees worldwide; (4) Google is in the best position to extract the data in an efficient manner; (5) there is no dispute about the importance of the issues in this litigation, which will require Google to change its highly profitable business model; (6) American has made its case that this data is important to its prosecution of this lawsuit: and, (7) Google has made no serious attempt to rebut that case.

---

[2] Mr. Haque's "estimates" are barebones, do not tell the Court the basis for the estimates and are thus not helpful to carry Google's burden. Mr. Yan, who filed a declaration about SQP, does not even provide an estimate of hours of work required to answer American's requests. Instead, he estimates the time period over which the task would take. Further, Mr. Yan's declaration does not comply with 28 U.S.C. §1746 for declarations made outside the United States (Mr. Yan signed his declaration in Shanghai) and may be disregarded.

Google's opposition is strangely silent on an important point: Why did Google wait five months to come up with any facts about burden or fulfillment of its obligations? If the requests truly were burdensome or had been fulfilled, Google should have been more forthcoming with American in the five months since American's requests were served in January. Instead Google put American to an expensive test which ultimately led to this motion to compel.

### D. Google Has Offered No Excuse To Refuse Access To Electronically Stored Information.

Google has described no burden for why it has refused to give American access to the electronic data that is readily available in AdWords, Google Analytics, and elsewhere. Google takes no issue with the fact that this information is readily available and is accessed daily by Google and/or its advertisers. For example, Mr. Yan declares that "Google began offering the SQP to advertisers in June 2007 and it maintains search query data from May 2, 2007 to present." Google App. Ex. E, pp. 22-23, at ¶ 3. As another example, Google's web pages boast that Google Analytics has over 80 reports readily available to advertisers. American App. Ex. T, p. 150.

Google defends its conduct through semantics, weakly arguing that American did not request *by name* any Google Analytics data.[3] Opp. at p. 10. Google, of course, ignores important facts. American raised the issue of Google Analytics repeatedly over several months in meet and confer sessions. See American App. Ex. I, pp. 73-75, at 74, letter dated February 21, 2008 ("This claim [of burden] is difficult to reconcile with Google's own representations that its

---

[3] Google's definition game is not accepted practice. *See* FED. R. CIV. P. 37(a) advisory committee's note (1993) ("Interrogatories and requests for production should not be read or interpreted in an artificially restrictive or hypertechnical manner to avoid disclosure of information fairly covered by the discovery request, and to do so is subject to appropriate sanctions under subdivision (a).").

*'Google Analytics'* program 'tracks all on-line campaigns, from e-mails to keywords, regardless of search engine or referral source'..."); *id.* Ex. M, p. 85, letter dated March 14, 2008 ("[O]ur requests fairly call for the disclosure of broad match search data..."; *id.* Ex. R, p. 126, letter dated March 31 ("Your letter confirms that Google has an easy way to give American access to *Google Analytics* information that has been requested."); *id.* Ex. O, p. 114 (inquiring of Google's corporate representative at deposition: "Do you know if Google has done any searching of *Google Analytics* for information responsive to requests in this case?").

In American's First Request for Production (American App. Ex. A, pp. 1-23), American made several requests for information related to Google's Advertising Programs.[4] Those requests were sufficient to require Google to provide information it maintained in Google Analytics or any other data base, whether or not that function was called out by name. *See* American's motion at 9-10. Google's only defense is that American's document requests did not mention "Google Analytics" by name, Opp. at 10-11. Again, Google seeks to limit its discovery obligations by unilaterally dictating the universe of documents at issue, not by complying in a straightforward manner with American's discovery requests.

---

[4] Request 21 sought "documents sufficient to show calculations and/or estimates of the total amount of revenues, profits, and other consideration that Google has received or expects to receive from the [use] of Trademarks Owned By Third Parties as Keywords..."; Request 28 sought "documents relating to every instance in which any of the American Airlines Marks ..., has been [used] as a Keyword ... including ... the advertisements or "Sponsored Links" triggered by or containing the American Airlines Marks..."; Request 29 sought an array of data related to "each and every Sponsored Link ... that was triggered by a Keyword ... that incorporates one or more of the American Airlines Marks..." Id.

Respectfully submitted,

*[signature]*

Dee J. Kelly (State Bar No. 11217000)
Dee J. Kelly, Jr. (State Bar No. 11217250)
Lars L. Berg (State Bar No. 00787072)
KELLY HART & HALLMAN LLP
201 Main Street, Suite 2500
Fort Worth, Texas 76102
Phone: (817) 332-2500
Fax: (817) 878-9280

Frederick Brown (admitted *pro hac vice*)
George A. Nicoud III (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
One Montgomery St., Suite 3100
San Francisco, CA 94104
Phone: (415) 393-8200
Fax: (415) 986-5309

Terence P. Ross (admitted *pro hac vice*)
Howard S. Hogan (admitted *pro hac vice*)
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, D.C. 20036
Phone: (202) 955-8500
Fax: (202) 467-0539

Attorneys for Plaintiff American Airlines, Inc.

## CERTIFICATE OF SERVICE

I certify that a true and correct copy of the foregoing was delivered on the 21st day of May, 2008 to Defendant's counsel, as follows:

*Via CMRRR #7007 0710 0000 0927 8280*
*and Email*
Joseph F. Cleveland, Jr.
BRACKETT & ELLIS, P.C.
100 Main Street
Fort Worth, TX 76102-3090

*Via CMRRR #7007 0710 0000 0927 8297*
*and Email*
Michael H. Page
Klaus H. Hamm
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704

_____
Lars L. Berg