



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| vs. | § | CIVIL ACTION NO. 4-07-487-A |
| | § | |
| GOOGLE, INC. | § | |
| | § | |
| Defendants. | § | |

## APPENDIX IN SUPPORT OF DEFENDANT GOOGLE INC.'S
## MOTION FOR SUMMARY JUDGMENT

Defendant Google Inc. ("Google") files this, its appendix in support of its motion for summary judgment.

Respectfully submitted,

_____
Joseph F. Cleveland, Jr.
Texas Bar No. 04378900
Richard H. Gateley
Texas Bar No. 07752500
BRACKETT & ELLIS
A Professional Corporation
100 Main Street
Fort Worth, Texas 76102-3090
Telephone: 817/338-1700
Metro: 817/429-9181
Facsimile: 817/870-2265

Michael H. Page
Klauss H. Hamm
Benjamin W. Berkowitz
Ajay S. Krishnan
Ragesh K. Tangri
Rachael Meny

**Vol. II of III**

Dockets.Justia.com

Daralyn J. Durie
Melissa J. Miksch
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: 415/391-5400
Facsimile: 415/397-7188

ATTORNEYS FOR DEFENDANT
GOOGLE INC.

## **CERTIFICATE OF SERVICE**

I hereby certify that on July 3, 2008, a copy of Defendant's Appendix was served on Plaintiff's attorneys of record as follows:

Dee J. Kelly                              **Via Hand Delivery**
Dee J. Kelly, Jr.
Lars L. Berg
Kelly Hart & Hallman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102

Frederick Brown                          **Via First Class Mail**
George A. Nicoud III
Gibson, Dunn & Crutcher LLP
One Montgomery St., Suite 3100
San Francisco, CA 94104

_____
Joseph F. Cleveland, Jr.

| Tab | Description | App. No |
|---|---|---|
| A | Declaration and Exhibits of Doris Joos | APP001-020 |
| B | Declaration of David Baker | APP021-023 |
| C | Email from Courtney Loyd to Peter Bui and Katie Badya dated May 2, 2007 at 4:44 p.m. re Negative keywords – Google campaign | APP024-025 |
| D | Bid engine mail [AAG-TM 000420126] | APP026-027 |
| E | FTC Business Review Letter dated June 27, 2002 | APP028-031 |
| F | Declaration of Rose Hagan | APP032-033 |
| G | Excerpts from Expert Report of Daniel L. Jackson dated June 9, 2007 | APP034-040 |
| H | Expert Report of Kent D. Van Liere, Ph.D., dated May 22, 2008, with Exhibits D and E | APP041-066 |
| I | Excerpts taken from the Deposition of Kent D. Van Liere, Ph.D., taken May 30, 2008 | APP067-098 |
| J | Exhibit 122 to the Deposition of Kent D. Van Liere, Ph.D., taken May 22, 2006 | APP099-128 |
| K | Declaration of Itamar Simonson, Ph.D. | APP129-183 |
| L | 2008-2009 Funjet Wholesale Fare Agreement | APP184-189 |
| M | 2007-2008 Travelocity Wholesale Fare Agreement | APP190-228 |
| N | Cheaptickets Contract [AAG-00353250] | APP229-235 |
| O | Excerpts from the Deposition of Christopher DeGroot taken June 18, 2008 | APP236-239 |
| P | Orbitz Supplier Link Agreement | APP240-275 |
| Q | Email from Julie Woodside to William Alcorn dated April 8, 2008 re: Unauthorized Use of AA Trademarks | APP276-277 |
| R | Excerpts of the American Airlines Complaint filed August 16, 2007 | APP278-284 |
| S | Granados, Grupta and Kaufmann article titled "Orbitz, Online Travel Agents and Market Structure Changes in the Presence of Technology-Driven Market Transparency" | APP285-311 |
| T | Travelocity, 10-K filing for 2000 | APP312-406 |
| U | Sabre Holdings 10-K filing for 2000 | APP407-467 |
| V | ARC Addendum | APP468-473 UNDER SEAL |
| W | ARC Agreement | APP474-543 UNDER SEAL |
| X | Travelocity US Point of Sale Agency Agreement | APP544-550 |



IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | | |
|---|---|---|
| AMERICAN AIRLINES, INC., | § | |
| | § | |
| Plaintiff | § | CIVIL ACTION NO. |
| | § | |
| v. | § | |
| | § | 4-07-CV-487-A |
| GOOGLE, INC., | § | |
| | § | |
| Defendant | § | |

## DECLARATION OF ITAMAR SIMONSON IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT

I, Itamar Simonson, declare that:

1.     I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University.  I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.  My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, survey methods, and human judgment and decision making.

