

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

AMERICAN AIRLINES, INC.,

                Plaintiff,

   v.

GOOGLE, INC.,

                Defendants.

Civil Action No. 4-07-CV-487-A

## DEFENDANT GOOGLE INC'S OPPOSITION
## TO PLAINTIFF'S SECOND MOTION TO COMPEL

Joseph F. Cleveland, Jr.
Richard H. Gateley
BRACKETT & ELLIS
A Professional Corporation
100 Main Street
Fort Worth, TX 76102-3090
Telephone: 817/338-1700
Facsimile: 817/870-2265


Michael H. Page
Klauss H. Hamm
Benjamin W. Berkowitz
Ajay S. Krishnan
Ragesh K. Tangri
Rachael Meny
Daralyn J. Durie
Melissa J. Miksch
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA 94111-1704
Telephone: 415/391-5400
Facsimile: 415/397-7188

ATTORNEYS FOR DEFENDANT
GOOGLE INC.

---

Dockets.Justia.com

# TABLE OF CONTENTS

**PAGE**

TABLE OF CONTENTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

I.  INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.  LEGAL STANDARD . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.  ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.  Google Believes It Has Complied With the Court's Order of
        June 16, 2008 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

        1.  The Court's Order does not provide AA access to all of
            Google's e-mail systems and other databases from which
            Google has already produced responsive information . . . . . . . . . . . . . . . 5

        2.  Google is not overly restricting AA's access to the electronic
            information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

            a.  Without the reasonable limitations proposed by Google
                there is no way to protect irrelevant third parties'
                confidential information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

            b.  Granting AA unlimited access to these databases would
                threaten third parties' private, valuable account information . . . 14

    B.  AA's Claim That Google Failed to Preserve Relevant Documents And Its
        Claim That Relevant Documents Have Been Destroyed Have No Basis . . . . . . 15

        1.  There is no evidence that Google ever destroyed responsive
            documents . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

        2.  There is no evidence that Google destroyed documents . . . . . . . . . . . . 17

        3.  There is no evidence that Google acted willfully or in bad faith . . . . . . . 18

C. The Court Should Deny AA's Motion To Compel Regarding The 12 Requests That AA Never Met and Conferred About Or Does Not Specifically Address In Its Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

D. Google Has Produced and Made Available to AA its Accessible "Broad Match" Data . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

E. Google Will Continue to Produce Technical Documents That Explain The Its Broad Match Functionality . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

F. Google Already Has Notified AA That The Keyword Tool Data AA Demands Does Not Exist . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

G. Google Is Producing Relevant Information About AA's Competitors . . . . . . . . 26

H. Google Has Produced Its Trademarks Studies and Documents About The Appearance Of Its Ads . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

I. Google Will Produce Relevant Documents From Jeffrey Zidell and Relevant OKR's . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

J. Google Has Worked Diligently To Produce The Documents Demanded by AA's Motion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

IV. CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

CERTIFICATE OF CONFERENCE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

CERTIFICATE OF SERVICE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

PAGE

## FEDERAL CASES

*A. Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186, 193 (C.D. Cal. 2006) . . . . . . . . . . . . 18

*Ameriwood Indus., Inc. v. Liberman*, 2006 WL 3825291, *4 - 5 (E.D. Mo. 2006) . . . . . . . . . . . 9

*Cent. Valley Chrysler Valley Jeep, Inc. v. Witherspoon*, 2006 U.S. Dist. LEXIS
    48892 (E.D. Cal. July 7, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Floeter v. City of Orlando*, 2006 WL 1000306, at *3 (M.D. Fla. 2006) . . . . . . . . . . . . . . . . . . . 7

*Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*,
    103 F.3d 1007, 1012-13 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In Re First Plus Financial Group, Inc., Sec. Litig.*, 2002 WL 31415951
    (N.D. Tex. Oct. 28, 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

*In Re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 7, 9

*Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) . . . . . . . . . . . . . . . . . . . 19

*Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 565893 (N.D. Cal. Jan. 5, 2006) . . . . . . . 18

*Malletier v. Dooney & Bourke, Inc.*, 2006 WL 3851151 at *3 (S.D.N.Y. 2006) . . . . . . . . . . . . 19

*Mansel v. Raytheon Co.*, 2003 WL 21752275, *1 (N.D. Tex. 2003) . . . . . . . . . . . . . . . . . . . . . 20

*Menke v. Broward County Sch. Bd.*, 916 So. 2d 8, 11 (Fla. Dist. Ct. App. 2005) . . . . . . . . . . . . 9

*Robinson v. Potter*, 453 F.3d 990, 995 (8th Cir. 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428, 430 (D. Mass. 1993) . . . . . . . . . . . 4

*School-Link Technologies, Inc. v. Applied Resources, Inc.*, 2007 WL 677647
    at *3, 4 (D. Kan. 2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

*Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 2007 WL 1723509, *2 (S.D. Ohio 2007) . . . . . . . . . . . 5

*Slattery v. Precision Response Corp.*, 167 Fed. Appx. 139, 141 (11th Cir. 2006) . . . . . . . . . . . 19

*United States v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002) . . . . . . . . . . . . 18

*Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003) . . . . . . . . . . . . . . . . . . 18

## STATE CASES

*In re Lowe's Companies, Inc.*, 134 S.W.3d 876 (Tex. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

*Texaco, Inc. v. Dominguez*, 812 S.W. 2d 451, 456 (Tex. App. - San Antonio 1991, orig. proceeding) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

## FEDERAL RULES

Fed. R. Civ. P. 26 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 4

Fed. R. Civ. P. 34 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6, 9

Fed. R. Civ. P. 37 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

## OTHER

Local Civil Rule 7.1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20, 21

8 Wright, Miller & Marcus, *Federal Practice & Procedure* § 2008.1 . . . . . . . . . . . . . . . . . . . . . 5

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION

| | |
|---|---|
| AMERICAN AIRLINES, INC.,<br><br>              Plaintiff,<br><br>v.<br><br>GOOGLE, INC.,<br><br>              Defendants. | Civil Action No. 4-07-CV-487-A |

## DEFENDANT GOOGLE INC'S OPPOSITION
## TO PLAINTIFF'S SECOND MOTION TO COMPEL

COMES NOW Defendant Google, Inc. ("Google") and files this its Opposition to Plaintiff's Second Motion to Compel and in support thereof would state as follows:

### I.      INTRODUCTION

Plaintiff American Airlines' ("AA") latest Motion to Compel ("Motion") is yet another attempt by AA to focus this case on discovery disputes in order to deflect the Court's attention away from the dispositive legal issues that should resolve this case in Google's favor. AA's Motion repeatedly claims that Google has completely, and intentionally, abdicated its discovery obligations in this case. That is not correct. Indeed, far from shirking its discovery obligations, Google has already gathered, and produced a vast amount of discovery, including:

- More than 40 millions pages of documents have been collected and reviewed and more than 200,000 pages of documents have been produced in electronic format. To do so, Google has spent over $1.6 million in vendor charges alone, and paid for thousands of hours of document review by its attorneys.

- Google has provided detailed and comprehensive responses to extensive interrogatories, requiring the search for and assimilation of millions of pieces of data.

- Google has devoted hundreds of hours of valuable engineering time, and thousands of hours of computer processing time, to write and process the complicated and specialized computer programs needed to provide AA with the requested information. In short, Google has already made a good faith effort to provide AA with responsive discovery and its good faith efforts are continuing today.

AA's Motion also claims that Google has not complied with the Court's June 16, 2008 Order. But Google has tried diligently to comply with that order, and believes that it has done so. In response to the Court's order, Google provided AA with "live" access to the relevant segments of its Advertising database via the "AdWords" interface and to the relevant segments of its "Analytics" database. This effort has provided AA with information that is vastly *over-inclusive* of the information actually relevant to this case and given AA the information that AA specifically requested in its motion. Google provided AA with access to this information in the only way which ensures that AA can access the data it wants while protecting the "live" database and its information – via a trained Google employee who is available full time to help AA navigate, and access, the relevant data without inadvertently changing it. This is also the only way to provide AA with access in a manner that protects third parties' important privacy rights because, without the trained employee to help navigate these databases, AA could inadvertently access third parties' irrelevant, confidential information. This manner of providing access is no different from making paper documents or a physical object available for inspection under Rule 34. And, although AA now complains that it desperately needs this data, AA only reviewed the databases for two days before it refused to review the data further and AA has now told Google that it has not yet reviewed any of the information it collected during this review.[1] Nevertheless, AA seeks an order permitting it to inspect yet more data.