2.     Attached hereto as Exhibit A is a true and correct copy of my Expert Report in this case, dated May 21, 2008, which I adopt as my testimony in this case under penalty of perjury.

3.     Attached hereto as Exhibit B is a true and correct copy of my Rebuttal Report in this case, dated June 9, 2008, which I adopt as my testimony in this case under penalty of perjury.

//

//

//

**DECLARATION OF ITAMAR SIMONSON IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT**
**NO. 4-07-cv-487-A**
420515.01 **Page** 1

APP129

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed in Stanford, California on July 2, 2008.

ITAMAR SIMONSON

**DECLARATION OF ITAMAR SIMONSON IN SUPPORT OF GOOGLE'S MOTION FOR SUMMARY JUDGMENT**
**NO. 4-07-cv-487-A**
420515.01 **Page 2**

APP130

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

                           Plaintiff,

       v.

GOOGLE, INC.,

                Defendants.

Civil Action No. 4-07-CV-487-A

## EXPERT REPORT OF DR. ITAMAR SIMONSON

Ex. A



EXHIBIT

"A"

tabbies®

# EXPERT REPORT OF DR. ITAMAR SIMONSON

## BACKGROUND AND QUALIFICATIONS

1.      I am the Sebastian S. Kresge Professor of Marketing at the Graduate School of Business, Stanford University. A copy of my curriculum vitae, which includes a complete list of my publications, is attached as Exhibit A.

2.      I hold a Ph.D. in Marketing from Duke University, Fuqua School of Business, a Master's degree in business administration (MBA) from the UCLA Graduate School of Management, and a Bachelor's degree from The Hebrew University with majors in Economics and Political Science.

3.      My field of expertise is consumer behavior, marketing management, trademark infringement from the consumer's perspective, survey methods, and human judgment and decision making. Most of my research has focused on buyers' purchasing behavior, the effect of product characteristics (such as brand name, price, features), the competitive context, and marketing activities (such as promotions, advertising) on buying decisions, and trademark infringement.

4.      I have received several awards, including (a) The award for the Best Article published in the *Journal of Consumer Research* (the major journal on consumer behavior) between 1987 and 1989; (b) The "Ferber Award" from the *Association for Consumer Research*, which is the largest association of consumer researchers in the world; (c) The 1997 O'Dell Award, given to the *Journal of Marketing Research* (the major journal on marketing research issues) article that has had the greatest impact on the marketing field in the previous five years; (d) The 2001 O'Dell award (and a finalist for the O'Dell Award in 1995, 2002, 2004, 2005, 2007, and 2008); (e) The award for the Best Article published in the *Journal of Public Policy & Marketing* (the major journal on public policy and legal aspects of marketing) between 1993 and 1995; (f) The 2007 *Society for Consumer Psychology* Distinguished Scientific Achievement Award; (g) The

1

APP132

2002 *American Marketing Association* award for the Best Article in the area of services marketing; and (g) I was a winner in a competition dealing with research on the effectiveness of direct marketing programs, which was organized by the *Direct Marketing Association* and the *Marketing Science Institute*.

5.    I have published three articles relating to trademark surveys and trademark infringement from the customer's perspective, including two in the *Trademark Reporter* and one in the *Journal of Public Policy & Marketing*. The two articles published in the *Trademark Reporter* were: "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test,"[1] and "An Empirical Investigation of the Meaning and Measurement of Genericness".[2] The *Journal of Public Policy & Marketing* article, titled "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications,"[3] was selected (in 1997) as the Best Article published in that journal between 1993 and 1995.