AA is now also demanding unprecedented, unlimited and unsupervised access to all Google databases and systems where responsive information might be found, even though Google has already produced responsive information from the systems it reasonably believes

may contain responsive data. AA goes so far as to demand that it be able to read <u>all</u> emails sent to or from Google employees because Google has produced some emails that were responsive to AA's requests. But, instead of presenting good cause or legal support for this unprecedented request, AA claims that the Court has already ruled on this motion. Google respectfully disagrees with that characterization of the Court's June 16 Order. AA's first motion did not seek unlimited access to all databases and systems from which responsive information was produced, and Google does not believe that this Court granted such a request. Additionally, AA's demand for unsupervised and unlimited access to numerous Google databases and systems implicates serious confidentiality and privacy concerns for hundreds of thousands of Google's customers and hundreds of millions of its users, none of whom are parties to this suit or to the parties' confidentiality agreement. If AA obtains what it seeks, AA will needlessly expose the business and private information of millions of third parties. There is no justification or legal precedent for the access AA seeks in this case.

AA also claims that Google has not taken "appropriate steps to preserve relevant documents" and that "responsive documents have likely been destroyed through Google's failure to issue timely litigation hold notices". (Motion at 7, 9.) AA's claims of destruction are unsupported. Indeed, although AA's motion selectively quotes, and distorts, the relevant facts and deposition testimony, there is <u>no</u> evidence that Google has <u>ever</u> intentionally destroyed any responsive documents in this litigation. Additionally, AA itself acknowledges that it is not now seeking an order finding any spoliation. App. 195.

With respect to AA's other specific discovery requests, in most cases Google already has produced large amounts of responsive information, and in those areas where AA wants more, Google has been and remains willing to accommodate. More importantly, all of these issues could have been resolved through a good-faith meet and confer process — and in many cases Google thought they were. App. 189-196.

---

[1] *See* App. 190.

---

**DEFENDANT GOOGLE INC'S**
**OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL**
**NO. 4-07-cv-487-A**

In sum, AA's motion should be denied given the facts of this case and the guiding principles that discovery must be limited in proportion to the needs of the case and that discovery should be limited where it "can be obtained from some other source that is more convenient, less burdensome or less expensive." Fed. R. Civ. P.26(b)(2)(C)(i) and (iii). Simply put, AA wants the right to dig through Google's databases and electronic systems, by itself, to find documents, no matter if relevant, despite the fact that its requests implicate serious privacy concerns for third parties, encompass terabytes of data that are equivalent to millions of books, and despite the fact that AA has admitted that it has not yet reviewed the information it has already received. Discovery should not be used as a tactical weapon to impose as much burden on the opposing party as possible. Accordingly, AA's Second Motion to Compel should be denied.

## II.    LEGAL STANDARD

AA may discover information that is relevant to the claim or defense of any party, but the standard of relevancy is "not so liberal as to allow a party to roam in shadow zones of relevancy and to explore a matter which does not presently appear germane on the theory that it might conceivably become so." *Food Lion, Inc. v. United Food & Commercial Workers Int'l Union*, 103 F.3d 1007, 1012-13 (D.C. Cir. 1997) (*quoting In re Fontaine*, 402 F. Supp. 1219, 1221 (E.D.N.Y. 1975)) (*quotation marks omitted*); *accord Cent. Valley Chrysler Valley Jeep, Inc. v. Witherspoon*, 2006 U.S. Dist. LEXIS 48892 (E.D. Cal. July 7, 2006) (attached to Google's Appendix as Exhibit "FF"). Even if some material that is responsive to a request might be relevant, a motion to compel will be denied if the request at issue is overbroad. A party "ought not to be permitted to use broadswords where scalpels will suffice, nor to undertake wholly exploratory operations in the vague hope that something helpful will turn up." *Sacramona v. Bridgestone/Firestone, Inc.*, 152 F.R.D. 428, 430 (D. Mass. 1993) (*quoting Mack v. Great Atl. & Pac. Tea Co.*, 871 F.2d 179, 187 (1st Cir. 1989)). Moreover, the Court may limit discovery if it determines that it is unreasonably cumulative or is obtainable from some other source that is more convenient or less expensive. Fed. R. Civ. P. 26(b)(2).

To this end, Fed. R. Civ. P. 26(b)(2)(C) provides, in relevant part, that:

(C) When [Limitations on Frequency or Extent of Discovery] Required. On motion or on its own, the court must limit the frequency or extent of discovery otherwise allowed by these rules or by local rule if it determines that:

(i) the discovery sought is <u>unreasonably cumulative or duplicative, or can be obtained from some other source that is more convenient, less burdensome, or less expensive;</u>

…

(iii) <u>the burden or expense of the proposed discovery outweighs its likely benefit,</u> considering the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the action, and the importance of the discovery in resolving the issues.

Fed. R. Civ. P. 26(b)(2)(C) (emphasis added). This rule "promote[s] judicial limitation of the amount of discovery on a case-by-case basis to avoid abuse or overuse of discovery through the concept of proportionality." 8 Wright, Miller & Marcus, *Federal Practice & Procedure* § 2008.1. Under the circumstances of this case, AA's demands should be denied.

## III.   ARGUMENT

### A.   Google Believes It Has Complied With The Court's Order of June 16, 2008

#### 1.   The Court's Order does not provide AA access to all of Google's e-mail systems and other databases from which Google has already produced responsive information.

On June 16, 2008, the Court ordered Google to provide AA with "access" to certain electronic information by June 26, 2008. Google understood the Order to be addressed to information that had not been previously provided to AA and thus was the subject of the motion to compel. (*See* Google's Motion for Clarification, Docket # 69.) Contrary to AA's current stance, Google does not believe that either party plausibly understood the Court's order to require unrestricted access to <u>all</u> underlying databases and systems from which any responsive information had previously been produced. That would be an unprecedented, draconian remedy that is not contemplated under the discovery rules and is not what AA requested or briefed in its motion to compel. Indeed, if granted, AA's demand would effectively lay bare the core of Google's billion dollar business and place in jeopardy confidential information for millions of third parties who have entrusted their data to Google.

AA is now trying to rewrite the Court's order as granting unsupervised access to numerous Google databases or systems, each of which contains immense amounts of irrelevant and confidential information belonging to Google, its advertiser customers, and its users. (Motion at 4.) AA's request would inaugurate a new era in discovery practice whereby a party was allowed to rummage through virtually <u>all</u> of an opposing party's files and engage in a massive and disruptive fishing expedition, with no ability to enforce confidentiality obligations and with the added risk of alteration or loss of original sources of data. Just as a party is not entitled to roam freely through an opponent's desk drawers and file cabinets randomly searching through hardcopy documents, a party is not entitled to ransack an opponent's electronically stored information without supervision or limitation. *Scotts Co. LLC v. Liberty Mut. Ins. Co.*, 2007 WL 1723509, *2 (S.D.Ohio, 2007) ("plaintiff is no more entitled to access to defendant's electronic information storage systems than to defendant's warehouses storing paper documents.") (attached to Google's Appendix at Exhibit "GG") Google respectfully does not believe that this is what the Court intended in its June 16 order.

Additionally, Google believes that it has fully complied with the Court's order, for at least the following four reasons:

- ***First***, Google has already produced documents in electronic form, thus complying with the Court's order with respect to that information. Producing electronic copies of electronically stored information is sufficient to meet one's discovery obligations under F.R.C.P. 34. *See* F.R.C.P. 34 (b)(ii). Google is not aware of any authority – nor has AA cited any – for the proposition that a party must provide direct login access to underlying databases and systems from which responsive information has *already* been produced. *See* F.R.C.P. 34(b)(2)(iii) ("A party need not produce the same electronically stored information in more than one form.")