6.    At Stanford University I have taught MBA and executive courses on Marketing Management, covering such topics as buyer behavior, developing marketing strategies, building brand equity, advertising, sales promotions, and retailing. I also taught an MBA course on Marketing to Businesses and a course on High Technology Marketing. In addition to teaching MBA courses, I have guided and supervised numerous MBA student teams in their work on company and industry projects dealing with a variety of markets.

7.    I have taught several doctoral courses. One doctoral course examines methods for conducting consumer research. It focuses on the various stages involved in a

---

[1]  Itamar Simonson (1993), "The Effect of Survey Method on Likelihood of Confusion Estimates: Conceptual Analysis and Empirical Test," Trademark Reporter, 83 (3), 364-393.

[2]  Itamar Simonson (1994), "An Empirical Investigation of the Meaning and Measurement of Genericness," Trademark Reporter, 84 (2), 199-223.

[3]  Itamar Simonson (1994), "Trademark Infringement from the Buyer Perspective: Conceptual Analysis and Measurement Implications," Journal of Public Policy and Marketing, 13(2), 181-199.

2

APP133

research project, including defining the problem to be investigated, selecting and developing the research approach, data collection and analysis, and deriving conclusions. A second doctoral course that I have taught deals with buyer behavior, covering such topics as buyer decision making processes, influences on purchase decisions, and persuasion. A third doctoral course that I have taught deals with buyer decision making. Prior to joining Stanford University, during the six years that I was on the faculty of the University of California at Berkeley, I taught an MBA Marketing Management course, a Ph.D. course on buyer behavior, and a Ph.D. course on buyer decision making. I also taught in various executive education programs, including a program for marketing managers in high technology companies.

8.      After completing my MBA studies and before starting the Ph.D. program, I worked for five years in a marketing capacity in a subsidiary of Motorola Inc., serving in the last two years as the product marketing manager for two-way communications products. My work included (a) defining new products and designing marketing plans for new product introductions, (b) customer and competitor analysis, and (c) sales forecasting.

9.      I have conducted, supervised, or evaluated well over 1,000 marketing research surveys, including many related to trademark, branding, marketing strategies, and advertising-related issues. I serve on eight editorial boards, including leading journals such as the *Journal of Consumer Research, Journal of Marketing Research*, and the *Journal of Consumer Psychology*. I am also a frequent reviewer of articles submitted to journals in other fields, such as psychology, decision making, and economics. I received the Outstanding Reviewer Award from the *Journal of Consumer Research*. As a reviewer, I am asked to evaluate the research of scholars wishing to publish their articles in leading scholarly journals. I have also worked as a consultant for companies and organizations on a variety of marketing and buyer behavior topics. And I have served as an expert in prior litigations involving various marketing and buyer behavior issues,

3

trademark-related matters, false advertising, branding, and other areas. A list of cases in which I provided sworn testimony during the past four years is included in Exhibit B. I am being compensated at my standard rate of $650 an hour.

10.    I was asked by counsel for Google Inc. to conduct a consumer survey in order to determine whether sponsored links triggered when consumers enter in the Google search engine the search term (or query) "American Airlines" cause consumer confusion as to source, affiliation, or permission. I have reviewed the American Airlines, Inc. Complaint in this matter.

4

## SUMMARY OF CONCLUSIONS

11.    Following well-established survey standards, I conducted a survey to estimate the likelihood that consumers, who enter the "American Airlines" search term using the Google search engine, mistakenly believe that triggered sponsored links (a) will take them to the website of American Airlines, (b) are placed by companies affiliated with American Airlines, or (c) placed by companies that received permission from American Airlines. The survey also contrasted consumers who entered the search term "American Airlines" and consumers entering "Airlines" with respect to the likelihood of selecting a sponsored link to purchase an American Airlines ticket

12.    Eight-hundred and four qualified respondents were interviewed in 16 consumer research centers around the country. Regardless whether respondents entered the search term "American Airlines" (half the respondents) or the generic term "Airlines," the search results pages shown to them were the same (except for sponsored links' presentation rotations that were needed to control for possible order effects). In addition to the "organic results" (all associated with American Airlines), each search results page presented three sponsored links selected from those identified as allegedly infringing in American Airlines' Complaint: "Cheap Tickets," "United Airlines," and "Major Airline Deals / Orbitz."