Indeed, AA's first motion to compel specifically requested access to databases from which Google had <u>not</u> produced responsive information because responsive "information d[id] not exist in a preexisting format or document" and because AA claimed that this was the only way it could obtain such information. App. 13-14. Similarly, AA's prayer for relief asked the

Court for access to electronically stored information "either by giving AA access to this information directly *or by providing AA a copy of this information in a reasonably usable form.*" *Id.* at 18. (emphasis added) . This necessarily excludes those databases from which Google had already collected responsive electronic documents. Thus, because Google has previously produced documents in a reasonably usable electronic form, Google believes that it has already complied with the Court's order as to that information.

- **Second**, AA's unprecedented demand for access to all of Google's databases or systems creates a new method of discovery, not envisioned by the rules, whereby a party can log directly into an opponent's computers and databases gaining instantaneous access to documents regardless of: (i) relevance; (ii) privilege; (iii) confidentiality or privacy concerns; (iv) the risk of inadvertent alteration or destruction of original data sources or systems; and (v) the inability of the affected party to record what data was produced and consequent inability to enforce the opposing party's confidentiality obligations. Granting AA's demand would eviscerate the restrictions and safety mechanisms built into the discovery rules, and would expose vast amounts of irrelevant, privileged, and competitively sensitive information to AA's unrestricted review.[2] And, AA is making this extraordinary demand without having made a sufficient showing to the Court that the information: (i) is responsive to AA's requests for production; (ii) is not duplicative of what Google is providing through AdWords and Analytics, or, if it is not, why it cannot be obtained through the normal course of discovery; or (iii) falls within the scope of the Court's order. (Motion at 2-7.) Discovery simply does not work this way, and Google is not aware of any case where a court has come close to awarding the scope of access that AA is now demanding. *See Texaco, Inc. v. Dominguez*, 812 S.W.2d 451, 456 (Tex. App. - San Antonio

---

[2] For example, AA is demanding access to Google's company wide e-mail system, which would give AA and its lawyers the ability to sift through all emails for each of Google's thousands of employees, including emails that contain confidential and privileged communications that have nothing whatsoever to do with this case. (Motion at 4). AA also wants complete access to the Ads Database, which contains multiple terabytes of data (more than is currently in print at the U.S. Library of Congress) covering every aspect of Google's advertising business. App. 68-69, ¶ 5-8. This database is the primary database that Google uses to run its advertising business and contains information that is highly proprietary and not available to the public. *Id.* at 68-69, ¶ 6,

**DEFENDANT GOOGLE INC'S**
**OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL**
420975.01 **NO. 4-07-cv-487-A**                                                          **Page 8**

1991, orig. proceeding) ("[T]o permit an adversary to search through its opponent's files exceeds the bounds of permissible discovery." ); *In re Ford Motor Co.*, 345 F.3d 1315, 1317 (11th Cir. 2003) ("Rule 34(a) does not give the requesting party the right to conduct the actual search.") (emphasis added); *Floeter v. City of Orlando*, 2006 WL 1000306, at *3 (M.D. Fla. 2006) (refusing plaintiff access to defendant's hard drives because the drives would contain information not relevant to the case and stating that Rule 34 "does not give the requesting party the right to conduct the actual search.") (Attached to Google's Appendix at Exhibit "HH."

Additionally, Google is not the only party who would suffer irreparable harm if AA's proposal is granted. The databases at issue contain highly sensitive and competitive information for hundreds of thousands of Google's customers, some of whom are AA's direct competitors, and the vast majority of whom have no data related to AA's discovery requests or claims. Granting AA unfettered access to all of these systems would override the privacy rights of these third parties – an unacceptable fallout given AA's needs in this case.

- *Third*, AA is severely distorting the scope of relief requested in its first motion to compel. In the May 7, 2008 Motion to Compel, AA indicated that what it was seeking under Rule 34 was access to the "databases" that Google offers to its advertisers regarding those advertisers' campaigns. The Motion states that AA seeks the "dynamic databases that ... Google's advertisers are given every day access to," and that AA wants "direct access to *these* electronic databases." App. 14 (emphasis added). This is precisely what Google has provided by giving AA access to the AdWords interface and the Analytics databases.[3] These are the

---

9, 10.

[3] AA's claim that it "made clear" to Google what information it was seeking "access" to is disingenuous. (Motion at 2.) Despite admittedly being aware on May 22, 2008 of the litany of databases searched by Google for responsive information in this case, AA did not claim a right to access these databases under the Court's order until June 25, 2008, the day before Google had to give AA access to the databases. (Motion at 3 – 4.) Further, during the parties' June 20, 2008 meet and confer over the scope of the Court's order, Google explicitly told AA that it construed this Order to require access to the AdWords and Analytics databases. App. 54-56. AA did not inform Google of its disagreement with this position until its June 25 letter, when, the day before Google's deadline to comply, AA first claimed that the order was not limited to AdWords and Analytics data. *Id.*

---

primary sources of information for advertisers relating to Keyword advertising with Google. App. At 68-69, ¶¶ 5-8, 11; App. At 64, ¶¶ 3, 6. Access to these systems includes access to Keyword Tool functionality, discussed in AA's Motion. App. At 176, ¶ 5-6.

Similarly, the only databases even mentioned in AA's papers are "Google Analytics" and "AdWords," and AA highlighted for the Court that it had requested "Google Analytics repeatedly ... in meet and confer sessions." App. At 50. As these were the only databases even mentioned by AA in its moving papers, these are the databases Google made available in response to the Court's order. When it became clear that the parties disagreed over the scope of the Court's order, Google promptly filed a motion for clarification in order to ensure that it was in compliance with the Court's intentions. (*See* Google's Motion for Clarification, Docket # 69.) Thus, AA's claim that Google should somehow be sanctioned for violating the Court's order is unfounded.

Nevertheless, in an effort to avoid further dispute or the need for Court intervention, Google asked AA on numerous occasions to identify any additional databases it believed were covered by the Court's order. In response, AA simply sent Google a laundry list of <u>all</u> the Google databases and electronic systems that any witness in this case has ever mentioned, and claimed that AA must be given access to "such" systems. *See* App. At 54-56. While Google has already made and is fully prepared to continue to make a reasonable universe of information available to AA, AA's demands for more go too far. AA is not entitled to such a broad array of confidential, privileged, and irrelevant information.

• ***Fourth***, and finally, courts routinely place limits on a party's improper and unjustified fishing trips where, as here, the discovery sought places dramatically more burden upon the adversary and the legitimate interests of third parties than the value of the information warrants. *See In re Lowe's Companies, Inc.*, 134 S.W.3d 876 (Tex. 2004) (rejecting as overbroad discovery order which allowed one party access to the other side's database without any limitation as time, place or subject matter.) Moreover, courts may narrow discovery requests that go far beyond a plaintiff's legitimate needs and amount to a massive invasion of a

defendant's business affairs. *See, e.g., Ameriwood Indus., Inc. v. Liberman*, 2006 WL 3825291, *4 – 5 (E.D. Mo. 2006) (holding that Rule 34(a) does not give the requesting party the right to search through all of the responding party's records and setting forth an extensive process for accessing an opposing party's computer hard drives to ensure privacy) (attached to Google's Appendix at Exhibit "II"); *Menke v. Broward County Sch. Bd.*, 916 So. 2d 8, 11 (Fla. Dist. Ct. App. 2005) (appeals court quashed subpoena granting unfettered access to computer because such access was overbroad where it exposed confidential, privileged information to the opposing party). The Court should not permit AA's unjustified and costly fishing expedition search through Google's systems and databases when the reasonable, relevant responsive information has been or will be produced.