13.    Half of the respondents were assigned to the "short version" of the questionnaire, in which they were asked about the listing that they would select to purchase (a) an American Airlines ticket, (b) a United Airlines ticket, and (c) a Delta Airlines ticket. They were also asked to explain their answers.

14.    The "short version" survey results show that (a) the search term that respondents entered had no effect on the likelihood of selecting sponsored links to purchase an American Airlines ticket or on the likelihood of confusion, and the provided explanations showed no effect of the search term entered on perceptions of the sponsored

5

APP136

links; and (b) respondents were as likely to select the "Cheap Tickets" and "Major Airline Deals" sponsored links to purchase a United Airlines ticket as they were to purchase an American Airlines ticket (and they were much more likely to select these links to purchase a Delta Airlines ticket).

15.     Respondents assigned to the "long version" of the questionnaire first indicated the link they would select to purchase an American Airlines ticket and the link they would select to get to the website of American Airlines. They were then asked questions regarding each of the three sponsored links, including (a) the company to which that link would take them, (b) whether the linked company was affiliated with another company, and if so, the identity of the other company, and (c) whether the linked company received permission from another company, and if so, the identity of the company that gave permission.

16.     The "long version" results again show that the search term ("American Airlines" versus the control term "Airlines") had no effect on the likelihood of selecting a sponsored link or on the likelihood of confusion estimate. Focusing on respondents who indicated that they would select a particular sponsored link to purchase an American Airlines ticket, the likelihood of confusion estimate pertaining to that sponsored link was approximately 0%. Similarly, if we include all respondents (i.e., including also the great majority of respondents who would purchase the ticket from an American Airlines website and would not select any of the sponsored links), the net (after subtracting the "Airline" control) likelihood of confusion estimates for the three sponsored links were well below the "noise" level, with an average (across the three links) of slightly over 2%.

17.     These results lead to the unambiguous conclusion that (a) the use of the "American Airlines" search term does not affect consumers' perceptions of sponsored links, and consumers appear to have a good understanding of what sponsored links are and what they are not; and (b) sponsored links triggered by the "American Airlines" search term do not create any consumer confusion.

6

APP137

## INTRODUCTION

18.    The American Airlines Complaint alleges (page 3) that sponsored links triggered by the American Airlines marks, when those marks are used as search terms with the Google search engine, cause consumer confusion. This hypothesis can be tested using a consumer survey: when a particular American Airlines mark (e.g., "American Airlines") is used as a search term and triggers certain sponsored links, does this use cause consumer confusion whereby they mistakenly believe that the sponsored links will take them to a website of American Airlines or a website that is affiliated with or received permission from American Airlines? By comparing confusion levels when users search for "American Airlines" with confusion levels when the search term is the generic term "Airlines," and keeping all other variables the same, we find (as described below) that the answer is an unambiguous "no."

19.    Of course, consumers who use the Google search engine may recognize sponsored links for what they are, such as advertisements that are relevant to the search term, and nonetheless choose to click on them. Such users are not confused, they are merely making different choices. Indeed, consumers who use the Internet and Internet search engines are routinely exposed to various ads, and consistent with basic principles of consumer learning, they are likely to recognize such marketing efforts. In particular, when using the Internet to obtain information about flights, consumers are likely to expect that flight or travel-related ads will be triggered, consistent with the common experience of Internet users in most other domains. Even in brick-and-mortar stores, consumers who look for brand X are often exposed to information about other brands and products in the same general category. For example, supermarket shoppers who purchase Tropicana orange juice may automatically receive a coupon at the checkout for Minute Maid orange juice. Similarly, consumers seeking out brand name products are regularly presented with cheaper "generic" alternatives (or store branded products) placed alongside them, and they may switch to those alternatives without any confusion. Such

7

APP138

common marketing tactics are based on the simple, familiar marketing practice of targeting competitors' customers. Consumers have undoubtedly come to recognize that marketplace (and web-place) reality. When receiving search results, consumers typically have a choice among various listings and options that are in some manner relevant to the subject of the search, though many of them have no business connection with the search term (e.g., the search term "Airlines" generates listings that relate to travel). Also, if consumers choose to click on a particular listing and then realize that it does not offer the information, service, or price they were looking for, they can easily go back to the search results page.