> **2.      Google is not overly restricting AA's access to the electronic information.**

In addition to demanding access to all Google databases or systems where responsive information might be found, AA is also claiming that its access must be "unlimited" and unsupervised by Google. (Motion at 5-6.) Again, AA's position is completely divorced from the rules of discovery, as it ignores the unbroken chain of authority cited in Google's Motion for Clarification holding that "Rule 34(a) does not grant unrestricted, direct access to a respondent's database compilations." *In re Ford Motor Co.*, 345 F.3d at 1316. Indeed, such unfettered access would allow AA to review vast amounts of sensitive and competitive information belonging to hundreds of thousands of third parties whose data has <u>nothing to do</u> with this lawsuit. App. At 70, ¶¶ 14-17;  App. At 64-65, ¶¶ 6-8, 11.  More importantly, AA's request for "unlimited" and unsupervised access to these databases would, essentially, give AA unlimited access to its competitors' information and a means by which it could inadvertently change such information. App. At 71-72, ¶¶ 19-22; App. At 65, ¶ 12; App. At 54-56. The risks inherent in allowing AA unfettered access to database information that AA can inadvertently alter during its review cannot be underestimated and are not, as AA claims, a "false specter." (Motion at 6.)  Rather,

giving AA the ability to make inadvertent changes to third parties' accounts, which Google

would not be able to detect and repair in real time, could cause irreparable harm to third parties'

online businesses, as well as to Google's proprietary databases, and expose Google to liability to

third parties whose accounts were altered. App. At 71, ¶ 21; App. At 65, ¶ 12. For example, if

an advertiser has a current bid of .10/click, and AA inadvertently changed it to $10/click, that

advertiser could then make a claim against Google that it had been overcharged. Not only that,

but every other advertiser bidding against that advertiser could argue that it might have been

overcharged too. These risks are actual and severe, and totally unnecessary.

Given these issues, Google has carefully considered how to provide AA with the required

access to these databases, while ensuring that AA does not inadvertently harm third parties'

accounts or the databases themselves, and does not access irrelevant information over which

third parties have a valid right of privacy. Google is now:

- Providing AA with access to the information that is located via the AdWords interface and in the Analytics databases concerning the accounts for the 55 advertisers about whom AA seeks discovery;

- Offering AA access to these databases at AA's counsel's offices in San Francisco, California, rather than requiring AA to travel to Google's counsel's offices, or Google's headquarters;

- Giving AA access to these databases using a trained Google employee who is available full time to help AA navigate through the databases; and

- Giving AA the ability to print and/or save the data as desired, limited only by the databases' own technological limitations. Google then promptly provides that information to AA, labeling such information under the Confidentiality Agreement and ensuring that Google has a copy of what is produced.

App. (*See* 6/26 Tangri Ltr.)

Having a trained and knowledgeable Google employee assigned to provide AA with

access to these databases and to assist AA in locating the relevant responsive information is the

most reasonable way to provide AA access, while ensuring that Google can also protect the

databases and the third party information contained therein and enforce AA's confidentiality

obligations. App. At 70-72, ¶¶ 14-22; App. At 65, ¶ 11. AA's claim that this supervision

somehow invades its counsel's "mental impressions and thought processes" is baseless, as evidenced by AA's total lack of support for this claim. (Motion at 6.) Google has given AA the ability to copy and print whatever data it wants, which its attorneys can then review and discuss at their leisure. There is no discovery rule which also gives AA the right to conduct the actual search in secrecy.

        **a.     Without The Reasonable Limitations Proposed By Google, There Is No Way to Protect Irrelevant Third Parties' Confidential Information.**

Although AA has informed Google that it seeks information from 55 specific advertisers' accounts,[4] both the AdWords interface for the Advertising database and the Analytics databases contain account information for more than hundreds of thousands of third parties. App. At 68-69, ¶¶ 4, 8; App. At 64, ¶ 4. As Google has explained to AA multiple times, it is not technologically possible for Google to provide AA with the full "access" that AA demands, without also providing AA with access to vast amounts of competitively sensitive, third party information that is wholly irrelevant to this litigation.[5] App. At 54-56; App. At 64-65, ¶¶ 6-8; App. At 70, ¶¶ 15-16. This is an especially significant problem because many of the 55 advertisers with information that AA seeks to review are AA's direct competitors.

For AdWords information, for example, Google cannot provide AA with direct access to the 55 named advertisers' AdWords accounts without providing AA with access to <u>all</u> of the information held in these third parties' accounts. App. At 70, ¶¶ 15-17. This unnecessarily intrudes on these third parties' legitimate business interests and privacy rights, given that the

---

[4] For these 55 advertisers, Google has been able to obtain contact information for almost all of these advertisers and has sent notifications to those that it has contact information for in order to notify them that AA will be accessing their information in these databases. Some of these third parties have informed Google that they object to providing AA with this data. *See e.g.*, App. At 58-59.

[5] Moreover, because of the dynamic manner in which these databases work, Google cannot simply extract from the database the accounts for the 55 advertisers listed by AA, and provide AA with a disk, or smaller database, with just these accounts. App. At 65, ¶ 11; App. At 70, ¶¶ 16-17.

underlying Advertising database is also the primary database for storing many other types of information unrelated to AdWords accounts or ads, including, for example, data related to products not yet launched, transient data types used for internal processing purposes, AdSense data, data related to the operation and configuration of applications, Google print, and experimental auctions. App. At 69, ¶ 8. This is highly sensitive and confidential data from third parties and Google's ability to maintain the confidentiality of this data is core to Google's business model and success. App. At 69, ¶¶ 9-10; App. At 58-59.

Similarly, with respect to the Analytics database, there are numerous different categories of competitive information contained within each user's account, only a tiny portion of which is even arguably relevant to this case. App. At 64, ¶¶ 6-7. Thus, for example, an Analytics user's accounts can contain wholly irrelevant information regarding a third party's products and competitive strategies, such as aggregated information about visits to a third party's own websites, including the typical geographic locations of its visitors or how long was typically spent on a website. App. At 64, ¶ 8. Google does not maintain these third parties' websites and thus is not in a position to disclose such information. Moreover, the accounts contain detailed analysis about access to these third-parties' websites by means other than Google – such as through other search engines – which are clearly not at issue in this case. Any such information cannot be disclosed because, beyond being irrelevant to this case, it is confidential and proprietary competitive information belonging to third parties.

By way of analogy, AA's demand for complete access to a third-party's entire Analytics account is analogous to a demand that a financial institution like Charles Schwab provide complete access to every account maintained by a particular individual simply because one account for that person included one trade that was relevant to the case. This is such a broad and overreaching request as to warrant a simple denial – not a grant of unfettered access.

Finally, Google must maintain some degree of control over access to its confidential information, and that of third parties, in order to protect its rights under the parties' Confidentiality Agreement. If AA were allowed direct and unfettered access to these databases, there would be no way for Google to know what data had been copied by AA's attorneys and no way for Google to protect its rights – and those of third parties who entrust Google with their confidential information –under this agreement. Moreover, the third parties, for whom the burden analysis is heightened because they are not even parties to the present dispute, are not even privy to confidentiality agreement that AA wrongly claims protects their interests.

### b. Granting AA Unlimited Access to the These Databases Would Threaten Third Parties' Private, Valuable Account Information.

AA's discovery demands must also be curbed in order to protect the rights of third parties who are not part of this litigation. Google has placed only minimal, reasonable restrictions on AA's access to databases in order to ensure that AA can examine, but not inadvertently modify or delete, any information in the databases.

As to the AdWords account information, Google does not have the ability to provide AA (or any third party user) with complete access to the AdWords accounts in a "read only" manner, *i.e.* in a manner that would allow AA to view other companies' account information but not allow AA to make changes to the information contained within any of the accounts that it views. App. At 71, ¶ 19. If AA were inadvertently to somehow make unauthorized changes to a third party's data during its review, such changes could cause severe damages to the third party's and to Google's business. App. At 71, ¶ 21.

Similarly, as to the Analytics database, Google does not currently have the ability to provide AA with limited access to the relevant parts of the database, while also ensuring that AA cannot make changes to the information contained in the database. App. At 65, ¶¶ 11-12. And again, if AA were to inadvertently alter third parties' data during its review, it could be very costly and require extensive remedial efforts. *Id.* at ¶ 12.

For both of these databases, Google does not have a reasonable, economically feasible way to ensure that, if AA has unfettered and unsupervised access to the databases, AA does not make any changes to any account information during its review of such information. App. At 71, ¶ 20-21; App. At 65, ¶ 11. Google has provided AA with access to these databases in the only practicable manner; by providing full access pursuant to the Court's order through a trained Google employee who can facilitate AA's access to the database while protecting its contents. App. At 71-72, ¶¶ 21-22; App. At 65, ¶ 11.