20.     A straightforward way to test whether sponsored links triggered by the "American Airlines" search term cause consumer confusion is by contrasting consumers' search behavior and perceptions depending on whether the search term entered is an American Airlines mark ("American Airlines") or a generic term (e.g., "Airlines"). Accordingly, the survey tested whether entering "American Airlines" as the search term, rather than a generic term such as "Airlines," increases the likelihood that consumers will select a sponsored link to purchase an American Airlines ticket. This test allows us to determine whether American Airlines' allegation that the fact that sponsored links are triggered by the "American Airlines" trademark causes consumers mistakenly to believe that these sponsored links are affiliated in some manner with American Airlines. If that allegation is correct, then the percentage of consumers clicking on the sponsored links at issue to purchase an American Airlines ticket will tend to be higher when the search term is "American Airlines" than when it is "Airlines."

21.     Consider a consumer who wishes to purchase an American Airlines ticket and enters the "American Airlines" search term, which triggers both "organic" listings and sponsored listings (that appear on the right-hand side or at the top-left, next to the heading "Sponsored Links"). If the consumer selects one of the organic listings to purchase the American Airlines ticket or obtain information about American Airlines

8

flights, his/her perceptions of (the non-selected, probably non-attended) sponsored links are largely irrelevant, because that consumer does not use any of the sponsored links and has likely not paid attention to them. That is, for all practical purposes, such consumers are not influenced by the sponsored links at issue. On the other hand, it is important to examine the perceptions of the sponsored links and any confusion they might create among those who indicate that they would select one of the sponsored links if they wanted to purchase an American Airlines ticket.

22.     However, in the present survey, all respondents (i.e., all those assigned to the "long version" described below, whether or not they indicated that they would select a sponsored link) were also asked about each of the presented sponsored links. That is, even those who did not mention any sponsored link when indicating which listing they would select to purchase an American Airlines ticket (and specifically said they would select one of the organic listings) were still asked questions regarding the affiliation of each sponsored link.

23.     The American Airlines Complaint provides examples of sponsored links that allegedly cause consumer confusion. For the purpose of the present survey, I chose three sponsored links from those identified by American Airlines. These sponsored links represent three types: (a) United Airlines, which is a competitor of American Airlines; (b) Orbitz (with the heading "Major Airline Deals"), which is a leading online seller of airline tickets (and other travel-related services); and (c) CheapTickets.com (with the heading "Cheap Tickets"), which is an example of an online seller of flight tickets that emphasizes its low prices. As described in more detail below, respondents were asked a series of questions about each sponsored link, including the website that the sponsored link would take the users to, any affiliation of that website, and whether it received permission from another company.

24.     A national mall-intercept survey was conducted during April, 2008. The survey respondents were 822 consumers, who had used and expected to use the Internet

9

to search for information about an airline or flights or to purchase an airline ticket, and would consider using a search engine for that purpose. The survey was conducted in a double-blind manner – the interviewers, supervisors, and respondents were all unaware of the purpose of the survey and the identity of its sponsor.

25.     The survey Screener is included in Exhibit C. The Supervisor Instructions are included in Exhibit D. The Interviewer Instructions are included in Exhibit E. The eight versions of the Main Questionnaire are included in Exhibit F. The eight DVDs used (one per version of the questionnaire) are in Exhibit G. Additional materials provided to interviewers and/or supervisors are included in Exhibit H. The interviewing procedure, the screening criteria, and the materials used are described next.

10

## SURVEY METHODOLOGY

### A.     Screening Criteria and Survey Population

26.     To qualify for participation in the study, respondents had to meet the following screening criteria:

(a) they and other members of their household did not work in advertising, public relations, or marketing research, they and did not work for an airline or an Internet search engine company.

(b) during the previous six months they had used the Internet to search for information about an airline or about flights or to purchase an airline ticket, and they expected to do so in during the following six months.

(c) they indicated that they would consider using a search engine to search for information about an airline or about flights or to purchase an airline ticket.

(d) they might fly American Airlines, and they might use the Google search engine.

(e) they had not participated in any survey in the previous 3 months.

(f) they were needed to complete the gender (about 50% male/female) and age quotas; about 50% were between the ages of 18 and 39 and about 50% were 40 years old or older.