**B.      AA's Claim That Google Failed to Preserve Relevant Documents And Its Claim That Relevant Documents Have Been Destroyed Have No Basis.**

AA's Motion claims that Google has not taken "appropriate steps to preserve relevant documents" and that "responsive documents have likely been destroyed". (Motion at 7, 9). This is false. In contrast to the distorted picture painted by AA, Google's document collection in this case has been an extensive and good faith effort to preserve and produce the continually growing universe of documents demanded by AA. To date, Google has specifically collected and preserved millions of pages of documents in response to AA's claims, and that number is growing. Google has also made repeated good faith efforts to meet and confer with AA on the scope of its broad and ever-changing requests, and to produce additional documents or information where justified. Google's production may not have been perfect – neither was AA's production – but that does not justify AA's overblown claims that documents were destroyed.

**1.      There is No Evidence That Google Ever Destroyed Responsive Documents.**

The only evidence AA cites to support its spoliation claim is deposition testimony provided by two current or former Google employees, Mr. Zidell and Mr. Holden. None of this testimony, however, says what AA claims it says – instead AA's Motion mischaracterizes the relevant testimony, and misleadingly quotes the testimony or misstates the relevant facts.

AA first incorrectly asserts that Mr. Zidell, a former Google employee, has confirmed that Google destroyed responsive documents because Mr. Zidell testified that he "<u>routinely</u> threw

away hand-written notes that he took on presentations to clients…". (Motion at 9) (emphasis added). Mr. Zidell said no such thing. First, Mr. Zidell confirmed that he had, in response to a document retention request, provided Google's lawyers with "essentially [his] hard drive" and "everything that I have worked on," including presentations, research reports, emails and spreadsheets. App. At 89:12 – 25; 90:1-8; 91:14-92:9; 88:13-25. Mr. Zidell also testified that he never kept documents in hard copy form. App. at 93:8-16. Second, Mr. Zidell never testified that he "routinely" threw away handwritten notes or that he ever threw away notes from any presentation responsive to this litigation during the time period that this litigation has been pending. App. At 87-106. Third, the only thing Mr. Zidell did say was that he had a general practice of taking notes during client meetings and that, as to one specific August 5, 2007 meeting which was held before AA filed its lawsuit against Google, Mr. Zidell made handwritten notes during the meeting, incorporated the notes into a document, and then threw such notes away, "shortly" after he had made changes to the other document and completed any follow-up items. See App. At 95:8-97:7; 98:14-99:1. The fact that these notes were incorporated into a document that AA has in its possession negates its claim for spoliation. Moreover, it clear that Mr. Zidell had no nefarious intent as he testified that he did not save the notes from this one meeting because the notes were made before this litigation was filed and given this "there was no reason I would have had to preserve or not preserve documents at that point in time". See App. At 97:4-9; 97:19-22; 98:14-18.

AA next claims that Mr. Zidell's testimony "revealed that Google altered highly-relevant documents in an attempt to prevent them from falling into AA's hands…" Motion at 9. This is incorrect. Indeed, AA fails to tell the Court that the both versions of the document that Mr. Zidell allegedly altered were, in fact, produced to AA during this litigation – in truth, Google produced both the original and second version of the presentation at issue to AA and AA has reviewed both versions. See Motion at 9 (discussing AA's review of both, produced versions of this presentation). Additionally, AA simply omits the part of Mr. Zidell's testimony in which Mr. Zidell explained that it was normal to make such changes to Google presentations before a

hard copy was sent to people outside of Google and that these specific changes were made after Mr. Zidell was told that the presentation contained inaccurate and unauthorized information. App. at 99:23-100:23; 101:2-4; 102:17-103:11; 1-3:17-19 (discussing that presentation was because it included incorrect and unapproved information); 104: 14-19 ("its not uncommon to make changes to a presentation"). Nothing in Mr. Zidell's testimony establishes any wrong-doing by Google.

AA also tries to support its claim by asserting that the testimony from Mr. Holden, one of Google's Rule 30(b)(6) witnesses, "confirms that he did not retain hand-written notes" and implying that Mr. Holden did not retain notes during this litigation. (Motion at 10). This is also incorrect. Indeed, as the cited part of Mr. Holden's testimony makes clear, Mr. Holden never testified that he had ever destroyed any hand-written notes related to this litigation or during the time period that he has been instructed to retain documents for this litigation. Instead, Mr. Holden testified that he only "sometimes" makes notes on paper and that he generally has "minimal paper" documents.[6] App. At 109:5-11; 110:1-5; 110:14-16. AA has presented no evidence that any documents were destroyed.

### 2.    There is no evidence that Google destroyed documents.

Additionally, the facts of this case show that Google has never intentionally destroyed any responsive documents in this litigation. App. At 198, ¶¶ 2-4. Moreover, because of Google's prior collections and standard retention policies, there is no evidence that material information was destroyed here. *See* App. At 198, ¶ 4; App. At 72 – 73, ¶¶ 23-25; App. At 66, ¶ 14; App. At 187, ¶ 5; App. At 177, ¶ 7; App. At 183-185, ¶¶ 5, 7-8, 17-18; App. At 174, ¶ 8; App. At 180, ¶ 7; App. At 134, ¶ 9; App. At 144, ¶ 7. Also, as the numerous declarations submitted herewith show, for the electronic systems that AA has put at issue in this motion, there

---

[6] Although AA also appears to claim that Google incorrectly failed to send Mr. Holden a litigation hold until April 2, 2008, Mr. Holden was only testifying as a Rule 30(b)(6) witness and he testified that he first learned that he might be a § 30(b)(6) witness in April 2008. *Compare* Motion at 10 to App. At 108:18-24; 112:9-14. Mr. Holden's testimony also confirms that he "receive[s] instructions to preserve documents fairly frequently for various matters" and that he believes he received such instructions in this case. App. At at 111:16-25. (Holden 31:16-25).

is no reason to believe that any relevant data has likely been destroyed since December 1, 2006, the date when AA claims Google should have sent litigation hold notices. *Id.* In light of these facts, AA's generic claim of prejudice is without basis.

### 3. There is no evidence that Google acted willfully or in bad faith.

AA has also presented no evidence that any responsive information was lost, much less that it was prejudiced by any such loss. (*See* Motion at 7-8) Even if it had, however, there is no basis for sanctions here, as AA does not and cannot argue that Google acted in bad faith or intentionally decided not to preserve relevant documents during this time period. App. At 189-196.

First, it is not clear that litigation between AA and Google was "probable" in December 2006.[7] Under existing case law, the "probable" requirement exists because litigation "is an ever-present possibility in American life." *Hynix Semiconductor Inc. v. Rambus, Inc.*, 2006 WL 565893 (N.D. Cal. Jan. 5, 2006) (citations and quotation marks omitted) (holding that litigation must be "probable" in order for the preservation duty to be triggered). Given the fact that litigation is always a "possibility", the applicable case law makes clear that the duty to preserve documents arises only when a litigant "knows or should know" that such documents are "relevant to <u>imminent</u> litigation." *A. Farber and Partners, Inc. v. Garber*, 234 F.R.D. 186, 193 (C.D. Cal. 2006) (Emphasis added.) Thus, while a duty to preserve evidence arose where "almost everyone associated with [an employee] recognized . . . that she might sue," such a belief by "one or two employees" would not have imposed a firm-wide obligation to preserve documents. *Zubulake v. UBS Warburg LLC*, 220 F.R.D. 212, 217 (S.D.N.Y. 2003). And, where no lawsuit was pending and documents are "kept and destroyed in the normal course of

---

[7] AA relies heavily on *Google v. American Blind & Wallpaper Factory Inc.*, 2007 WL 1848665 (N.D. Cal. 2007). (Motion at 7.) As reflected in the Court's order on Google's motion, the facts of these two cases could not be more inapposite because, in the prior case, the court concluded that American Blind had failed to preserve relevant evidence by reviewing action American Blind took <u>after</u> the complaint was filed, including the fact that American Blind failed to send out a document retention notice for almost three years after Google filed its complaint . *Id* at *

business", spoliation does not occur. *United States v. Kitsap Physicians Service*, 314 F.3d 995, 1001 (9th Cir. 2002)

Here, the Standstill Agreement was entered into after AA notified Google that "a potential dispute may exist between AA and Google..." *See* AA App. Ex. A at 001 (emphasis added). This Agreement never states that AA might file a lawsuit against Google – instead the Agreement only provides that, during the standstill time period, Google "shall not file any lawsuit against AA...". *Id.*, ¶ 1. The Agreement also requires that, during the standstill time period, both AA and Google will undertake good faith efforts to reach a "business resolution" to the dispute. *Id.* And, during the time period of the Standstill Agreement, AA and Google were actually engaged in on-going business negotiations that focused on obtaining a "business" resolution to this matter. *See* App. At 198, ¶ 3.