(g) those who usually wear glasses or contact lenses when shopping had their glasses or contact lenses with them.

Respondents received $5 for participating in the survey.

### B.     Survey Administration and Interviewing Locations

27.     The data collection was coordinated and managed by Target Research Group, a marketing research company that has had extensive experience in conducting similar mall intercept studies.  The survey was conducted in consumer research centers in 16 shopping malls around the country, including four locations in each of four regions:

11

APP142

| SOUTH: | Atlanta, GA; Boynton Beach, FL; Dallas, TX; Houston, TX |
| NORTHEAST: | Albany, NY; Brooklyn, NY; Cherry Hill, NJ; Woodbridge, NJ |
| MIDWEST: | Chicago, IL; Detroit, MI; Milwaukee, WI; Minneapolis, MN |
| WEST: | Denver, CO; Santa Ana, CA; Seattle, WA; Tracy, CA |

28.    Each survey location received specific instructions for both interviewers and supervisors (Exhibit E). In addition, at the beginning of the survey, I reviewed the Screener and Main Questionnaires with the 16 local supervisors, making sure that they understood the survey questions and interviewing procedures.

C.    Main Questionnaires

29.    The eight versions of the main questionnaire were of two basic types – a "short version" and a "long version." All respondents first entered the search term "American Airlines" or a control search term "Airlines" into a standard Google home page search box, and were then shown the same Google search results page (as described below). Those respondents who were randomly assigned to the short questionnaire version (about half the respondents) were asked about the link they would select if they wanted to purchase an American Airlines ticket, a United Airlines ticket, and a Delta Airlines ticket. Respondents assigned to the longer version were first asked about the link they would select if they wanted to purchase an American Airlines ticket and the link they would select if they wanted to go to the American Airlines website. Next, these respondents were asked questions that were designed to assess the alleged confusion regarding the three presented sponsored links.

30.    A likelihood of confusion survey conducted in the context of litigation must include a control. There were two types of controls in the present survey. First, as indicated, about half the respondents entered the search term "Airlines" rather than

"American Airlines." This control allowed us to determine whether particular responses were due to the use of "American Airlines" as a search term. In addition, as indicated, respondents assigned to the "short version" of the questionnaire were asked about the link they would select if they wanted to purchase a United Airlines ticket and a Delta Airlines ticket (after indicating the listing they would select to buy an American Airlines ticket). As explained below, United Airlines in particular, but also Delta Airlines, served as additional controls.

31.    The interviewer first told each qualified respondent:

"This is a nationwide survey about Internet searches regarding different airlines. I will ask you to type in a search term or name that I will show you. You'll see the page that is seen after a person types in that search term." The interviewer then handed the respondent a card with the word/s "American Airlines" or "Airlines" and asked the respondent to type the search term as it appeared on the card and click the "Google Search" button. The interviewer further said,

> "When the screen comes up with the search results, take as much time looking at the screen as you normally would if you were doing a search like this. Feel free to scroll up or down if that's what you normally would do. Just tell me when you are done.
>
> I will next ask you some questions. First, if you don't know the answer to any question I ask, please don't guess, just tell me you don't know or don't have an answer, and we'll go on to the next question."

The interviewer next asked a series of questions, which (except for the first question) were different in the "short version" and "long version" of the questionnaire. I will review the questions in each version, starting with the short version.

32.    The first question in the "short version" was as follows (in the control version, "American Airlines" was replaced with "Airlines"):

> "1. As you know, using your mouse to click on underlined words will take you to another web page or website. Suppose you wanted to purchase an 'American

13

Airlines' ticket. Without clicking on anything, please move the mouse to put the cursor on the listing on this page that you would have clicked on if you wanted to purchase an 'American Airlines' ticket."

The interviewer recorded the selected listing and asked,

"2. Why did you select this listing to purchase an American Airlines ticket? Any other reason for selecting this listing if you wanted to purchase an American Airlines ticket?"

33.     The same two questions were then repeated with respect to the listing the respondent would select to purchase a United Airlines ticket and Delta Airlines ticket. For example, the first question pertaining to United Airlines was the following:

"3. Now suppose you wanted to purchase a 'United Airlines' ticket. Please move the mouse to put the cursor on the listing on this page that you would have clicked on if you wanted to purchase a 'United Airlines' ticket."