Second, in light of such facts, there is no evidence that Google ever intentionally decided not to issue a litigation hold notice during this time period. Instead, because the parties were engaged in on-going business negotiations about this matter, Google's in house counsel treated the matter as a business issue, not a legal issue, and thus did not consider sending out a litigation hold during the business negotiations.[8] App. At 198, ¶ 3. Additionally, it was reasonable to assume that documents were preserved because: (i) Google has already litigated five other Keywords related cases and had already collected many of the relevant documents as part of its document collection efforts in these prior litigations; (ii) Google's trademark policy had not

---

1-2, 4.

[8] Relatedly, AA's motion also claims that Google did not issue timely litigation holds in this litigation because it did not issue its first litigation hold until October 2007 and "even then it did not instruct all of the relevant individuals". Motion at 8. However, as detailed in the Lacavera declaration submitted herewith, Google issued its litigation hold in the way such holds are typically issued -- Google sent out a litigation hold to those that were first identified as being custodians who might have responsive documents and then sent out additional litigation holds as it identified other, potential custodians. App. At 198, ¶ 3. Lastly, as Google identified its Rule 30(b)(6) witnesses, it also included those witnesses in the litigation holds even though such witnesses do not need to be people who actually have personal knowledge of the facts at issue. *See supra*, fn.8,; *Hjeck v. Menlo Logistics, Inc.*, 2008 WL 465274 at *3,4 (N.D. Tex 2008) (recognizing that "it is not necessary that [a 30(b)(6) witness] have direct, personal knowledge..." of the matters he or she testifies to).

---

DEFENDANT GOOGLE INC'S
OPPOSITION TO PLAINTIFF'S SECOND MOTION TO COMPEL
NO. 4-07-cv-487-A

420975.01

Page 20

changed since 2004 and Google had already collected many of the relevant documents about that policy; and (iii) Google's normal retention practice and policies were believed to preserve the majority of potentially relevant documents. *Id.* ¶ 4. As courts have frequently recognized, parties to litigation might inadvertently fail to produce documents for reasons that are entirely attributable to human error, but this is not bad faith action. *See, e.g., Greyhound Lines, Inc. v. Wade*, 485 F.3d 1032, 1035 (8th Cir. 2007) (rejecting spoliation claim just because some material was not preserved); *In re FirstPlus Financial Group, Inc., Sec. Litig.*, 2002 WL 31415951 (N.D. Tex., Oct. 28, 2002), at *7 (accepting explanation of proposed class representative that, because of an "honest mistake[]," he initially failed to produce records he erroneously believed were duplicates). Moreover, as courts have recognized, allegations that a party failed to preserve documents after the lawsuit was imminent or pending are not enough – a party complaining of spoliation must also show that documents were intentionally destroyed. *Malletier v. Dooney & Bourke, Inc.* 2006 WL 3851151 at * 3 (S.D.N.Y. 2006) (rejecting claim that defendants did not instruct certain defendants to preserve documents where plaintiffs do not provide evidence suggesting that documents were destroyed) (attached to Google's Appendix at Exhibit "DD"); *Slattery v. Precision Response Corp.*, 167 Fed. Appx. 139, 141 (11th Cir. 2006) (holding that, for spoliation finding, plaintiff must show that defendant "withheld or tampered with...documents in bad faith" and holding that no such finding exists, even if you assume that documents were wrongly withheld); *School-Link Technologies, Inc. v. Applied Resources, Inc.*, 2007 WL 677647 at *3, 4 (D. Kan. 2007) (rejecting claim that spoliation occurred because "a corporation...need not preserve 'every shred of paper, every e-mail or electronic document, and every back up tape" and because plaintiff "has not identified what documents and information were allegedly destroyed") (attached to Google's Appendix at Exhibit "EE").

For these reasons, AA has not, and cannot, support its claim that Google has destroyed any relevant documents, much less done so in bad faith.

**C.    The Court Should Deny AA's Motion To Compel Regarding The 12 Requests That AA Never Met and Conferred About Or Does Not Specifically Address In Its Motion.**

AA has moved to compel the production of documents responsive to nine requests about which it did not meet and confer with Google before filing its Motion and three requests that are not discussed, or even cited, in its Motion, except in the Prayer for relief.[9]  *See* App. At 115, ¶¶ 3-4.  The Court should deny AA's motion as to these requests.

Rule 37(a)(1) requires litigants to either meet and confer in good faith or attempt to meet and confer before filing a motion to compel.  Local Civil Rule 7.1(b)(1) requires moving parties to detail meet and confer efforts.  A failure to attempt to meet and confer is grounds for denying a motion to compel.  *See Robinson v. Potter*, 453 F.3d 990, 995 (8th Cir. 2006) (upholding denial of motion to compel because movant "cannot show the parties attempted to confer in good faith to resolve the discovery request"); *see also Mansell v. Raytheon Co.*, 2003 WL 21752275, *1 (N.D.Tex. 2003) (denying motion to compel in part because "the court is not persuaded that the exchange of e-mails between counsel ... constitutes the type of meaningful conferring contemplated in Rule 37(2)(B) and local Rule 7.1(b)(2).  Had such conferring occurred ... the basis for Raytheon's general objections could have been explored, thus giving Plaintiff fair notice of Defendant's position").  Because AA's failure to meet and confer has prevented the parties from resolving differences about the scope of AA's discovery without court intervention and denied Google the opportunity to respond to AA's concerns, the Court should deny the motion as to the following nine requests:  Request Nos. 10-15 and 17 from AA's Fourth Requests For Production and Request Nos. 2 and 3 from AA's Fifth Requests For Production.

---

[9] The nine requests on which AA did not meet and confer with Google are:  Request Nos. 10-15 and 17 from AA's Fourth Requests For Production and Request Nos. 2 and 3 from AA's Fifth Requests For Production.  In fact, AA waited just nine days after receiving Google's responses on June 23, 2008 to the two requests from AA's Fifth Requests For Production before moving.  AA's App. Ex. EE, pp. 249-56.

Similarly, AA's "Prayer" lists three requests—Nos. 5, 11 and 12 from AA's Third Requests For Production—that are not cited or discussed anywhere else in AA's Motion. (*See* Motion). All of these requests should be denied accordingly.[10]

**D.** **Google has produced and made available to AA its accessible "broad match" data.**

AA seeks an order compelling further responses to four requests for "broad match" data:

- Request No. 2 from AA's Third Requests for Production seeks all information about Sponsored Links triggered by a keyword or "other designated search term" that incorporates an AA trademark or similar term.[11] AA's App. Ex. I. AA has narrowed this request to information about 55 advertisers. AA's App., Ex. Y pp. 216-18 (June 23, 2008 letter from Fred Brown).

- Request No. 13 from AA's Third Requests for Production seeks to identify the 100 "Broad Match Keywords" that most frequently triggers the Sponsored Links of advertisers who have designated an AA trademark as a keyword.[12] AA's App. Ex. I p. 12.

- Request Nos. 4 and 5 from AA's Fourth Requests for Production seek all data "associated with transactional activity related to the AdWords Process" for ads displayed when a search query contained an AA trademark or similar term and when a Broad Match keyword contained an AA trademark or similar term but the search query did not.[13] AA's App., Ex. M pp. 10-11. AA has narrowed these requests to information about 55 advertisers. AA's App., Ex. Y pp. 216-18 (June 23, 2008 letter from Fred Brown).

---

[10] Also, AA claims that two of the requests cited in AA's brief—Request Nos. 2 and 3 from AA's Fourth Requests For Production—seek broad match information. (Motion at 11.) They do not. These requests do not contain the phrase "Broad Match" or any word or phrase that is defined to include Broad Match. AA's App. Ex. M at 114-15. AA's brief does not explain why these requests should be interpreted to include broad match or, for that matter, any explanation at all about why the Court should grant its motion to compel the production of documents responsive to these Requests. The Court should deny AA's Motion to compel documents responsive to these two requests.