34.     Finally, respondents and interviewers entered the information on the "Respondent Certification" page, which was needed for validation purposes.

35.     The first two questions in the "long version of the questionnaire were the same as in the short versions. Next, respondents were asked,

"3. And where would you click on this page if you wanted to go to the website of American Airlines?

4. What makes you say that the listing you pointed to will take you to the website of American Airlines?"

36.     The next series of questions focused on the three sponsored links, starting with the one appearing at the top-left of the page, followed by the first one on the right-hand side and the one appearing below it. To account for any order effects, there were two versions of the search results page, with the listing "Major Airline Deals" and "Cheap Tickets" appearing either at the top left-hand side or second on the right-hand

14

side (just below the "United Airlines" sponsored link). The same sponsored listing rotation applied to the "test version," in which the search term was "American Airlines," and the "control version," in which the search term was "Airlines."

37. The interviewer told the respondent, "Now I would like to ask you about some of the listings on this page." Then, pointing to the sponsored listing at the top, the interviewer asked the following set of questions:

"5. As you know, if you click on this listing, it will take you to another web page or website. If you know, which company's website will this listing take you to?

6. What makes you say that? Anything else?

7a. If you know, is or isn't (COMPANY NAME MENTIONED IN Q.5) affiliated with any other company or companies?" [Respondents who did not provide a name in Question 5 were asked instead: "If you know, is or isn't the company, whose website this listing takes you to, affiliated with any other company or companies?" Similar rewording was applied to the other questions described below.]

If respondents said "Yes" in Question 7a, they were asked Question 7b:

"7b. With which other company or companies is (COMPANY NAME MENTIONED IN Q.5) affiliated? Is it affiliated with any other company?"

For each company mentioned in Question 7b, respondents were asked Question 7c:

"7c. What makes you say that (COMPANY NAME MENTIONED IN Q.5) is affiliated with (COMPANY NAME MENTIONED IN Q.7b)? Anything else?"

38. Respondents were next asked the same series of questions with respect to the first sponsored listing and then the second sponsored listing on the right-hand side. Finally, respondents and interviewers entered the information on the "Respondent Certification" page, which was needed for validation purposes.

APP146

D.    Analysis and Validation

39.    Completed questionnaires were shipped from the research centers to Target
Research Group. A total of 822 interviews were completed. The questionnaires were
first examined by Target Research Group staff, and five questionnaires were removed
(two respondents indicated in the screener that they would not fly American Airlines; the
indicated question skip patterns were not followed for two other respondents; and the
answers of one respondent were not properly recorded).

40.    A validation survey (see Exhibit I) was conducted by an independent
research firm, Field Solutions of Lighthouse Point, Florida. It was designed to determine
if the interviews were indeed conducted and make sure that the interviewees were
qualified to participate in the survey. The validation firm reached 613 (75%) of all
respondents, a validation rate that far exceeds industry standards. Thirteen respondents
were deleted from the sample based on their answers in the validation survey: seven
respondents said that they did not use the Internet for the indicated purpose, three
respondents said that they had not participated in the survey, and three respondents said
that they would not consider flying American Airlines. These and the other five
respondents were removed from the data, leaving a net sample size of 804 respondents.

APP147

## SURVEY RESULTS

A.    Introduction

41.    As described earlier, respondents who were assigned to the "short version" of the questionnaire were asked about the listing they would select if they wanted to purchase (a) an American Airlines ticket, (b) a United Airlines ticket, and (c) a Delta Airlines ticket.  Respondents assigned to the "long version" of the questionnaire were asked about (a) the listing they would select to purchase an American Airlines ticket, (b) the listing they would select to get to the American Airlines website, and (c) regarding each of the sponsored links, the company to which that listing was linked, whether it was affiliated with another company or companies (and, if so, which company or companies), and whether the linked company received permission from another company or companies.

42.    Given the differences between the "short version" and "long version" of the questionnaires, I will report the main results separately for each version.

B.    Short Questionnaire Version:  Key Findings

43.    The complete survey results for the short version are included in Exhibit J. Table 1 summarizes the key findings based on the 401 qualified respondents who completed that questionnaire version.

17