[11] Google objected to this request as, among other things, overbroad and unduly burdensome but agreed to produce limited responsive data. AA's App. Ex. O at 131.

[12] Google objected to this request as, among other things, unintelligible and unduly burdensome. Google agreed to meet and confer with American regarding this request. AA's App. Ex. O at 137.

[13] Google objected to these requests, as among other things, overbroad, unduly burdensome, and because it seeks third party confidential information. Google agreed to meet and confer with American regarding this request. AA's App. Ex. U at 196-98. AA's Motion also seeks production of documents responsive to Requests No. 14 and 15, but AA has not met and conferred with Google about these requests. See Section III(C), *supra*. The Court should deny AA's Motion as to these requests for that reason and because the requests are overbroad and unduly burdensome.

---

Some of AA's requests seek information about Broad Match keywords and some seek information about search queries that Google matches to Broad Match keywords (and some requests are not clear). These are distinct concepts, and providing data about them pose distinct challenges to Google. Search queries are the terms that Google *users* enter into the Google search engine. Broad Match keywords are terms that Google *advertisers* select to trigger advertisements. In determining whether to display an ad, Google matches Broad Match keywords to search queries that either incorporate the terms of the Broad Match keyword or are similar to the terms of the Broad Match keywords. App. at 136-137.

AA's Motion should be denied because Google has provided AA with information reasonably accessible to it about both (a) ads triggered by Broad Match keywords that contain AA's trademarks or similar terms and (b) information about ads triggered by search queries that contain AA's trademarks or similar terms that Google matches to Broad Match keywords.

First, Google already has provided AA with data describing when advertisers have used AA trademarks or similar terms as keywords. Among other things, this information specifies keyword type (*i.e.*, Broad Match, Exact Match and Phrase Match), the number of times the associated ad has appeared, how many Internet users have clicked on an ad, and how much Google has charged advertisers for these clicks. AA can use this data to determine the most commonly used keyword for each keyword type, including the 100 Broad Match keywords that have triggered ads the most.

*Second*, AA has already been provided access to Google's AdWords account information and thus to data about ads displayed by 55 advertisers identified by AA. This access allows AA to see *more* information about the advertisers' accounts than the advertisers themselves can see. App. at 69, ¶ 11. AA can see the Broad Match keywords used by the advertisers and information about whether ads were displayed in response to a search query that contains AA's marks or similar terms. Among other things, AA can determine when advertisers added keywords, when campaigns ran, how much Google charged for ads, and the conversion rates for the ads. AA also can use this access to create Search Query Performance Reports, which AA has identified as an

example of the "depth and breadth of the information that Google promises to provide to its advertisers about broad match." (AA's First Motion to Compel at 8). These reports show which queries match to Broad Match keywords. App. At 138-139. (**http://adwords.google.com/support/bin/answer.py?answer=68074**) Thus, AA can create reports for its competitors' advertising campaigns that show whether the query "AA" (or any other search query) triggered ads for campaigns that do not contain the Broad Match keyword "AA." AA can view this data in multiple formats. It can retrieve a summary, or view daily data, or data by day of week, weekly, monthly, quarterly, or yearly metrics. App. 140-141.

     *Third*, Google also has now offered to attempt to construct data from its ads query log for a reasonable number of sample days provided by AA for data about the ads that appear when users have entered search queries consisting of AA's trademarks or similar terms. App. At 191-192. Because of the size of these logs, obtaining information from them about searches for a greater time period is not feasible. App. At 143, ¶ 4. Google's ad query logs contain information about the ads displayed to internet users who have used Google's search engine for the past several years, including the language of the user's search query, the location of the user, the output language of the ad, the text of the ad, the delivery period, the position of the ad in the auction, the location of the ad on the search results page, and the cost of a click on the ad. App. at 143, ¶ 3. Although the ads query log also includes user IP addresses, Google will not include those because of user privacy concerns.

     By the above efforts, Google has complied and will comply with AA's requests for broad match data.

## E. Google will continue to produce technical documents that explain the its broad match functionality.

     AA has moved on one interrogatory and seven requests that demand detailed technical information about how various features Google's search and advertising technology work. Indeed, Interrogatory No. 9 of its Second Set of Interrogatories and Request Nos. 1-3, 10-13 of its AA's Fourth Requests for Production all seek documents explaining the technology, including

in some case algorithms, of Google's Broad Match keywords, the "AdWords process," Google's KeyWord Tool, its optimization process, its Did You Mean feature (which is not implicated by AA's complaint), its Query suggestion feature (which is not implicated by AA's complaint), and the structure of Google's advertising databases.[14]  AA's App. Ex. N at 124 and Ex. M at 113-16. Some of these requests seek "documents" and others seek "all documents."  For only one of these six requests, however, did AA both meet and confer with Google before moving and explain its basis for moving in its Motion, and the only explanation provided was that American required an explanation about broad match.  *See* Section III(C) and III(D), *supra*.

In response to such requests, Google has offered to produce additional internal, confidential documents that provide a technical overview of how Broad Match keyword technology and the Keyword Tool operates, as well as documents from its Product Design Database related to Broad Match keywords and the Keyword Tool.  App. 191-195.  Google also has invited American to identify additional relevant program features.

AA's interrogatory and requests cannot reasonably be interpreted to require more, as its demands for algorithms are for technical information that it might not even be entitled to in a patent or trade secret litigation, even though this in is a trademark dispute whose primary focus is consumer perceptions of certain ads.  In a copyright infringement action, the Southern District of New York denied a similar demand for Google's source code because the moving party did not establish a factual predicate for the production of such an important corporate asset, whose value depends in part on its non-disclosure, even pursuant to a protective order.  (A copy of this decision is attached to Google's Appendix as Exhibit "S").  Google's algorithms for Broad Match keywords, and similar documents, are highly sensitive and not relevant.  Further, to the extent AA demands all documents (including all communications regarding their development)

---

[14] Google objected to Interrogatory No. 9 as seeking irrelevant and highly confidential information.  AA's App. Ex. V at 207-7.  Google objected to the Requests as, among other things, overbroad and unduly burdensome.  AA's App. Ex. U 194-202.  Google objected to Request Nos. 1-3 as vague and Requests No. 12-13 to the extent it seeks documents subject to a confidentiality agreement between Google and its customers.  In response to Request Nos. 1-3, Google agreed to produce documents sufficient to provide a high-level description of the feature

related to these features, they are overbroad. Because Google has agreed to produce documents sufficient to describe how the relevant features of Google operate at a technical level, the Court should not require further production.

**F.     Google already has notified AA that the Keyword Tool data AA demands does not exist.**

AA seeks data from Google's Keyword Tool through its Request No. 10 of its Third Requests For Production, in which AA seeks a list of the 50 keywords that Google's keyword tool "suggest[s]" most frequently when someone has designated an AA trademark as a keyword. *Id.* .[15] AA's App. Ex. I p. 83. AA now argues that it asked Google at an unspecified time if it maintains this information and claims that "Google has not responded" (Motion at 14).

In truth, however, Google has previously provided AA with a declaration, on May 15, 2008, stating that "Google does not keep a record of Keywords that are output when particular seed terms or seed phrases are entered into the keyword tool service." App. At 170-171. Google does not have the information sought by this request. Despite this, Google will agree to produce the relevant data Keyword Tool output that it does have and has dedicated three engineers to that time-consuming project. App. At 178, ¶ 12. Nothing more is required.

**G.     Google is producing relevant information about AA's competitors.**

AA has moved to compel documents responsive to Request Nos. 3, 4 and 7 from its Third Requests For Production, which seek documents concerning Google's communications and presentations to advertisers.[16] AA's App. Ex. I pp. 81-82. On their face, the requests contain no meaningful limit on the subject matter of the documents they seek (or the advertisers about

---

at issue.

[15] Google responded to this request by stating that it has no responsive documents to produce. AA's App. Ex. O p. 136.

[16] Google objected to these request, as among other things, overly broad, unduly burdensome and to the extent it requires the production of documents subject to a confidentiality agreement between Google and its customers. Google responded that it would meet and confer with

---

whom they seek information). Request No. 3, for example, seeks all documents concerning "reporting on, advertising, marketing, optimizing or selling of Google's Advertising Programs" and Request No. 4 all documents concerning "Studies, analyses, report or presentations" without *any* limitation on the subject matter. AA's App. Ex. I pp. 81-82. Essentially, these request seeks *all* documents at Google related to the advertising, even documents that have nothing to do with the trademark-related advertising practice at issue in this lawsuit.

Not surprisingly, AA nowhere justifies the breadth of these requests. It admits that the requests seek documents related to "Google's knowledge of responses to its Internet searchers to its Sponsored Links and the representations that Google makes to advertisers about the capabilities of these" ads (Motion at 15), but does not attempt to explain why documents about every time someone has clicked on a travel-related ad at Google *for any reason* are relevant to this trademark dispute. This is an overbroad request and production of all responsive documents is not appropriate.

Despite this, after AA finally narrowed the scope of two of these three requests to 55 advertisers,[17] Google took two main actions to provide AA with information about these advertisers. First, Google gave AA access to the AdWords and Analytics accounts for any of the advertisers that had them. These accounts provide AA with the same access to the advertisers' account information that Google customer service representatives have, which is more access than the advertisers themselves have. App. At 69, ¶ 11. The vast majority of this data is not relevant to this dispute because it does not include advertising information involving AA's marks, but AA has nevertheless had access to it. Second, Google has now also agreed to produce

---

American regarding Request Nos. 3 and 4. AA's App. Ex. O pp. 132-35.

[17] On June 13, 2008, AA limited Request Nos. 3 and 4 from its Third Requests for Production to 55 advertisers (AA's App. Ex. Y, p. 216 (June 13, 2008 Letter from Fred Brown), although its Motion states that it also offered to limit Request No. 7 from its Third Requests for Production. Google will consider the request so narrowed. Prior to June 13, 2008, AA had never offered to limit its requests to advertisers whose ads it believed infringed its trademarks. Its March 31, 2008 offer to limit advertisers who spent more than $100 triggered by AA trademarks or similar terms, includes numerous advertisers whom AA's damages experts acknowledges are not related to AA or the travel industry, such as AA Eagle Outfitters and AA Roadside Assistance.

all documents described by paragraph 3 on page 24 and 25 of AA's Motion from these customer service representatives. App. At 194-195. AA's requests do not reasonably require the production of more.

## H. Google has produced its trademarks studies and documents about the appearance of its ads.

AA has moved to compel documents in response to Request No. 8 from its Third Requests For Production and Request No. 17 from its Fourth Requests For Production.[18] AA's App. Ex. I p. 82 and Ex. M p. 117. These requests seek documents "analyzing or reporting on the effect on consumer of the layout, design or wording of the results page that a consumer seeks after conducting a Google search" and any documents "concerning the role of trademarked terms in consumer search activity." *Id.*

Google already has produced non-privileged documents about studies it has conducted regarding user reactions to the display of ads for companies when the user enters the trademark of the company's competitor as a search term and other studies it has conducted regarding the appearance of ads. Moreover, although American characterizes Google's production of studies as "extremely limited," Google also has produced more than 65,000 pages of documents regarding numerous other studies it has conducted regarding the appearance of ads, even if the studies have little or anything to do with the issues in this litigation.[19] Such studies include considerations about changing the spacing, positioning or appearance of its uniformly formatted ads. These documents include, among other things, high level summaries, data, project reviews,

---

[18] Google objected to these requests as overbroad and unduly burdensome. AA's App. Ex. O p. 135 and Google's Responses to Fourth Requests For Production. Google responded that it would meet and confer with AA about Request No. 8 from its Third Requests For Production and that, in response to Request No. 17 from its Fourth Requests For Production, it would produce documents that provide general-level descriptions of the role of trademarked terms in search activity or the effectiveness of using trademarks as keywords. AA has not met and conferred with Google about this specific request.

[19] The studies and related documents include virtually all of the following documents produced with the prefix G004: 143497-926, 124394-132653, 145934-164728, 164777-165759, 182425-188054, and 192283-222636.

eye tracking study results, and emails discussing various aspects of the research. Finally, Google has agreed to search for and produce documents relating to its surveys and studies of the effect on consumers of the layout, design or wording of the results pages that the user sees after conducting a Google search. App. At 194. Nothing more is required.

## I. Google will produce relevant documents from Jeffrey Zidell and relevant OKRs

AA's Motion demands various documents from former Google employee Jeffrey Zidell without citing any document requests and without explaining why these documents are relevant. (*See* Motion) In order to eliminate any dispute about the production of Mr. Zidell's documents, however, Google will produce any additional documents from Mr. Zidell related to AA's advertising on Google, any additional documents related to any other advertisers regarding the appearance of advertisements in response to a search query that is a trademark owned by a competitor, and any documents that discuss advertising on brand names as a general concept, as well as the items collected from him listed in paragraph 3 on page 24 of American's Motion. App. At 194-195. Google also will produce any OKRs from the list of people listed in Exhibit SS to American's motion. *Id.*

## J. Google Has Worked Diligently To Produce The Documents Demanded By AA's Motion

While AA will undoubtedly complain about the timing of Google's production of the documents discussed above, such complaints are not well-founded. The scope of AA's demands have steadily escalated throughout this case, requiring the parties to engage in extensive dialogue in order to understand exactly what AA is seeking. For example, while AA complains extensively about Google's production of documents relating to "advertisers" (Motion at 14 - 16), it neglects to mention that AA did not clarify the scope of its overbroad requests until June 13, 2008. (Motion at 16) Nor does it mention that Google has produced documents from more than 50 custodians.

Additionally, as explained throughout this brief, much of the information that AA is requesting does not exist in any one place and is not easily obtainable for Google. The information is located throughout many disparate data sources, and requires an enormous amount of time and resources to assemble in the very specific level of detail AA has demanded. With more than 16,000 employees, no one person at Google has a clear understanding of its sophisticated technical infrastructure and people have often needed to collaborate to respond to AA's requests. Indeed sometimes the understanding of one engineer will conflict with that of another. The number of people and the amount of engineering time that Google has needed to devote to this process is significant, and has contributed to the delays in Google's production. Google respectfully submits that any delays in its production is due more to the complicated and technical nature of AA's requests than to any lack of effort or diligence on Google's part.

In an effort to avoid any further dispute with AA over the timing of Google's production, Google will not oppose an extension for AA to supplement its expert reports with recently received information, nor will Google oppose an extension for AA's response to Google's motion for summary judgment. Neither of these extensions will affect the Court's trial schedule, and are adequate to cure any claim of prejudice AA might raise.

## IV.    CONCLUSION

For the foregoing reasons, Google respectfully requests the Court to deny AA's Motion to Compel.

Dated:                                            Respectfully submitted,

                                                  _____
                                                  Joseph F. Cleveland, Jr.
                                                  Texas Bar No. 04378900
                                                  BRACKETT & ELLIS
                                                  A Professional Corporation
                                                  100 Main Street
                                                  Fort Worth, TX  76102-3090
                                                  Telephone:  817/338-1700
                                                  Metro:       817/429-9181
                                                  Facsimile:   817/429-9181


**OF COUNSEL:**

Michael H. Page
California Bar No. 154913
Klaus H. Hamm
California Bar No. 224905
Ajay S. Krishnan
California Bar No. 222476
Benjamin W. Berkowitz
California Bar No. 244441
KEKER & VAN NEST LLP
710 Sansome Street
San Francisco, CA  94111-1704
Telephone:  415/391-5400              ATTORNEYS FOR DEFENDANT
Facsimile:  415/397-7188              GOOGLE INC.

## CERTIFICATE OF SERVICE

The undersigned attorney certifies that a true copy of the foregoing document has been

served on counsel of record as follows:

**Via Hand Delivery**
Dee J. Kelly
Dee J. Kelly, Jr.
Lars L. Berg
Michael D. Anderson
Kelly Hart & Halman, LLP
201 Main Street, Suite 2500
Fort Worth, TX 76102

Dated:

By: _____
Joseph F. Cleveland, Jr.